UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

SUPERB MOTORS INC. *et al.*,

                        *Plaintiffs*,

            -against-

ANTHONY DEO *et al.*,

                        *Defendants*.

----------------------------------------------------------X

**OPINION AND ORDER**

23-CV-6188 (JMW)

**A P P E A R A N C E S:**

    Jamie Scott Felsen, Esq.
    **Milman Labuda Law Group PLLC**
    3000 Marcus Avenue, Suite 3W8
    Lake Success, NY 11042
    *Attorneys for All Plaintiffs*

    Emanuel Kataev, Esq.
    **Sage Legal LLC**
    18211 Jamaica Avenue
    Jamaica, NY 114232327
    *Attorney for All Plaintiffs*

    Jeffrey C. Ruderman, Esq.
    Russell J. Shanks, Esq.
    **Cyruli Shanks & Zizmor LLP**
    420 Lexington Avenue, Suite 2320
    New York, NY 10170
    *Attorneys for Plaintiffs 189 Sunrise Hwy Auto LLC, Northshore Motor Leasing, LLC, Brian Chabrier, Joshua Aaronson, Jory Baron, 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC, and Island Auto Management, LLC*

Brian M. Levine, Esq.
**The Levine Firm, P.C.**
260 North Broadway, Suite 2a
Hicksville, NY 11801
*Attorney for Defendants Anthony and Sarah Deo, Harry Thomasson, Dwight*
*Blankenship, Marc Merckling, Michael Laurie, Car Buyers NYC, Inc., Gold Coast Cars*
*of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group*
*LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast*
*Motors of Smithtown LLC, UEA Premier Motors Corp.*

John Anthony Lentinello, Esq.
Peter Seiden, Esq.
**Milber Makris Plousadis & Seiden, LLP**
1000 Woodbury Road, Ste. 402
Woodbury, NY 11797
*Attorneys for Defendants Thomas Jones and Jones, Little & Co., CPA's LLP*

Ariel E. Ronneburger, Esq.
Thomas Baylis, Esq.
**Cullen and Dykman LLP**
333 Earle Ovington Boulevard, Ste 2nd Floor
Uniondale, NY 11553
*Attorneys for Defendant Flushing Bank*

Bonnie Rae Golub, Esq.
**Weir Greenblatt Pierce LLP**
667 Madison Ave., 5th Fl.
New York, NY 10065
*Attorney for Libertas Funding LLC*

Anthony Carmine Valenziano, Esq.
**Sherman Atlas Sylvester & Stamelman LLP**
1185 Avenue of Americas, 3rd Floor
New York, NY 10036
*Attorney for J.P. Morgan Chase Bank, N.A.*

Brooke Suarez, Esq.
**Riker Danzig LLP**
One Speedwell Avenue
Morristown, NJ 07962
*Attorney for J.P. Morgan Chase Bank, N.A.*

*No appearance for Defendants DLA Capital Partners Inc.*

# <u>Table of Contents</u>

**BACKGROUND** ....................................................................................................... 7

**I.   *Factual Background*** ............................................................................. 7

    **A.   *Ownership and Operations at Northshore and Sunrise*** ............ 7

    **B.   *Deo's Activities at Northshore and* Sunrise** ............................. 9

    **C.   *Defendants' Fraudulent Scheme at* Superb Motors** .............. 12

**II.   *Procedural History*** .......................................................................... 18

**DISCUSSION** ......................................................................................................... 23

**I.   *Defendants' Motions to Dismiss: Legal Standard*** ........................ 23

**II.   *Plaintiffs' RICO Claims*** .................................................................. 24

    **D.   *Violation of RICO,* ==18 U.S.C. § 1962== – *Against All Defendants*** .............................. 25

    **E.   *RICO Conspiracy,* ==18 U.S.C. § 1962(d)==—*Against All Defendants*** .......................... 41

    **F.   *Injunctive Relief under RICO--* ==18 U.S.C. § 1964(a)== – *Against the Deo Defendants*** 43

**III.   *Plaintiffs' Defend Trade Secrets Act Claims*** ................................. 44

    **A.   *Violation of* ==18 U.S.C. § 1836== – *Against the Deos, Merckling, Blankenship, and Thomasson*** ................................................................................. 44

    **B.   *Injunctive relief under the DTSA --* ==18 U.S.C. § 1836==, *et seq* – *Against the Deo Defendants*** ......................................................................................... 52

    **C.   *Misappropriation under the DTSA* – *Against the Deo Defendants*** ................ 53

**IV.   *Unfair Competition* – *Against the Deo Defendants*** ..................... 55

**V.   *Tortious Interference with Contracts, Business Relations, and Prospective*** ............ 59

***Economic Advantage* – *Against the Deo Defendants*** ................................. 59

**VI.   *Conversion* – *Against the Deo Defendants, Thomasson, Deo, and the Bank Defendants; Aiding and Abetting Conversion* – *Against Thomasson*** ...................... 61

**VII.   *Unjust Enrichment Claims* – *Against Deo, Northshore, and Sunrise*** .................. 66

**VIII.   *Civil Conspiracy* – *Against the Deo Defendants*** ....................... 68

**IX.   *Fraud --* *Against Deo and Jones*** ..................................................... 71

**X.   *Article 4-A of the New York UCC* – *against Flushing Bank*** .................. 73

**XI   *Negligence* – *Against Flushing Bank and Chase Bank; Unauthorized Payments* – *Against Flushing Bank*** ................................................................... 77

**XII.   *Drawee Liability* – *Against Chase Bank*** .................................... 80

**XIII.   *Violation of New York UCC §3-419* – *Against Flushing Bank and Chase Bank*** ..... 82

**XIV.**    *Professional Malpractice – Against Jones CPA LLP* ................................ 84

**XV.**    *Plaintiffs' Breach of Duty Claims* ................................................................ 88

    **A.**    *Breach of Duty of Loyalty – Against Deo* ............................................ 88

    **B.**    *Aiding and Abetting Breach of Duty of Loyalty – Against Thomasson* ................. 89

    **C.**    *Breach of Fiduciary Duty – Against Deo* ............................................ 90

    **D.**    *Aiding and Abetting Breach of Fiduciary Duty – Against Thomasson* .................... 91

**XVI.**    *Accounting – Against Deo* ............................................................................ 92

**XVII.**    *Violation of New York Judiciary Law § 487 – Against Thomasson* .................... 93

**XVIII.**    *Piercing the Corporate Veil – Against Deo* .......................................... 96

**XIX.**    *Violation of NY GBL § 349 – Against Deo* ................................................ 98

**XX.**    *Permanent Injunction – Against Deo and Libertas Funding* ................. 100

**XXI.**    *Declaratory Judgement – Against Deo* .................................................. 102

**XXII.**    *Contribution and Indemnification for Fraud, Bread of Fiduciary Duty, Breach of Loyalty and Conversion – Against Deo; Contribution and Indemnification for Conversion and Aiding and Abetting Conversion, Fraud, Breach of Fiduciary  Duty, Breach of Duty of Loyalty – Against Thomasson* ................. 103

**XXIII.**    *Plaintiffs' Cross-Motions to Amend the Pleadings: Legal Standard* ................. 106

    **A.**    *Plaintiffs' First Motion to Amend* ................................................ 110

    **B.**    *Plaintiffs' Second Motion to Amend* ............................................ 114

        **1.**    *The Addition of Northshore and Sunrise as Defendants* ................. 114

        **2.**    *Allegations Pertaining to Piercing the Corporate Veil* ................. 116

        **3.**    *Violation of Judiciary Law § 487* ................................................ 116

        **4.**    *Misappropriation* ................................................................ 117

        **5.**    *Tortious Interference; Negligence and Conversion Against the Bank Defendants* ..................................................................................118

        **6.**    *Fraud – Against Deo and Jones* ................................................ 118

        **7.**    *Standing – Urrutia and Team Auto* ............................................ 119

**CONCLUSION** ................................................................................ 119

**WICKS**, Magistrate Judge:

This is an action brought by various auto dealerships and their owners against their former business partners, bank and other accounting entities, alleging that Defendants engaged in various frauds and schemes to both pocket proceeds from car sales in violation of the Civil RICO Act, as well as misappropriating the dealerships' trade secrets in the car sales market at other competing dealerships. (*See generally*, ECF No. 65.) Specifically, Plaintiffs[1] bring this action against Defendants[2] for: (i) violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"); (ii) violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); (iii) misappropriation of trade secrets; (iv) unfair competition; (v) tortious interference with contractual relations, business relations, and prospective economic advantage; (vi) unjust enrichment; (vii) conversion; (viii) fraud; (ix) breach of fiduciary duty; and (x) civil conspiracy. (*See generally*, ECF No. 65.)

Before the Court are the following pleadings motions filed by the parties:

(1) Defendant Libertas Funding's Motion to Dismiss for Failure to State a Claim (ECF No. 164);

---

[1] "**Plaintiffs**" are Superb Motors Inc., Team Auto Sales LLC, Robert Anthony Urrutia (the "Superb Plaintiffs"), 189 Sunrise Hwy Auto LLC, Northshore Motor Leasing, LLC, Brian Chabrier, *individually and derivatively as a member of* Northshore Motor Leasing, LLC, Joshua Aaronson, *individually and derivatively as a member of* 189 Sunrise Hwy Auto, LLC, Jory Baron, 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC and Island Auto Management, LLC (collectively "IAG Plaintiffs"). IAG is a group of franchised new car dealerships in New York and New Jersey in which Plaintiffs allege David Baron had certain direct or family ownership. (ECF No. 65 at ¶ 81.)

[2] "**Defendants**" are Anthony Deo, Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, UEA Premier Motors Corp. (collectively the "Deo Defendants"), DLA Capital Partners Inc. ("DLA Capital"), Jones, Little & Co., CPA'S LLP, Thomas Jones, CPA, (collectively the "CPA Defendants"), and Flushing Bank, Libertas Funding LLC, and J.P. Morgan Chase Bank, N.A. (collectively the "Bank Defendants"). The Deo Defendants, DLA, CPA Defendants, and the Bank Defendants are collectively hereinafter the "Defendants."

(2) Defendant Jones and Jones, Little & Co. CPA's LLP's Motion to Dismiss for Failure to State a Claim (ECF No. 168)

(3) Defendant Flushing Bank's Motion to Dismiss for Failure to State a Claim (ECF No. 175)

(4) The Deo Defendants' Motion to Dismiss for Failure to State a Claim (ECF No. 176)

(5) Defendant Chase Bank's Motion to Dismiss for Failure to State a Claim (ECF No. 177)

(6) Plaintiffs' Motion for Leave to Amend the Pleadings and Opposition to Flushing Bank's Motion to Dismiss (ECF No. 178)

(7) Plaintiff's Motion for Leave to Amend the Pleadings and Oppose the Remaining Defendants' Motions to Dismiss (ECF No. 181).

For the reasons set forth below, the Deo Defendants' Motion to Dismiss (ECF No. 176) is **GRANTED** *in part* and **DENIED** *in part*, the Bank Defendants' Motions to Dismiss (ECF Nos. 164, 175 and 177) is **GRANTED** *in part* and **DENIED** *in part,* and the CPA Defendants' Motions to Dismiss (ECF No. 168) is **GRANTED**; and Plaintiffs' Motions for Leave to Amend (ECF Nos. 178 and 181) are **GRANTED** *in part* and **DENIED** *in part*.

## **BACKGROUND**

### I.   *Factual Background*

#### A.   *Ownership and Operations at Northshore and Sunrise*

The following allegations are taken from the First Amended Complaint at ECF No. 65 and are assumed true for the purposes of the Motions to Dismiss. Plaintiffs Northshore Motor Leasing, LLC ("Northshore") and 189 Sunrise Hwy Auto, LLC ("Sunrise") each operate a retail used car dealership from their respective locations in Syosset and Amityville. (ECF No. 65 at ¶¶ 67-72.)  Chabrier, David Baron's estate, and Khan each have a one-third (⅓) membership interest in Northshore, whereas Deo was never an owner. (*Id*. at ¶¶ 48-52.) The Articles of the Northshore Operating Agreement hold that only a majority in interest of the members or the

members' unanimous consent can approve decisions, transfers, or assignments of membership interests. (*Id*. at ¶¶ 53-56.) Similarly, Aaronson, David Baron's estate, J. Baron, and Raymond Phelan each have a twenty-five percent (25%) membership interest in Sunrise, whereas Deo was never an owner. (*Id*. at ¶¶ 57-62.) The Articles of the Sunrise Operating Agreement hold that only a majority in interest of the members or the members' unanimous consent can approve decisions, transfers, or assignments of membership interests. (*Id*. at ¶¶ 63-66.) Additionally, David Baron had direct or familial ownership interests in IAG, a group of franchised new car dealerships across New York and New Jersey. (*Id*. at ¶ 81.) Because of the relationship between David Baron, Northshore, Sunrise, Chabrier, Aaronson, and J. Baron, IAG financially backed much of the dealerships' operations. (*Id*. at ¶ 85.)

New York law requires a license issued by the Department of Motor Vehicles ("DMV") to operate such a dealership. Chabrier holds this license as Northshore's applicant; Aaronson and J. Baron hold it as applicants for Sunrise. (*Id*. at ¶¶ 67-72.) This DMV license lets dealerships like Northshore and Sunrise issue both "dealer" license plates and those of New York State. The DMV license holder is responsible for the protection and proper issuance of these plates. (*Id*. at ¶¶ 109-10.)

To purchase inventory, Northshore and Sunrise maintained a "Floor Plan" credit line with Ally Bank. Under the Floor Plan, Ally Bank kept a lien on vehicles that Northshore and Sunrise purchased through the Floor Plan until the dealerships repaid Ally Bank the amount initially borrowed to buy those vehicles. (*Id*. at ¶¶ 77-85.) IAG and Ally Bank required monthly financial reports from Northshore and Sunrise to justify continued Floor Plan provisions. (*Id*. at ¶ 127.) As for the financing arrangements between lending institutions and the dealerships' customers, Northshore and Sunrise placed liens upon the titles of any financed vehicles to protect those

lenders were the customer to default. (*Id*. at ¶¶ 99-101.) If the dealerships failed to perfect such a lien, they would have to repurchase the lender's loan to the customer. (*Id*.) Customers could "trade in" vehicles as part of a purchase, and Northshore and Sunrise had the responsibility of satisfying any existing loan or lease balance on these traded-in vehicles. (*Id*. at ¶¶ 92-93.) Northshore and Sunrise also issued extended warranties to customers, and, in doing so, accrued fees due to third-party warranty companies and vendors. (*Id*. at ¶ 105.)

The failure to satisfy any of these loans or obligations could leave the dealerships with civil and criminal liability as well as risking the loss of both the DMV licenses and the ability of the licensees Chabrier, Aaronson, and J. Baron to obtain a license for any other dealership. (*Id*. at ¶¶ 96-97, 103-04.)  The unpaid loans also jeopardize the goodwill between the lenders and the dealerships and the dealerships' reputation at large. (*Id*.) Until December 2022, both Northshore and Sunrise employed Deo as the general manager of each dealership. (*Id*. at ¶¶ 74-76.) As general manager, Deo was responsible for ensuring the dealership satisfies financing plans for both its own inventory and its customers, providing accurate monthly financial reports for the Floor Plan, repaying any vendor or warranty fees, completing the necessary documentation for out-of-state customers, and accounting for vehicle titles. (*Id*. at ¶¶ 87-88, 94, 102, 106-08, 128-29.)

B.  ***Deo's Activities at Northshore and* Sunrise**

While Deo was the manager of Northshore and Sunrise overseeing these operations, Plaintiffs allege he "took numerous actions for his own benefit, causing damage to Northshore and Sunrise and the other IAG Plaintiffs and jeopardizing the [DMV] licenses." (*Id*. at ¶ 76.) Using the Floor Plan, Deo purchased "many vehicles" on behalf of Northshore and Sunrise, but then sold these vehicles for "less than their purchase price," allegedly incurring a deficiency of

over $3,000,000. (*Id*. at ¶¶ 86-89.) IAG had to pay Ally Bank this deficiency to cure the Floor

Plan's shortcomings. (*Id*.) In a subsequent inspection and audit of floor-planned inventory,

neither IAG nor Ally Bank could locate several vehicles, and other assets appeared to be

damaged. (*Id*. at ¶¶ 90-91.) Under Deo's management, Plaintiffs additionally allege the

dealerships failed to perfect liens in the financing process of "numerous [sold] vehicles," leaving

the dealerships (and, vicariously, IAG) with over $850,000 owed to the lenders as part of the

loan-repurchase agreements. (*Id*. at ¶¶ 102-04.) Plaintiffs assert Deo failed to have the

dealerships pay off the existing loan or lease balances "on numerous [t]rade-ins," leaving the

vehicles' prior owners liable on those debts despite their lack of ownership or possession of the

vehicle, and, while issuing extended warranties, Northshore and Sunrise, under Deo's control,

accrued $158,000 due to warranty companies and vendors. (*Id*. at ¶¶ 92-95.) Plaintiffs allege Deo

did not complete out-of-state customer documentation and "refused to account for the dealer

license plates and a number of unissued New York State license plates" designated for customer

use. (*Id*. at ¶¶ 111-12.) Deo sent unsold Northshore vehicles to various garages for repair but,

"[d]espite due demand," would not disclose the garages' locations or identities. (*Id*. at ¶ 113-14.)

At least one of the garages placed a lien on at least one of the missing vehicles resulting from

Deo's failure to satisfy that lien, and that garage has since sold the vehicle off in auction. (*Id*. at

¶¶ 115-17.)

   Plaintiffs assert that "Deo has been treating [the dealerships] and their respective assets as

his own." (*Id*. at ¶ 118.) Deo has allegedly taken for himself over $230,000 in customers' cash

deposits and has been issuing and signing checks from Northshore's bank accounts, despite

having no signatory authority under the Operating Agreement. (*Id*. at ¶¶ 63-66, 119-20.) For

example, Deo issued a $60,000 check from Northshore to his own corporation Car Buyers NYC,

Inc. (*id*. at ¶ 121), used Sunrise's American Express card to pay for personal expenses, and failed to terminate over $300,000 of lender financing for canceled purchases. (*Id*. at ¶¶ 122-23.) Plaintiffs allege Deo took these loans for himself (*id*. at ¶ 124), and note that Deo's son still drives an $80,000 Maserati that IAG paid for but without the group's consent. (*Id*. at ¶ 125.) 126. In order for Deo to perpetuate his financial wrongdoings he needed the IAG Plaintiffs and their Floor Plan lender, Ally Bank, to continue to provide the Floor Plan to Northshore and Sunrise. (*Id*. at ¶ 126.) Deo enlisted the help of Thomas Jones and Jones CPA LLP to "manipulate[]" and "falsif[y]" Northshore's and Sunrise's monthly financial reports "with an intent to defraud the [sic] IAG Plaintiffs and Ally Bank." (*Id*. ¶¶ 130-35.) These alleged financial fabrications induced IAG and Ally Bank to sustain the dealerships' Floor Plan. (*Id*. at ¶¶ 136-37.) Deo then used these financial records to present himself as the true owner of Northshore and secured a loan from Flushing Bank "and/or" Flushing Financial Solutions, all without the consent or knowledge of Northshore's members. (*Id*. at ¶¶ 169-72.)

Shortly after David Baron's death in 2021, Deo, on behalf of Northshore, applied through the Small Business Association ("SBA") for a $ 196,425.00 COVID-19 Economic Injury Disaster Loan ("EIDL"), wherein he claimed to be a fifty percent (50%) owner of Northshore. (*Id*. at ¶¶ 50, 142-43.) He also applied for an EIDL in Sunrise's name, claiming to be the facility's full owner. (*Id*. at ¶ 145.) Between both applications, he allegedly evaded the true owners' oversight. (*Id*. at ¶¶ 144, 146.) Finally, around November 15, 2022, purportedly representing himself as a full owner of Northshore but without the knowledge of its members, Deo agreed to sell $997,500.00 of the dealership's future receipts to Libertas in exchange for $735,000 (hereafter, the "Libertas Funds"). (*Id*. at ¶¶ 148-50.) IAG confronted Deo, who claimed to be a full owner of both Northshore and Sunrise. (*Id*. at ¶ 153.) A dispute arose over the

11

Libertas Funds, and Aaronson, under duress from retired and active police officers Blankenship and Merckling pressuring the Nassau County Police Department to arrest him, arranged to place the Funds into the trust account of Harry Thomasson, who represented himself as the attorney for Northshore, Sunrise, and Deo, pending the dispute's resolution. (*Id*.) Despite the IAG Plaintiffs' appeals that the Funds be kept in escrow, Thomasson "did as he pleased and immediately disbursed the Libertas Funds to Deo." (*Id*. at ¶ 163.) Libertas had levied counterclaims against the IAG plaintiffs in state court to recover the value of the future receipts or the Libertas Funds; those claims have been discontinued without prejudice for the purpose of raising them here. (*Id*. at ¶¶ 166-68.)

### C. *Defendants' Fraudulent Scheme at* Superb Motors

Since its inception in June 2021, Robert Anthony Urrutia was the President and majority shareholder of Superb Motors. (*Id*. at ¶ 173.) In addition to Superb, Urrutia owns Volkswagen of Freehold, Team-Mitsubishi Hartford, and Team Nissan of Pittsfield Massachusetts. (*Id*.) Shortly after their first meeting in November 2022, Deo and Urrutia entered into a Cross-Purchase Agreement, which stipulated that Deo, presenting himself as the sole owner of Northshore and Sunrise, would pay Urrutia $500,000 and in turn issue him a twenty-five percent (25%) interest in Northshore and Sunrise, and that Urrutia would grant to Deo a forty-nine percent (49%) interest in Superb. (*Id*. at ¶¶ 175-77.) In the Cross-Purchase Agreement, Deo made representations and warranties to Urrutia: (i) that he was the sole owner of Northshore and Sunrise, (ii) that he had the power and right to transfer Northshore's and Sunrise's assets, (iii) that he had no pending action against him, that he would deliver units of Northshore and Sunrise free of liens and encumbrances, and (iv) that none of his representations were materially false or omitted material fact. (*Id*. at ¶ 177.)

On November 21, 2022, after Blankenship and Merckling had intervened with the Nassau County Police to pressure Aaronson, Aaronson wired $735,000 into Thomasson's escrow account. (*Id*. at ¶ 181.) Deo then wired $300,000 to Urrutia on November 22 and another $200,000 on November 29, fulfilling the Cross-Purchase Agreement's $500,000 price. (*Id*. at ¶ 182.) Deo issued both these wires from his Car Buyers NYC corporation, "despite the fact those funds obviously came from Thomasson's escrow account." (*Id*.)  Thomasson's "direct participation" and his release of the "stolen funds" from escrow enabled Deo to pay Urrutia funds fraudulently obtained from Libertas, and execute the Cross-Purchase Agreement on December 1, 2022. (*Id*. at ¶¶ 180, 183.)

After the Cross-Purchase Agreement, Urrutia and Deo executed a Shareholders' Agreement on December 22, 2022, pursuant to which Urrutia held a fifty-one percent (51%) interest in Superb while Deo owned a forty-nine percent (49%) interest. (*Id*. at ¶¶ 184-85.) The Shareholders' Agreement: (i) provided that Urrutia, as Superb's President, had the independent right to make all decisions regarding the dealership's day-to-day operations, or to delegate that authority at his discretion; and the right to hire or terminate all employees, save for the right to terminate a Shareholder (*id*. at ¶ 186); (ii) provided that "the grant of any mortgage, lien, or other security interest in the assets of Superb" required the written consent of at least a majority of the voting shares, and only the majority of voting shares could sell stock (*id*. at ¶¶ 187-88); (iii) granted Urrutia the "final say on hiring and firing of employees…, including but not limited to third party vendors, agents and/or contractors," "review and final approval of financing agreements with lending institutions" for Superb to use in financing vehicle sales, and "supervision and complete control of the accounting department of Superb," including "sole check authorization and sole control of bank accounts owned by Superb." (*Id.* at ¶ 189.) By

contrast, Deo as a minority shareholder could only propose who would serve as General Manager of the day-to-day operations, whom Urrutia would either approve or reject. (*Id.* at ¶ 190.)

Superb, like Northshore and Sunrise, also operated with the help of a bank that provided floor plan financing, where vehicles available for sale at the dealership served as collateral for the plan. (*Id.* at ¶ 197.) The bank that issues this financing arrangement also perfects a security interest in the vehicle, and the dealership must, with limited exceptions, make that financed vehicle present and available for sale at the dealership. (*Id.* at ¶ 198.) Dealerships that use one vehicle as collateral for multiple loans and thus receive twice the funding for that single asset engage in an illegal practice known in dealership lexicon as "double flooring." (*Id.* at ¶ 199-200.) Superb set up its floor plan agreement with Nissan Motor Acceptance Corporation ("NMAC"). (*Id.* at ¶ 199.) Superb facilitated these operations and others with its "unique DMS [(Dealer Management System)] system" Tekion, "specifically customized for Superb." (*Id.* at ¶ 228.) Urrutia taught Deo how to manage Superb with Tekion and used the DMS "to streamline dealership operations, inventory management, cash flow management, and reporting features that identify areas of improvement." (*Id.* at ¶ 229; 38-2 at 1, 38.) Urrutia spent over $120,000 to weave Tekion into Superb's business model, claiming it "contained the blueprint for Urrutia's success at his dealerships" because he knew how to give his business "a unique competitive advantage" through the DMS' features. (*Id.* at ¶¶ 231-32, 265.)

Urrutia partnered with Bobby Clarke ("Clarke") and his radio station Irie Jam, 93.5 FM, in $1.5 million worth of advertising "to over 2 million listeners in the Caribbean community," generating a "substantial customer list[.]" (*Id.* at ¶¶ 237-38.) "Due to the unique nature of Urrutia's partnership with Clarke," this customer list could not possibly be reverse engineered or

independently generated without also substantially investing in Irie Jam. (*Id*. at ¶ 239.) Urrutia
went to great efforts in creating both this advertising list and Superb's business model premised
on the Tekion DMS, using his decades of experience in the automotive industry, relationships
forged in that industry, "and the unique know-how he has in how to successfully operate
automobile dealerships." (*Id*. at ¶ 260.) Superb "took many reasonable measures to keep its
confidential information secret" by restricting this information's access to only employees who
were required to maintain its confidentiality in a computer system secured with firewalls,
usernames, and passwords. (*Id*. at ¶ 266.)

   About five days after Deo warranted in the Cross-Purchase Agreement that he was the
sole member of Northshore and Sunrise, those dealerships' true owners brought action against
Deo in New York Supreme Court, Nassau County, alleging "financial improprieties and massive
fraud…strikingly similar to the conduct complained of with respect to Superb." (*Id*. at ¶¶ 191-
93.) To this end, Plaintiffs allege Deo misrepresented not only his member status of the
dealerships, but also whether he anticipated or had pending litigation against him and whether he
had the power and right to transfer and deliver shares of the dealerships to Urrutia and Superb.
(*Id*. at ¶¶ 194-95.) In preparation to abscond with Superb's earnings and assets, Deo made further
misrepresentations to Flushing Bank, presenting himself as Superb's sole owner to open a bank
account under Superb's name in blatant violation of the Shareholders' Agreement, which
delegated authority over Superb's accounts and checks solely to Urrutia. (*Id*. at ¶ 209-11.)

   Plaintiffs allege Flushing Bank participated in this scheme by letting Deo illicitly open
the Superb account "when [the bank] knew that he had no authority to do so," since Flushing
apparently "was in possession of documentation indicating that Deo had no such authority." (*Id*.
at ¶ 315.) Plaintiffs assert Deo deposited approximately $455,000 of customer payments into this

unauthorized account only to transfer those payments into his own accounts and, "upon information and belief," those of Thomasson, Blankenship, Merckling, Jones, S. Deo, and DLA Capital owner Michael Laurie (*id*. at ¶¶ 212-15), and that Deo logged cash payments into Superb's DMS but pocketed those funds for himself – and even had Merckling and Blankenship pilfer Superb's safe. Plaintiffs contend this cash scheme further cost Superb over $400,000. (*Id*. at ¶¶ 216-19.) In further contravention of his inability to authorize checks as a minority shareholder under the Shareholders' Agreement, Deo signed and issued multiple checks from Superb's Chase Bank accounts under Urrutia's control, made payable to Thomasson, Laurie, Northshore, and other entities owned by Deo. (*Id*. at ¶¶ 220-21.)[3] Plaintiffs assert Chase additionally permitted "Deo to process checks from Superb's bank account when it knew that he had no authority to sign checks," because "Deo was not an authorized signatory on Superb's account at Chase Bank." (*Id*. at ¶ 316.)

Plaintiffs further allege Merckling and Blankenship used their power as "former or active police officers" to encumber an investigation into Deo when Urrutia sought to have police remove his former partner when their relationship deteriorated. (*Id*. at ¶¶ 205, 243; 38-2 at 55-56.) S. Deo managed and controlled the Flushing Bank account (*id*. at ¶ 241), and Thomasson as counsel endowed the operation with a veneer of legitimacy and conspired with Deo and agreed to his directives. (*Id*. at ¶¶ 247-50.) All four of these Deo Defendants are alleged to have aided and abetted Deo by delivering the unauthorized checks to banks for payment. (*Id*. at ¶ 254.) Moreover, Laurie used his business DLA Capital and its connections to help Deo open the Flushing account, with knowledge that this breached the Shareholders' Agreement "because he

---

[3] Plaintiffs contend Urrutia made this discovery during a top-down audit of Superb, but do not proffer specific check numbers or financial statements in exhibit. (*Id*. at ¶ 221.)

had sat in on meetings with Urrutia and Deo and knew that Urrutia… [held] sole check authorization and sole control of all Superb bank accounts." (*Id*. at ¶ 244.) Jones also "knew Superb was operating at a loss," yet "nonetheless altered journal entries" to make it seem as though Superb was profitable, procuring Urrutia's ill-gotten confidence in Deo. (*Id*. at ¶ 245.) Laurie and Jones are alleged to have "enabled wire fraud" by submitting "false tax returns, false bank applications, and false loan applications[.]" (*Id*. at ¶ 255.)

On July 31, 2023, NMAC contacted Superb's Chief Operating Officer ("COO") Bruce Novicky ("Novicky") to inform the dealership that it discovered the vehicles NMAC had been financing served as collateral for additional loans from another bank and thus were illegally double-floored, costing Superb $760,868.75 in default to NMAC. (*Id*. at ¶¶ 199-201.) This Court found that Superb had demonstrated irreparable harm caused by the Defendants' conduct, notably in the termination of the floor plan between Superb and NMAC. (*Id*. at ¶ 204) (citing to ECF No. 55, Memorandum & Order on Preliminary Injunction). Deo, S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones effectuated the double-flooring scheme by "filling out applications for financing and making material misrepresentations in said applications[.]" (*Id*. at ¶ 203.)

After the double-flooring incident came to light, Urrutia ordered Novicky on August 3, 2023 to conduct a physical inventory at Superb to ensure all financed vehicles were present at the dealership as per the floor plan, and that all vehicles entered into the DMS were on site, as well. (*Id*. at ¶ 205.) The inventory review found that Superb was missing "over one hundred (100) vehicles," even though these vehicles were listed on both the DMS and the general ledger. (*Id*. at ¶ 206.) Novicky confronted Deo, who "demonstrably lied as to certain vehicles" and "failed to adequately explain" others. (*Id*.) For example, Deo said a particular vehicle was sold, but the

customer listed on the purchase denied buying that vehicle, and Deo could not supply documents

of the alleged sale. (*Id*. at ¶ 207.) Urrutia subsequently removed Deo from Superb and initiated a

top-down audit, the findings of which "included incontrovertible proof of Deo's duplicity and

clear breaches of his fiduciary obligations." (*Id*. at ¶ 208.) The top-down audit "soon made Deo's

intentions very clear." (*Id*. at ¶ 225.)

During his tenure at Superb, Deo had been building up his own dealerships – GCC

Syosset, GCC Sunrise, GGC LIC, GCC Roslyn, and GCC Smithtown – all under the Gold Coast

Motors Automotive Group. (*Id*. at ¶ 226.) There, Deo put Urrutia's own "dealership processes

and know-how" to use and implemented the "unique, confidential, and proprietary" Tekion DMS

and "the exact customization used by Superb" in his own dealerships. (*Id*. at ¶¶ 227-28, 230,

233-34.) Plaintiffs further allege Deo poached Superb employees for the Gold Coast dealerships

and trained them in Tekion's use. (*Id.* at ¶¶ 235-36.) Deo and these employees used their time at

Superb and familiarity with its customer list to redirect Caribbean listeners of Irie Jam to Gold

Coast dealerships. (*Id.* at ¶¶ 237-40.) As such, Plaintiffs allege Deo effectively and illicitly

channeled Urrutia's decades of experience, the Irie Jam customer list, and the Tekion DMS

customized for Superb into his own Gold Coast dealerships. (*Id*. at ¶ 258-60.)[4]

## II.    *Procedural History*

Plaintiffs originally filed their complaint on August 17, 2023.  (ECF No. 1.)  Plaintiffs

amended, by subsequently filing the operative Amended Complaint (ECF No. 65) on October 13,

2023, alleging: (i) RICO violations,  (ii) DTSA violations, (iii) misappropriation of trade secrets;

---

[4] Plaintiffs claim Defendants are currently benefitting from the confidential information Urrutia
developed and sourced over thirty years in the automobile dealership industry, and since 2020, when he
came to own his first dealership, which Defendants stole from the Superb Plaintiffs. (*Id*. at ¶ 258.) This
information includes Superb's customer lists, Urrutia's contacts, including Tekion and Superb's
customized DMS system from Tekion, and other proprietary information. (*Id*. at ¶ 269.)

(iv) unfair competition; (v) tortious interference with contractual relations, business relations, and prospective economic advantage; (vi) unjust enrichment; (vii) conversion; (viii) fraud; (ix) breach of fiduciary duty; and (x) civil conspiracy. (*Id*. at ¶ 4.)

Specifically, Plaintiffs seek damages and injunctive relief related to Defendants' alleged:

unlawful conspiracy and scheme to engage in wire fraud by, among other things, signing checks they had no authority to sign, opening bank accounts by providing false and misleading information to financial institutions and depositing into those accounts, in the name of Superb Plaintiffs but controlled by Defendants, checks made payable to the Superb Plaintiffs, then to be diverted to Defendants' own use, improper poaching of Superb Plaintiffs' employees, and misappropriating Superb Plaintiffs' confidential information and trade secrets.

(*Id*.)

Plaintiffs' Amended Complaint asserts a catalogue of claims, alleging no less than 52 causes of action:

- (1) Violation of RICO, 18 U.S.C. § 1962 – Against All Defendants
- (2) Conspiracy Under 18 U.S.C. § 1962(d) – Against All Defendants
- (3) Injunctive Relief Under RICO, 18 U.S.C. § 1964(a) – Against Deo Defendants
- (4) Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. §1836 – Against Deo, S. Deo, Merckling, Blankenship, and Thomasson
- (5) Injunctive Relief under the DTSA (18 U.S.C. § 1836, *et seq.* – Against Deo Defendants
- (6) Misappropriation – Against Deo Defendants
- (7) Unfair Competition – Against Deo Defendants
- (8) Tortious Interference with Contracts, business relations, and prospective economic advantage – Against Deo Defendants
- (9) Conversion – Against Deo Defendants
- (10) Civil Conspiracy – Against Deo Defendants
- (11) Professional Malpractice – Against Jones CPA LLP
- (12) Fraud – Against Deo and Jones
- (13) Permanent Injunction – Against Libertas Funding
- (14) Article 4-A of the New York UCC – Against Flushing Bank
- (15) Negligence – Against Flushing Bank
- (16) Declaratory Judgment – Against Deo
- (17) Declaratory Judgment –Against Deo
- (18) Conversion – Against Deo
- (19) Unjust Enrichment – Against Deo
- (20) Breach of Duty of Loyalty – Against Deo

- (21) Breach of Fiduciary Duty – Against Deo
- (22) Permanent Injunction – Against Deo
- (23) Conversion – Against Deo
- (24) Unjust Enrichment – Against Deo
- (25) Breach of Duty of Loyalty – Against Deo
- (26) Breach of Fiduciary Duty – Against Deo
- (27) Permanent Injunction – Against Deo
- (28) Contribution and Indemnification for Fraud, Breach of Fiduciary Duty, Breach of Loyalty and Conversion – Against Deo
- (29) Conversion – Against Thomasson
- (30) Aiding and Abetting Conversion – Against Thomasson
- (31) Contribution and Indemnification for Conversion – Against Thomasson
- (32) Contribution & Indemnification for Aiding & Abetting Conversion – Against Thomasson
- (33) Contribution and Indemnification for Aiding and Abetting Fraud – Against Thomasson
- (34) Aiding and Abetting Breach of Fiduciary Duty – Against Thomasson
- (35) Contribution and Indemnification for Aiding and Abetting Breach of Fiduciary Duty – Against Thomasson
- (36) Aiding and Abetting Breach of Duty of Loyalty – Against Thomasson
- (37) Contribution and Indemnification for Aiding and Abetting Breach of Duty of Loyalty – Against Thomasson
- (38) Unjust Enrichment – Northshore
- (39) Piercing the Corporate Veil – Against Deo
- (40) Unjust Enrichment – Against Sunrise
- (41) Piercing the Corporate Veil – Against Deo
- (42) Violation of NY GBL § 349 – Against Deo
- (43) Accounting – Against Deo
- (44) Accounting – Against Deo
- (45) Violation of New York Judiciary Law § 487 – Against Thomasson
- (46) Violation of New York Uniform Commercial Code §3-419 –Against Flushing Bank and Chase Bank
- (47) Conversion – Against Flushing Bank and Chase Bank
- (48) Negligence – Against Flushing Bank and Chase Bank
- (49) Unauthorized Payments – Against Flushing Bank
- (50) Drawee Liability – Against Chase Bank
- (51) Professional Malpractice – Against Jones CPA LLP
- (52) Fraud – Against Deo and Jones

(*See generally*, ECF No. 65.)

On October 17, 2023, the parties consented to the undersigned's jurisdiction for all

purposes. (ECF No. 70.) Following the filing of the Amended Complaint, Defendants filed pre-

motion letters for the dismissal motions (*see* ECF No. 73; 101, 114, 126, and 127).   After

various extensions to the briefing schedule (Electronic Order dated Mar. 3, 2024 and Apr. 10,

2024), all motion papers were finally filed by May 15, 2024. (ECF Nos. 164, 168-171,175-194.)

On May 14, 2024, Plaintiffs filed a motion for leave to amend the pleadings (ECF No.

178, 181), which Defendants vehemently oppose. (*See* ECF Nos. 184, 187-189, 191.)

Specifically, Plaintiffs' proposed Third Amended Complaint ("TAC") seeks to further amend the

claims as follows:

- Counts 16, 17, 18, 21, 23, 26, and 42: The TAC adds the prerequisite demand to the derivative claims and adds the necessary plaintiffs and Northshore and Sunrise as defendants.  (*Id*. at 38-39.)

- Count 22: In the TAC, Northshore now asserts the corporate waste claim. Plaintiffs further argue that it is "nonsensical" to dismiss Chabrier's claim against Deo, as Deo's mismanagement of Northshore cost Chabrier the DMV license.  (*Id*. at 39.)

- Count 27: Like Count 22, Sunrise now asserts the corporate waste claim, and Plaintiffs argue that Aaronson's and J. Baron's claims have merit because Deo's mismanagement of Sunrise cost those Plaintiffs the DMV license.  (*Id*. at 40.)

- Count 28: *First*, the TAC asserts the prerequisite demand and adds Northshore as a nominal defendant.  (*Id*. at 40.)  *Second*, Plaintiffs note that Libertas Funding has discontinued its claim against IAG Plaintiffs in state court to pursue the claim in this Court; thus in the interest of judicial economy, the claim should stand.  (*Id*. at 41.)

- Counts 29 to 37: In TAC, Counts 29, 20, 34, and 36 are now brought against Northshore directly, and Counts 31, 32, 33, and 35 as standard indemnification claims "should be successful against any indemnified party."  (*Id*. at 41.)

- Counts 38 and 40: The TAC alleges a contractual relationship between IAG and Northshore and Sunrise, such that an agreement obligated the former to cover the duties of the latter.  (*Id*. at 42.)

- Counts 39 and 41: The TAC omits these counts.  (*Id*. at 42-43.)

- Counts 43 and 44: The TAC addresses the prerequisite demand and joins Northshore and Sunrise as nominal defendants.  Moreover, it alleges that Deo owed Northshore and Sunrise accurate accounting through his role as manager.  (*Id*. at 43.)

- Count 45: The FAC "adequately allege[s]" Thomasson's knowledge of the scheme surrounding the Libertas Funds, and, therefore, Plaintiffs assert he is guilty of lying in open court when he claimed there was nothing wrong with using his attorney escrow account to transfer the funds from IAG Plaintiffs to Deo. (*Id.* at 44.)

- Count 52: While the FAC shows Aaronson, a member of Sunrise, had obligations between IAG and Northshore and Sunrise, the TAC goes into further detail about that relation, such that IAG needed accurate information to continue the Floor Plan. (*Id.* at 46.) Further, Aaronson is an executive at IAM, and IAM manages all the IAG Plaintiffs. (*Id.*) Thus, Plaintiff contend the IAG Plaintiffs are not "merely unaffiliated guarantors" of the obligations between Ally and Northshore and Sunrise; rather, the IAM "umbrella" keeps these parties in privity. (*Id.* at 46.)

- Count 13: Plaintiffs have changed this to Declaratory Judgment, and it is Count 15 in the TAC seeking relief for Northshore and Sunrise only. (*Id.* at 47.)

- Urrutia and Team Auto's Standing: Between the TAC and FAC, Plaintiffs argue they have made a case for Urrutia's and Team Auto's standing. Plaintiffs assert Urrutia has standing because he is "President of Superb Motors" and "has been harmed by the Defendants' conduct." (*Id.* at 48-49.) Team Auto has standing because it is an auto wholesaler that owned 13 cars Deo allegedly absconded with. (*Id.* at 49.)

- Misappropriation: Plaintiffs rehash much of the same arguments they proffered for the DTSA claim. (*Id.* at 49-52.)

- Unfair Competition: Plaintiffs assert that Defendants' misappropriation of trade secrets and employees sufficiently demonstrates this claim. (*Id.* at 53.) Furthermore, Plaintiffs maintain that this claim just needs to show the misappropriation of "the fruits of Superb Plaintiffs' labor." (*Id.* at 53.)

- Tortious Interference: Plaintiffs reason that, because they had a business relation with NMAC and Deo "intentionally interfered" with that relation to harm Superb and caused harm, they have successfully stated this claim. (*Id.* at 55.)

- Conversion: Plaintiffs argue that IAG Plaintiffs have a conversion claim over the Maserati and Libertas funds, despite Northshore's rightful ownership of those assets and their unfulfilled, insistent demands on return. (*Id.* at 56.) As for the Superb Plaintiffs, the FAC sufficiently alleges conversion regarding the Floor Plan inventory (over 100 missing cars), the missing customer payments, and the misappropriated trade secrets. (*Id.* at 57.)

- Negligence and Conversion Against Chase: Plaintiffs contend that their claim here is not preempted because it only has to do with conduct preceding and following the processing of checks. (*Id.* at 58.)

- Civil Conspiracy: Plaintiffs claim that their two illustrations of fraud (double flooring and forged instruments to open a Superb account in Flushing Bank) coupled with the allegations of the enterprise and their knowing participation towards the fraudulent conduct sufficiently constitute a civil conspiracy. (*Id*. at 59-60.)

- Fraud: Since Jones could only commit fraud "by and through" Deo, Plaintiffs believe these allegations properly cover both Defendants.

(*Id*. at 60-61.)

## DISCUSSION

### I.   *Defendants' Motions to Dismiss: Legal Standard*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. "[T]he pleading standard Rule 8 announces . . . demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A claim has facial plausibility when the plaintiff pleads sufficient facts allowing the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556–57 (internal citations omitted)).

When considering a motion to dismiss, the Court assumes all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, this tenet does not apply to legal conclusions or

"threadbare recitals of a cause of action's elements." *Iqbal*, 556 U.S. at 663. Pleadings that offer

only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will

not do." *Twombly*, 550 U.S. at 555. More is required. *See id.*; *see also Rozz v. Town of*

*Hempstead*, No. 20-CV-1812 (JMA) (AYS), 2023 U.S. Dist. LEXIS 56996, at *9-10 (E.D.N.Y.

Mar. 31, 2023) (citing *Iqbal* and *Twombly* as the standard cases for deciding a motion to

dismiss); *Solomon v. Flipps Media, Inc.*, No. 22-cv-5508 (JMA) (JMW), 2023 U.S. Dist. LEXIS

176480, at *3-4 (E.D.N.Y Sept. 30, 2023) (same).

## II. *Plaintiffs' RICO Claims*

"RICO provides a civil remedy to persons injured in their business or property by a

violation of the statute." *Alkhatib v. New York Motor Grp. LLC*, No. CV-13-2337 ARR, 2015

WL 3507340, at *8 (E.D.N.Y. June 3, 2015), *report and recommendation adopted in part*, No.

13CV2337 (ARR)(SMG), 2016 WL 5660372 (E.D.N.Y. Sept. 30, 2016) (citing 18 U.S.C. §

1964(c)); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004)

("*Satinwood*") (quoting 18 U.S.C. § 1962(c)) ("The RICO statute makes it unlawful 'for any

person employed by or associated with any enterprise to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'").

As stated, Plaintiffs assert RICO and RICO conspiracy claims pursuant to 18 U.S.C. §§ 1961(c)

and (d) against all Defendants – distinguished by group as the Deo Defendants, DLA, the CPA

Defendants, and the Bank Defendants.

"To state a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18

U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the

violation of § 1962." *Jordan v. Pierre*, No. 18-CV-8528 (JGK), 2021 WL 2581444, at *3

(S.D.N.Y. June 22, 2021), *aff'd sub nom. Jordan v. Tilzer*, No. 21-1938, 2022 WL 16544335 (2d

Cir. Oct. 31, 2022) (quoting *De Falco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). "A defendant may be liable for violating RICO if the defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in the affairs of an enterprise involved in interstate commerce." *Alkhatib*, 2015 WL 3507340, at *8.

### D.   *Violation of RICO, 18 U.S.C. § 1962 – Against All Defendants*

"A RICO enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Alkhatib,* 2015 WL 3507340, at *9 (quoting 18 U.S.C. § 1961(4)). "An 'association-in-fact' enterprise must have 'at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Id*. (quoting *Boyle v. United States,* 556 U.S. 938, 956 (2009) ("*Boyle*")); *see also United States v. Turkette,* 452 U.S. 576, 583 (1981) (an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct.").

The Supreme Court's decision in *Boyle* "establishes a low threshold for pleading such an enterprise." *Delgado v. Ocwen Loan Servicing, LLC,* 2014 WL 4773991, at *16 (E.D.N.Y. Sept.24, 2014) (internal citations omitted). "Formal hierarchy, role differentiation, regular meetings, or established procedures are not required; rather, an informal group may constitute an enterprise as long as 'the group ... function[s] as a continuing unit and remain[s] in existence long enough to pursue a course of conduct.'" *Alkhatib*, 2015 WL 3507340, at *9 (quoting *Boyle,* 556 U.S. at 948). Relevant here:

> A RICO enterprise must have an ascertainable structure distinct from the pattern of racketeering activity in which its members engage. Nevertheless, the evidence used to prove the pattern of racketeering activity, and the evidence establishing an enterprise may in particular cases coalesce. Finally, the enterprise as alleged must be distinct from the person or persons alleged to be conducting the affairs of the enterprise. This requirement

is satisfied when an owner or employee of a corporation is the person alleged to be conducting the affairs of the enterprise and the enterprise is the corporation itself.

*Alkhatib*, 2015 WL 3507340, at *9 (internal citations omitted) (cleaned up); *see also Palatkevich v. Choupak*, No. 12 CIV. 1681 (CM), 2014 WL 1509236, at *15 (S.D.N.Y. Jan. 24, 2014) (emphasis in original) ("[W]ithin the meaning of § 1962(c), a *natural person* named as the defendant 'person' is inherently distinct from a corporate entity 'enterprise' for which he acts as an agent; in such a case, the distinctness requirement is met. But where a *corporate entity* is named as the defendant 'person,' it is not distinct from any alleged 'enterprise' consisting of that corporate defendant together with related companies, employees, or agents.").

RICO liability does not extend to all "persons" associated with an enterprise but is limited to those who 'conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Racketeering activity is defined as "(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical ... which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code[,]' including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud)." *Jordan v. Pierre*, No. 18-CV-8528 (JGK), 2021 WL 2581444, at *3 (quoting 18 U.S.C. § 1961(1)).

A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity enumerated in § 1961(1) and (2) committed within a ten-year period. 18 U.S.C. § 1961(5); *Alkhatib*, 2015 WL 3507340 at *11; *GICC Cap. Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 465 (2d Cir. 1995). Predicate acts are comprised of at least two racketeering activities, both related to each other and proximate to the enterprise that an enterprise member engages in. *U.S.*

*v. Delgado*, 972 F.3d 63, 79 (2d Cir. 2020).  To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are 'related, and they amount to or pose a threat of continued criminal activity.'"  *Alkhatib*, 2015 WL 3507340 at *11 (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999) quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989))).  The predicate acts cannot be isolated or sporadic instances.  *U.S. v. Indelicato*, 865 F.2d 1370, 1383 (2d. Cir. 1989).

Predicate acts must have both horizontal relatedness, wherein the acts are related to each other, and vertical relatedness, wherein the acts are related to the whole enterprise.  *Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017); *U.S. v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012). Vertical relatedness means either (1) the defendant was able to commit the acts because of his control over or position in the enterprise, or (2) the act is related to the enterprise's activities. *U.S. v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010).  As to horizontal relatedness, the activities of a business whose purpose is racketeering, like an organized crime family, are horizontally related if the activities are simply connected to that enterprise.  *U.S. v. Cappola*, 671 F.3d 220, 243 (2d Cir. 2012).  However, where the enterprise is primarily a lawful business, its predicate acts must evince interrelatedness among themselves through "similar purposes, results, participants, victims, or methods of commission." *H.J.*, 492 U.S. at 240.  The Second Circuit has adopted the legitimate business / illegitimate business distinction for the purposes of establishing continuity, as well: where an otherwise legitimate business engages in illicit predicate acts, those acts must be sufficiently related to each other for there to be a threat of such conduct in the future.  *Reich*, 858 F.3d at 61-62.

"The latter so-called 'continuity' requirement can be satisfied either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir. 2008). Regarding close-ended continuity, the Second Circuit looks for crimes extending at least over two years. *Reich*, 858 F.3d at 60; *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008). Courts can find open-ended continuity where the illicit predicate acts are the regular way of operating a particular business, even if the nature of that business is lawful. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 243 (2d Cir. 1999).

Relevant here, 18 U.S.C. §§ 1341 and 1343 prohibit any person engaging or intending to engage in a fraudulent scheme or planning to use fraud to illicitly gain another's money or property, from using the mail or interstate or foreign wire services to further or execute that scheme. 18 U.S.C. §§ 1341, 1343; *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 488 (2d Cir. 2014). Mail and wire fraud require "(1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of wires [or mail] to further that scheme." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 137 (2d Cir. 2018). The scheme to defraud is a question of a fair and civil exchange (or lack thereof) in business transactions; the monies or property at the center of the scheme must be the victim's own; and the use of wires or mail must further the fraudulent scheme "as conceived by the perpetrator at the time." *Bayshore Capital Advisors, LLC v. Creative Wealth Media Finance Corp.*, 667 F.Supp.3d 83, 124-25 (S.D.N.Y. 2023) (internal quotations and citations omitted).

Claims of fraud are subject to a heightened pleading standard.  *Alkhatib*, 2015 WL
3507340 at *11.  Where the RICO claims allege fraudulent predicate activity, courts require that
plaintiffs plead with particularity in accordance with Rule 9(b).  *Saintwood, Inc.*, 385 F.3d at
178; Fed. R. Civ. P. 9(b).  To this end, plaintiffs must identify: (1) the specific content or
statements of the alleged fraudulent communication, (2) the speaker, (3) where and when the
statements were made, and (4) *why* the content or statement is fraudulent.  *Spool*, 520 F.3d at
185.  That is, there must be a factual basis manifesting a strong inference of fraudulent intent.
*O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991).  Plaintiffs can
establish that strong inference either by proffering facts showing the defendant had motive and
opportunity to defraud, or by proffering strong circumstantial evidence of the defendant's
knowing misbehavior or recklessness.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir.
2006).  Notably, in the Second Circuit, if the plaintiff alleges the defendant used wire or mail to
further a fraudulent scheme, while *not* alleging that the wire or mail *itself* contained anything
fraudulent, then the plaintiff must only plead with specificity the circumstances of the scheme at
large, and not the "'temporal or geographic particulars of each mailing or wire transmission'"
furthering that scheme.  *Angermeir v. Cohen*, 14 F.Supp.3d 134, 145-46 (S.D.N.Y. 2014)
(quoting *In re Sumitomo Copper Litig.* 995 F.Supp. 451, 456 (S.D.N.Y. 1998)).

In order to hold a defendant civilly liable under RICO, he or she must be demonstrated to
have participated in the conduct of the charged enterprise's affairs through a pattern of
racketeering activity. *Alkhatib*, 2015 WL3507340 at *14.  To establish that a defendant
committed mail or wire fraud, the plaintiff must allege "facts giving rise to a strong inference
that the defendant knew the statements to be false and intended to defraud the plaintiff at the
time they were made." *Id.*  If a plaintiff alleges that a defendant participated in conducting the

affairs of an enterprise, the plaintiff must allege that the defendant "participated in the operation or management of the enterprise itself." *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1995) ("*Reves*")).  For an individual to be subject to RICO liability, they "must have some part in directing [the enterprise's] affairs" but that is not to say that only those with primary responsibility will be culpable; RICO liability may very well apply to "lower rung participants in the enterprise who are under the direction of upper management." *Id.* (quoting *Reves*, 507 U.S. at 179, 184).  However simply taking direction and performing tasks helpful or necessary to the enterprise's purpose "without more, is insufficient to bring a defendant within the scope of § 1962(c)." *Diaz*, 176 F.3d at 92 (citing *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994)).

An enterprise must be distinct from the person or persons alleged to be conducting the affairs of the enterprise, such as when an owner or employee of a corporation is the person alleged to be conducting the affairs of the enterprise. *Alkhatib*, 2015 WL 3507340 at *9.  A complaint satisfies RICO's distinctness requirement if it alleges an enterprise comprised of a corporation and names as defendants "natural persons who own or work for the corporation and participated in the corporation's affairs through a pattern of racketeering." *Id.* at *10.

For a plaintiff to have standing to pursue RICO claims, the RICO violation must be the proximate cause of the plaintiff's injury, meaning there was a direct relation between the purported injury and supposed misconduct. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Nygard v. Bacon*, No. 19-CV-1559 (LGS)(KNF), 2021 WL 4312581, at *10 (S.D.N.Y. Mar. 31, 2021); *In re Conte*, at *32-33.  Moreover, the RICO violation must be the but-for cause of the injury, "meaning that but for the RICO violation, he would not have been injured." *Zou v. Han*, 2024 WL 4450781 at *17 (E.D.N.Y. 2024) (quoting *Alix v. McKinsey & Co.*, 23 F.4th 196, 203 (2d Cir. 2022)).

Here, as to the Superb Plaintiffs' allegations against the Deo Defendants, the Court finds Amended Complaint adequately alleges wire fraud. Deo and Urrutia, the President of Superb Motors Inc., both executed a shareholder's agreement, with Urrutia as the majority shareholder (51% interest) and Deo as minority shareholder (49% interest). *See* ECF No. 65 at ¶¶ 184-85. Urrutia the majority shareholder had, among other responsibilities, the power to review and approve financing agreements with lenders, as well as control over Superb's accounting department. *Id*. at ¶ 189. Conversely, Deo as a minority shareholder could only propose who would serve as General Manager of the day-to-day operations, whom Urrutia would either approve or reject. *Id*. at ¶ 190. However, Deo signed multiple checks from Superb's Chase bank accounts under Urrutia's control; none of the checks were authorized, but Deo signed each of them in contravention to his limited power under the shareholder agreement, inferably between the time of Urrutia's and Deo's signing of the shareholder agreement, effective December 22, 2022, and up to or before August 3, 2023, when Superb's accounting uncovered Deo's activity. *Id*. at ¶¶ 185, 199, 205, 220-21, 640.

Thus, the Complaint facially charges the defrauder (Deo), the content of his defrauding (the forged checks), where and when the defrauding occurred (between December 2022 and August 2023, at Superb's accounts in Chase), and why the activity was fraudulent (the unauthorized signing of checks in breach of the shareholder agreement). *See e.g., BC Liquidating, LLC*, 519 B.R. at 423 (finding mail and wire fraud alleged where defendant concealed transfers, made misrepresentations to other people and paid off other defendants to conduct false audits); *see also Ideal Steel Supply Corp. v. Anza*, 02 Civ. 4788 (RMB) (AJP), 373 F.3d 251, 264 (S.D.N.Y. July 2, 2004) (stating that the Second Circuit has found that "mail fraud

based upon the mailing of fraudulent sales tax returns constitutes a predicate act" under RICO).

Accordingly, the Court finds that mail and wire fraud have been adequately pled.

The Deo Defendants contend that the Complaint does not properly illustrate a RICO enterprise because it fails it identify the structure, roles, and activities of the alleged enterprise and the distinct participation of each defendant in it, and, that the purpose is not clear. *See* ECF No. 176-1 at 5-6. However, this contention is unavailing because "an established hierarchy is not essential to the existence of an enterprise." *Alkhatib*, 2015 WL 3507340 at *10 quoting *Boyle v. U.S.*, 556 U.S. 938, 948 (2009)). Plaintiffs' allegations describe actions taken by each of the individual Deo Defendants from "which their roles in the enterprise may be logically inferred." *Id.*

The Deo Defendants further contend that the Complaint's "broad, conclusory allegations" of fraudulent misrepresentations lack the necessary specificity. *See* ECF No. 176-1 at 4. However, the Court finds Plaintiffs' Complaint "describes in exhaustive detail a sophisticated scheme" comprising all four of the Deo Defendants engaged in wide-ranging schemes to defraud the Superb Plaintiffs. *See* ECF No. 65 at ¶ 253; *see Alkhatib*, WL 3507340 at *11. Shortly after their first meeting in November 2022, Deo and Urrutia entered into a Cross-Purchase Agreement, which stipulated that Deo, presenting himself as the sole owner of Northshore and Sunrise would pay Urrutia and issue him twenty-five percent interest in Northshore and Sunrise, and that Urrutia would grant to Deo a forty-nine percent interest in Superb (ECF No. 65 at ¶¶ 175-177) essentially "treating [the dealerships] and their respective assets as his own." *Id.* at ¶ 118.

Furthermore, Laurie used his business DLA Capital and its connections to help Deo open accounts with knowledge that this breached the Shareholders' Agreement because he had been in

attendance in a meeting with Urrutia and thus knew Urrutia held sole check authorization and control of Superb's bank accounts. *Id.* at ¶ 244. And Deo, with the help of other Deo Defendants such as S. Deo, Thomasson, Blankenship, Merckling and Laurie, are alleged to have organized a double-flooring scheme by "filling out applications for financing and making material misrepresentations in said applications" (*id.* at ¶ 203), costing Superb $760,868.75 in default to NMAC. *Id.* at ¶¶ 199-201.

Plaintiffs specifically allege that around November 15, 2022, Deo agreed to sell almost one million dollars of the dealership's future receipts to Libertas for $735,000. *Id.* at ¶¶ 148-50. However, when a dispute arose over the Libertas Funds – shortly after Deo was confronted by Urrutia for lying about his true role at Northshore and Sunrise – Blankenship and Merckling, retired and active police officers, used their connections with the Nassau County Police Department to shield Deo from being arrested. *Id.* at ¶ 243.

Plaintiffs allege that at all relevant times, Thomasson claimed to be the attorney for Northshore, Sunrise, and Deo and was aware that the Libertas Funds were paid by Libertas to Northshore for the purported sale of future receipts. *Id.* at ¶¶ 155-156. When a dispute arose concerning the rights to the Libertas funds, the IAG Plaintiffs agreed to place the funds in Thomasson's attorney trust account pending resolution allegedly because Blankenship and Merckling once again abused their authority to threaten to have Aaronson arrested if he refused. *Id.* at ¶¶160-61. Plaintiffs claim that despite his knowledge of the ongoing dispute, Thomasson distributed the Libertas Funds to Deo declaring he would not be told what to do regarding his own escrow accounts, thus furthering Deo's scheme. *Id.* at ¶¶ 163-65.

Blankenship and Merkling's intervention with the Nassau County Police to pressure Aaronson into wiring money to Thomasson's account (*id.* at ¶ 181) enabled Thomasson's "direct

participation" and his release of the "stolen funds" which enabled Deo to pay Urrutia funds fraudulently obtained from Libertas on December 1, 2022.  *Id.* at ¶ 180, 183.  It is further alleged that Deo misrepresented not only his member status of the dealerships, but also whether he anticipated or had pending litigation against him and whether he had the power and right to transfer shares of the dealerships to Urrutia.  *Id.* at ¶ 194-95.

Here, the Court finds Plaintiffs sufficiently allege that the Deo Defendants, S. Deo, Thomasson, Blankenship, Merckling, and Laurie each substantially assisted Deo in carrying out his unlawful schemes, most notably in diverting and misappropriating Superb funds.  *Id.* at ¶¶ 241-244.  When Urrutia, upon becoming aware of Deo's conduct, informed NCPD to remove him, Blankenship and Merckling allegedly used their positions to hinder the investigation and protect Deo.  *Id.* at ¶ 243.  Plaintiffs sufficiently allege not only Deo's wrongful conduct, but that Merckling and Blankenship used their power to block any investigation and intimidate those who caught on to further Deo's fraudulent objectives.  *Id.* at ¶ 160, 161, 243.  Plaintiffs further allege that Thomasson provided the operation with a veneer of legitimacy posing as counsel for the dealership but also aided and abetted Deo by delivering the unauthorized funds directly to Deo. *See* ECF No. 65 at ¶¶ 205, 241, 243, 254.

Ultimately, it is not always reasonable to expect a plaintiff to have available sufficient factual information regarding the inner workings of a RICO enterprise to determine if a defendant was "substantially involved" in the enterprise or participated in the operation or management.  *Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 WL 3710370, at *8 (E.D.N.Y. Feb. 22, 2005) (citing *Friedman v. Hartmann*, 1994 WL 376058, at *2 (S.D.N.Y. July 5, 1994)).  Therefore, "where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question." *Aiu Ins. Co. V. Olmecs Med. Supply*

*Inc.,* 2005 WL 3710370, at *8 (E.D.N.Y. Feb 22, 2005) (citing *Friedman v. Hartmann,* 1994 WL 376058, at *2 (S.D.N.Y. July 15, 1994)).  Plaintiffs' allegations give rise to a strong inference that the Deo Defendants played a significant part in directing the affairs of the enterprise and advancing the goals of the scheme to defraud.  *Alkhatib,* 2015 WL 3507340 at *15.

     As to the CPA and Bank Defendants, Plaintiffs asserting RICO claims against outside service professionals like banks, law firms and accounting firms (or "outsider defendants") have been held sufficient after *Reves* only when they have alleged more substantial involvement by the outsider defendant in the charged racketeering activity than Plaintiffs attribute to the CPA Defendants and Bank Defendants here.  *See Alkhatib,* 2015 WL 3507340 at *18.  Where a party deals in an ordinary way with its agents and others who owe the party a professional obligation, so that their role in an entity's illicit activities is purely incidental as a course of ordinary business, and. where there is no evidence that these agents acted with the intent to effectuate those illicit activities, the party plus its agents do not constitute an associated-in-fact enterprise for the purposes of a RICO claim.  *See in re: General Motors LLC Ignition Switch Litigation,* No. 14-MD-2543 2016 WL 3920353 at *15 (S.D.N.Y. July 15, 2016).

     With respect to the CPA Defendants, Plaintiffs fail to allege two or more predicate acts sufficient to constitute a pattern of racketeering activity, proximate causation, or specific participation in or knowledge of the RICO operation to find the CPA Defendants liable.  *See* ECF No. 168 at 10-11. Furthermore, Plaintiffs cannot use negligence or accounting malpractice or general fraud as the predicate acts for their RICO claims.  *See id.* at 14.  Plaintiffs' Amended Complaint merely alleges that the CPA Defendants "aided and/or assisted the so-dominated Deo Defendants' alleged wrongful actions by falsifying financial statements, altering financial records, altering journal entries, and creating and submitting forged instruments or false

financials to create the illustration that Superb was profitable[,]" which does not meet the requirement elements to state a RICO claim.  *Id.* at 11.

Plaintiffs emphasize that Deo directed Superb accountants to alter journal entries to further the floor plan fraudulent scheme such that they only performed limited financial services for Superb.  *See* ECF No. 182 at 21.  However, the Supreme Court has established that "mere drafting of statements based on misinformation supplied by the defendants' clients did not rise to the level of *directing the enterprise's affairs* and therefore does not constitute sufficient participation in the operation or management of the enterprise to be liable under RICO statutes. *Reves,* 507 U.S. at 170 (emphasis in orginal).  Furthermore, "an accountant's audit reports... are always 'integral to the continuing operation' of the enterprise in the sense that professional services are essential to the continued existence of the business" but "provision of services – even essential services – to a RICO enterprise is not the same as controlling the enterprise's affairs."  *Dept. Of Economic Development v. Arthur Anderson & Co. (U.S.A.),* 924 F.Supp. 449, 467-68 (S.D.N.Y. 1996) (explaining that electricity is also essential to the continued existence of a business, but "it would be absurd to say that the public utility that provides the electricity participates in the operation or management of the enterprise"); *Univ. Of Maryland at Baltimore v. Peat, Matwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) ("[S]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result.").

For all these reasons, the allegations against the CPA Defendants are simply insufficient to give rise to a strong inference of a knowing or intentional participation in a fraudulent scheme or to establish their participation in the conduct of the affairs of an enterprise through a pattern of racketeering.

With respect to the Bank Defendants, as stated above, claims against outside professionals that agreed to provide important services to a racketeering enterprise is not the same as *directing* the affairs of the enterprise.  *Dept. Of Econ. Dev.,* 924 F.Supp. at 466.  Here, the Superb Plaintiffs allege that the Bank Defendants "directly assisted in (and aided and abetted) the Deo Defendants in carrying out their schemes" since the Vice President of Flushing Bank "must have known that only Urrutia, and not Deo, has the authority to open a bank account on Superb's behalf" such that letting him do so, aided and abetted the Deo Defendants' enterprise.  *See* ECF No. 179 at 12-13.  These accusations rest only on an alleged conversation between Deo and the Chief Operating Officer of Superb whereby Deo claimed the Vice President at Flushing Bank could secure a $500,000.00 line of credit for Superb and that the credit underwriter and Flushing were "in his pocket."  *Id.* at 3.  Plaintiffs took this to mean that Deo requires Flushing to act outside of normal banking procedures but allege no sufficient basis for such an allegation aside from this conversation.  *Id.*

Plaintiffs' RICO claims with respect to the Bank Defendants consist of baseless conclusory factual allegations, for example, that "Flushing knew that Deo was not the 100% owner of Superb and had no authority to open a bank account[,]" without any specific factual allegations to corroborate this supposed knowledge.  *See* ECF No. 184 at 16.  Plaintiffs' only supported allegation with respect to Flushing Bank was that it substantially assisted Deo in opening a bank account.  *Id.* at 9.  Plaintiffs do not claim any interpersonal relationship between Flushing and the Deo Defendants or that Flushing Bank shared any nefarious intention, nor had any knowledge of Deo's scheme nor means of benefitting from it. *Id.*; *see also Moss v. BMO Harris Bank, N.A.*, 258 F.Supp.3d 289, 298 (E.D.N.Y. 2017) (explaining that a plaintiff must specifically allege "that members of an association-in-fact enterprise share a wrongful intent to

violate RICO.")  Plaintiffs have not substantiated a claim that Flushing Bank shared a common

illicit interest with the Deo Defendants. *See* ECF No. 184 at 9.

Ultimately, the facts alleged here with respect to the banks fail to demonstrate that they

deliberately disregarded earmarks of fraud or had any authority or responsibility to intervene on

Plaintiffs' behalf.  *See Alkhatib*, 2015 WL 3507340 at *17.  These allegations are plainly

insufficient to survive the very difficult "operation and management" test set forth by the

Supreme Court in *Reves*; the mere fact that a bank provided banking services, without more, is

insufficient to state a claim under Section 1962(c)).  *See e.g.*, *Zhu v. First Atlantic Bank,* 2005

WL 275736, at *5 (S.D.N.Y. Oct. 25, 2005) (holding that plaintiffs fail to sufficiently allege

banks were involved in the "operation and management" of an alleged enterprise even though the

money transferred "eventually benefitted the alleged extortionist" that had no bearing on the

banks' limited roles which consisted of each bank simply transferring funds that the plaintiff

requested they transfer.)  Similarly, here, Flushing Bank purely provided banking services when

Deo misrepresented himself and opened accounts in the name of Superb.  *See* ECF No. 65 at ¶

612.  Likewise, Chase, performed banking services as requested by what they understood to be

an authorized user and permitted Deo to draw checks on Superb's account.  *Id.* at ¶ 613.  As

mentioned, Plaintiffs asserting RICO claims against outside professionals like banks are only

sufficient when they allege substantial involvement by the outsider defendant in the racketeering

activity.  *Alkhatib*, 2015 WL 3507340 at *18.  The Court finds Plaintiffs fail to sufficiently allege

that the banks were involved in the "operation and management" of the alleged fraudulent

enterprise of the Deo Defendants, aside from performing standard bank services.  *See Zhu*, 2005

WL 2757536 at *5 (finding no existence of an enterprise when the only "pattern of activity"

alleged by the plaintiff is that of banks complying with their customers' requests).

As to Libertas Funding, Plaintiffs Amended Complaint fails to establish a RICO claim against it and thus must be dismissed. *See* ECF No. 164-1 at 11.  Plaintiffs did not specifically allege an enterprise as required by the RICO statute pertaining to Libertas Funding specifically but rather broadly stated that Libertas and the Bank Defendants participated with Deo and the Deo Defendants to further the alleged scheme, without alleging any way in which Libertas benefitted from said scheme.  *Id.* at 12.

Similarly, with respect to claims against Chase, Plaintiffs fail to properly allege facts demonstrating that Chase participated in the operation and management of the RICO enterprise. *See Reves,* 507 U.S. at 180.  Plaintiffs allege Chase was negligent in allowing Deo to open an account in Superb's name and withdraw checks using the account (ECF No. 177-1 at 8), but these allegations are insufficient as well because they are merely incidental to the Deo Defendants' scheme.  *See e.g., Ifill v. West,* 1999 WL 690144, at *8 (E.D.N.Y. Aug. 24, 1999) (holding that it constituted more than merely incidental to the fraudulent scheme when the defendant bank was shown to have recruited prospective victims sufficient to be charged with racketeering activity).  As stated above, merely providing important services to a racketeering enterprise, such as opening accounts or failing to flag fraud, without more, is not the same as directing the affairs of the enterprise.  *See Dep't of Econ. Dev.,* 924 F.Supp. at 466.

Plaintiffs allege the Bank Defendants' participation enterprise consisted primarily of opening bank accounts and allowing Deo to draw checks from such accounts, thus failing to act reasonably to uncover he was not the authorized signer he purported to be.  *See* ECF No. 65 at ¶¶ 612-15.  While these banking services may have been an integral part of the enterprise's function, these acts still fall short of satisfying the "operation and management" test.  *See generally, Reves,* 507 U.S. at 179 (emphasis in original) (explaining that "RICO liability is not

limited to those with a formal position in the enterprise's affairs... but *some* part in directing the enterprise's affairs is required.")  It is not enough for Plaintiffs to allege merely that the enterprise could not function without the banks, even if that is the case.  *See Dept. of Econ Develop.,* 924 F.Supp. at 476 (reasoning that whether the conduct was "integral to the continuing operation of the enterprise" is not equivalent to *Reves'* more demanding operation or management test which requires "some part in directing the enterprise's affairs.").

Notably, *Reves* is a difficult standard to satisfy.  *See Burke v. Dowling,* 944 F.Supp. 1036, 1055 (E.D.N.Y. 1995) ("*Burke*") (explaining that in *Reves* although a jury found the account defendants engaged in securities fraud, "mere drafting of statements based on information supplied by the board did not constitute sufficient participation in the operation or management of the enterprise" such that "even if the defendants had engaged in intentional fraud, they could not be held liable under RICO").  In *Burke,* the bank defendant was found to have met this standard because it not only helped to initiate the scheme but also was shown to have "exerted substantial control over the enterprise" given other defendants owed debts to the bank.  *Id.* at 1055 (holding that based on these facts plaintiffs could proceed to discovery to determine the extent of the role but that the bank "will not be liable if it merely performed routine services for the RICO enterprise.")  Unlike the allegations in *Burke,* here, only routine services are alleged to have been completed by the banks. *See id.* Specifically, it is asserted that Flushing Bank, at Deo's request while misrepresenting his true role, opened an account in the name of Superb (ECF Nos. 65 at ¶ 609; 184. at 9) and Chase permitted Deo to draw checks on Superb's account. *Id.* at ¶ 613. Neither of these actions rise to the level of operation or management of the enterprise because Plaintiffs have not alleged the Bank Defendants played any part in "directing the enterprise's affairs." *See Dept. of Econ Develop.,* 924 F.Supp. at 476.

For the reasons stated above, the Deo Defendants' motion to dismiss the RICO claims asserted against them is *denied*, and the CPA Defendants, the Bank Defendants, Libertas Funding's motion to dismiss the RICO claims asserted against them is *granted*.

E.   **RICO Conspiracy, 18 U.S.C. § 1962(d)—Against All Defendants**

To establish a RICO conspiracy under § 1962(d), a plaintiff must show that there was an agreement to violate RICO's substantive provisions. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 244 (2d. Cir. 1999) (citing *U.S. v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997)). Specifically, to find conspiratorial intent, courts look for (1) facts implying the existence of an agreement (2) involving each of the defendants (3) to commit two or more predicate acts, (4) as well as facts indicating each defendant understood the enterprise's scope, and (5) was aware the acts were part of a racketeering pattern, continuous and related. *Dornberger v. Metropolitan Life Ins. Co.*, 961 F.Supp. 506, 527 (S.D.N.Y. 1997); *Hecht v Commerce Clearing House, Inc.*, 897 F.2d 21, 25-26 (2d Cir. 1990). However, as is the case in criminal conspiracies, agreements in civil conspiracies are not always easily shown by direct evidence, but may be inferred from circumstantial evidence. *Cofacredit*, 187 F.3d at 239 (reasoning that conspiracy may be shown with circumstantial evidence to support a finding that each defendant joined the conspiracy and committed an overt act in furtherance thereof).

With respect to the RICO conspiracy claim, the Deo Defendants argue that Plaintiffs did not provide any facts that show each of the Defendants had a "meeting of the minds" with respect to the alleged violations. *See* ECF No. 188 at 12. However, taking the Plaintiffs allegations as true, there are sufficient facts to support an inference that the Deo Defendants understood the scope of the scheme and agreed to further it, and, therefore, the Court finds Plaintiffs state a valid § 1962(d) claim.

In *Dornberger,* the plaintiff met this standard when the plaintiff alleged that the defendants reached an agreement to commit predicate acts of fraud, and that the defendants were aware of the fraudulent nature of the representations and omissions. *Dornberger*, 961 F.Supp. at 527. Here, as in *Dornberger*, Plaintiffs set forth the role each of the Deo Defendants played in the conspiracy. With respect to Deo, Plaintiffs assert that he treated the dealerships as his own, taking over $230,000 in customers' cash deposits and issuing and signing checks from Northshore bank accounts with any signatory authority whatsoever. *See* ECF No. 65 at ¶¶ 118-120. Deo allegedly purchased vehicles on behalf of Northshore and Sunrise then sold them allegedly incurring a deficiency of over $3,000,000. *Id.* at ¶¶ 86-89.

Most notable to the conspiracy, Deo, misrepresenting himself as the full owner of Northshore, allegedly agreed to sell $997,500.00 of the dealership's future receipts to Libertas for $735,000. *Id.* at ¶¶ 148-50. Deo and his wife, Sarah Deo, employed retired police officer Blankenship and active police officer Merckling, and, when a dispute arose over these funds, Deo allegedly enlisted retired and active police officers Blankenship and Merkcling to pressure the Nassau County Police Department to arrest Aaronson, who, under duress, arranged to place such funds in the trust account of Thomasson. *Id.* at ¶¶ 26, 153. Thomasson – who represented himself as the attorney for Northshore, Sunrise, and Deo, pending the dispute's resolution and despite requests from IAG Plaintiffs that the funds be kept in escrow – went ahead and disbursed these funds to Deo. *Id.* at ¶ 163. Taking these allegations are true, there are sufficient facts to support an inference that the Deo Defendants understood the scope of this scheme and agreed to

further it.  *See Dornberger*, 961 F.Supp. at 527.  Therefore, Plaintiffs have stated a RICO

conspiracy against the Deo Defendants as a matter of law.[5]

### F.   *Injunctive Relief under RICO--*
###       *18 U.S.C. § 1964(a) – Against the Deo Defendants*

Injunctive relief is available under RICO.  *See* 18 U.S.C.S. § 1964(a).  Section 1964(a)

authorizes courts to "prevent and restrain violations" of RICO by "issuing appropriate orders,

including, but not limited to: ordering any person to divest himself of any interest, direct or

indirect, in the enterprise; imposing reasonable restrictions on the future activities or investments

of any person, or ordering dissolution or reorganization of any enterprise."  18 U.S.C.S. §

1964(a).  However, § 1964(c) states that private litigants may seek monetary damages, and

"whether private litigants may obtain injunctive relief under § 1964(a) is an open and

questionable proposition" to an extent.  *Kerik v. Tacopina*, 64 F.Supp.3d 542, 558-59 (S.D.N.Y.

2014).

It is important to note that § 1964(a) vests federal courts with jurisdiction to hear RICO

claims and sets out general remedies, including injunctive relief.  *Chevron Corp. v. Donziger*,

833 F .3d 74, 138 (2d Cir. 2016).  It is widely accepted and understood that § 1964(a) is not

purely a jurisdictional section, but also a section that "grant[s] district courts authority to hear

RICO claims and then… spell[s] out a non-exhaustive list of the remedies district courts are

empowered to provide in such cases."  *Id.* However, § 1964(a) does not state explicitly state that

any category of persons may not obtain relief nor specify the persons in whose favor the courts

are authorized to exercise the powers there granted.  *Id.* The Second Circuit has interpreted the

---

[5] Given that the RICO claim fails with respect to the Bank Defendants and the CPA Defendants, the
RICO conspiracy claim as against them is dismissed for Plaintiffs' failure to plead the substantive RICO
claim.

ambiguity to mean "that Congress did not intend to limit the court's subsection (a) authority by reference to the identity or nature of the plaintiff." *Chevron*, 833 F.3d at 138-39 (reasoning that, "while subsections (b) and (c) limit the categories of plaintiffs to which the relief they respectively specify may be granted, we do not interpret those subsections as limiting the authorized relief to the types they mention"). To this end, given that the Second Circuit interpreted the limited categories of relief provided in subsections (b) and (c) not necessarily as limiting the authorized relief to the types they mention, it is possible that the Plaintiffs may seek injunctive relief under 18 U.S.C.S. § 1964(a) against the Deo Defendants for their alleged RICO violations.

## III. *Plaintiffs' Defend Trade Secrets Act Claims*

### A. *Violation of 18 U.S.C. § 1836 –*
### *Against the Deos, Merckling, Blankenship, and Thomasson*

The Defend Trade Secrets Act ("DTSA"), codified in 18 U.S.C. § 1831, "created a federal cause of action for the misappropriation of trade secrets used in interstate commerce." *Core SWX, LLC v. Vitec Group US Holdings, Inc.*, 2022 WL 3588081 at *4 (E.D.N.Y. July 14, 2022) (quoting *Elsevier Inc. v. Doctor Evidence, LLC*, 17-cv-5540(KBF), 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23. 2018). For a DTSA claim, plaintiff must show (1) the existence of a trade secret, (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce," and (3) misappropriation of the trade secret. *Id.*

Trade secrets include "all forms and types of business information" but only if (1) the owner has taken reasonable measures to keep such information a secret and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* ((quoting *TRB Acquisitions*

*LLC v. Yedid*, No. 20-CV-0552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021) (citing

18 U.S.C. § 1833(3))). Defining a trade secret is often a fact-dependent analysis by which the

court will consider the following factors:

> (1) The extent to which the information is known outside of the business; (2) the extent to
> which is it known by employees and others involved in the business; (3) the extent of
> measures taken by the business to guard the secrecy of the information; (4) the value of
> the information to the business and its competitors; (5) the amount of effort or money
> expended by the business in developing the information; (6) the ease or difficulty with
> which the information could be properly acquired or duplicated by others.

*Univ. Processing LLC v. Weile Zhuang*, No. 17 CV 10210-LTS, 2018 WL 4684115, at *3

(S.D.N.Y. Sept 28, 2018); *see also Iacovacci v. Brevet Holdings, LLC*, 437 F.Supp.3d 367, 380

(S.D.N.Y. 2020); *Uni-Sys., LLC v. U.S. Tennis Assoc., Inc.*, 350 F.Supp.3d 143, 172 (E.D.N.Y.).

The plaintiff need not allege all factors to establish the existence of a trade secret. *Core SWX,*

*LLC v. Vitec Group US Holdings, Inc.*, 2022 WL 3588081, at *4 (E.D.N.Y.) July 14, 2022).

Furthermore, "general and vague references to methods, processes, interpretation, programs, and

data configuration protocols do not plausibly support the existence of a trade secret without

supportive facts explaining, for example, how such strategies, techniques or models function, the

[the party] derives value from them, or what [the party] specifically does to ensure their

secrecy." *Id.* at *5 (quoting *Intrepid Fin. Partners, LLC v. Fernandez*, No. 20 CV 9779-LTS,

2020 WL 7774478, at *4 (S.D.N.Y. Dec. 30, 2020)).

A business that invests substantial amounts of time and money into advertising to procure

a particular list of customers or the patronage of a certain class of customers, either of which are

otherwise unknown to industry competitors, has likely done enough to create a trade secret.

*Garvey v. Face of Beauty LLC*, 634 F.Supp.3d 84, 97 (S.D.N.Y. Oct. 6, 2022); *Expert Connect,*

*L.L.C. v Fowler*, 2019 WL 300461 at *2-3, 5 (S.D.N.Y. July 10, 2019). Courts do not

automatically qualify non-disclosure agreements standing alone as reasonable protection against

misappropriation and would rather see NDAs coupled with password protections, employee policies detailing the use of specific information, or confidentiality amendments to licenses. *Zabit*, 540 F.Supp.3d at 424-25; *Expert Connect, L.L.C.* at *4. However, the most important consideration in determining whether information constitutes a trade secret is dependent on whether the information was secret. *See Zabit v. Brandometry, LLC*, 540 F.Supp.3d 412, 421 (S.D.N.Y. May 18, 2021). Furthermore, "if an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Id.* at 422 (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002 (1984)).

Notably, trade secrets are not one and the same as confidential information. *Core SWX, LLC*, 2022 WL 3588081 at *5 (citing *Elsevier Inc.* 2018 WL 557906, at *5). The secrecy surrounding a trade secret need be sufficient but not absolute such that "except by use of improper means, there would be difficulty acquiring the information." *Id.* at *7 (citing *Zabit*, 540 F.Supp.3d at 427) (finding that where numerous other individuals had access to the purported trade secret and that the information that the plaintiff licensed to defendant was done without confidentiality agreements, nor any instructions to keep the information secret or other security measures was insufficient to allege the secrecy required for a trade secret under the DTSA).

"Courts in the Second Circuit generally look to whether confidentiality or nondisclosure agreements are in place and whether the information is guarded by physical- or cyber-security protections." *Id.* at *7 (quoting *Turret Labs USA, Inc. V. Cargo Spring, LLC,* 19-CV-6793, 2021 WL 535217, at *4 (E.D.N.Y. Feb. 12, 2021). Reasonable measures include, but are not limited to "confidentiality agreements, password protection, sharing information with employees only on

a need-to-know basis, emphasizing the need to keep the information confidential and frequently

reminding employees of the need to maintain confidentiality." *Id.* at *7.  However, a mere duty

of loyalty "does not somehow transform freely shared information into a *secret*." *Zabit*, 540

F.Supp.3d at 427 (to hold otherwise "would risk expanding the limited category of 'trade secrets'

to cover any confidential information.").

Relevant here, a customer list is likely a trade secret if (1) it enumerates specific

customers with particular tastes, (2) the defendant can use that list to divert customers to a

competing business to the material and reputational detriment of the business seeking trade

protection, and (3) where the defendant could not have obtained the list but for the novel efforts

of the business seeking protection.  *Expert Connect, L.L.C. v Fowler*, 2019 WL 300461

(S.D.N.Y. July 10, 2019) at *2-3, 5.  Furthermore, a customer list has been found not to be a

trade secret when it was "not under lock and key, and there [was] no evidence of any effort on

the part of the plaintiff to insure that [the list] should be considered secret or confidential."

*Defiance Button Machine Co. v. C&C Metal Products Corp*, 759 F.2d 1053, 1063-64 (2d. Cir.

1985) (holding that information left in the memory of a computer, from which it could be

retrieved by using a file name or password readily available was sufficient to show plaintiffs did

not take adequate measures to ensure the secrecy of the lists.").  Further, security measures such

as password are not sufficient without any confidentiality agreements or instruction or policy to

keep the items secret. *Zabit*, 540 F.Supp.3d at 426 (holding that plaintiffs did not meet the

threshold for sufficient secrecy when they licensed the information to another party, without

confidentiality agreements, instructions to keep it secret, or other protective measures).

Here, there are two purported trade secrets at issue: (i) the Irie Jam Customer List (the

"Customer List"), and (ii) the Tekion DMS system (hereafter, "Tekion DMS system" or

"DMS").  Plaintiffs successfully set forth that the information derives independent economic

value from not being generally known and not being readily ascertainable by others.  *See TRB*

*Acquisitions LLC v. Yedid*, No. 20-CV-0552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28,

2021).  However, Plaintiffs far fall short in alleging the existence of a trade secret in that the

complaint is devoid of any information that they took reasonable measures to guard such

information a secret. *Id.*

    With respect to economic value portion of the test, Superb used the Tekion DMS system

to set up its floor plan agreement with Nissan Motor Acceptance Corporation, and facilitated

these operations with its unique DMS that was specifically customized for Superb by Tekion.

*See* ECF No. 65 at ¶¶ 199, 228.  Pursuant to factor (5), Superb expended effort and money to

develop this information; Urrutia spend over $120,00 to weave Tekion into Superb's business

model. *Id.* at ¶ 231-32; *see also, Univ. Processing LLC*, 2018 WL 4684115, at *3.  Pursuant to

factor (4), this information is objectively valuable, not just financially, but in the competitive

marketplace; Urrutia described this tool as "the blueprint for Urrutia's success at his dealerships"

such that it also gave his business "a unique competitive advantage."  *Id.* at ¶ 231-32, 265; *see*

*also, Univ. Processing LLC*, 2018 WL 4684115, at *3.  DMS enabled Superb to effectively

"streamline dealership operations, inventory management, cash flow management, and reporting

features that identify areas of improvement" at their dealership.  *Id.* at ¶ 269; ECF No. 38-2 at 1,

38.

    Similarly, the Customer List derives independent economic value from not being

generally known. Courts have held that when a business invests substantial amounts of time and

money into advertising to procure a particular list of customers or the patronage of a certain class

of customers, either of which are otherwise unknown to industry competitors, said business has

likely done enough to create a trade secret. *See, e.g.*, *Garvey v. Face of Beauty LLC*, 634 F.Supp.3d 84, 97 (S.D.N.Y. 2022). Whether a customer list constitutes a trade secret may depend on whether customers are readily ascertainable outside the employer's business such that they are discoverable only with extraordinary efforts secured by years of effort and advertising effected by the expenditure of substantial time and money. *Id.* at 97 (citing *24 Seven, LLC v. Martinez,* No. 19-CV-7320, 2021 WL 276654, at *7 (S.D.N.Y. Jan. 26, 2021)). Here, Urrutia partnered with Bobby Clarke ("Clarke") and his radio station Irie Jam, 93.5 FM in $1.5 million worth of advertising targeting over 2 million listeners from the Caribbean community which in turn generated a "substantial customer list[.]" *Id.* at ¶¶ 237-38.

Pursuant to factor (5), the amount of effort expended to generate the Customer List is alleged to be extensive and attributable solely to Urrutia who created it using his decades of experience in the industry, relationships he established along the way and his own "unique know-how" in operating automobile dealerships. *Id.* at ¶ 260; *see also, Univ. Processing LLC*, 2018 WL 4684115, at *3. Pursuant to factor (6), the Customer List could not easily be acquired or duplicated because it was a direct result of "the unique nature of Urrutia's partnership with Clarke" such that it "could not possibly be reverse engineered or independently generated without also substantially investing in Irie Jam." *Id.* at ¶ 239; *see also, Univ. Processing LLC*, 2018 WL 4684115, at *3; *Iacovacci, v. Brevet Holdings, LLC*, 437 F.Supp.3d 367, 380-81 (S.D.N.Y. 2020) (holding non-public sourcing information for over 2,000 clients constituted a trade secret).

Plaintiffs allege Deo illicitly channeled Urrutia's decades of experience, the Customer List, DMS customized for Superb, and other proprietary information into his own Gold Coast Dealerships. *See* ECF No. 65 at ¶¶ 258-60, 269. Plaintiffs claim this enabled the Deo

Defendants to benefit from the confidential information Urrutia developed and sourced over thirty years in the automobile dealership industry, essentially stealing from the Superb Plaintiffs. *Id.* at ¶ 269.  Plaintiffs allege that Deo implemented the confidential and proprietary DMS and the "exact customization used by Superb" in such dealerships of his own. *See* ECF No. 65 at ¶¶ 227-28, 230, 233-32. This allegation is corroborated by the fact that Deo poached Superb employees for his own dealerships and trained them to utilize the DMS.  *Id.* at ¶¶ 235-36. Furthermore, Deo and his staff used their history at Superb and familiarity with the Customer List to redirect listeners to the Gold Coast dealerships.  *Id.* at ¶¶ 258-60.

Although Plaintiffs have sufficiently alleged that both DMS and the Customer List have substantial economic value, they cannot show that they took sufficient measures to keep them secret or confidential, and, therefore, do not sufficient allege violation of the DTSA.  Plaintiffs do not sufficiently allege reasonable measures taken to keep their confidential information secret. *Id.* Superb alleges that it restricted this information's accessibility only to employees that were required to maintain its confidentiality in a computer system secured with firewalls, usernames and passwords.  *See* ECF No. 65 at 266; *see also, Univ. Processing LLC,* 2018 WL 4684115, at *3.  However, Deo Defendants successfully push back that there are no instances of non-disclosure agreements or contractual obligations binding employees to secrecy over either DMS or the Customer List sufficient to allege reasonable measures were taken to protect its secrecy, and further, that Superb did not claim their employees did not have access to the customer lists nor were they under any contractual obligation to keep same confidential.  *See* ECF No. 176-1 at 10.

For example, in *Core SWX LLC,* the plaintiff alleged that the information at issue was only accessible to employees and that the employee "understood" the confidential nature of the

information, however, the Court found such claims lacked any specificity regarding why the

individual would understand the information's proprietary and confidential nature, such as

instructions in an employee handbook and/or whether the individual was reminded of the

information's confidential status. *Core SWX, LLC*, 2022 WL 3588081 at *8-9 (finding that the

claimant did not plausibly state the existence of a trade secret). The Superb Plaintiffs' similar

restriction of the information's accessibility only to employees that were required to maintain its

confidentiality in a computer system secured with firewalls, usernames and passwords (ECF No.

65 at ¶ 266) is not sufficient to establish secrecy sufficient for a DTSA claim against defendants.

The Deo Defendants successfully argue that Plaintiffs failed to allege a DTSA violation

claiming they did not assert a trade secret, but only "generalized categories of information."

ECF 176-1 at 8; *see also Elsevier Inc.*, 2018 WL 557906, at *6 (holding that "alleging the

existence of general categories of confidential information, without providing any details to

generally define the trade secrets at issue does not give rise to a plausible allegation of a trade

secret's existence."). Superb does not allege any of these specifics but only that Urrutia

partnered with Irie Jam in $1.5 million worth of advertising "to over 2 million listeners in the

Caribbean community," generating a "substantial customer list" but without specifying why this

list could not possibly reverse engineered or independently generated without such an

investment. *See* ECF No. 65 at ¶¶ 237-38.

Ultimately, while Plaintiffs likely demonstrated enough factors to show the economic

value of both the DMS and the Customer List, especially given the substantial investment's

Urrutia made on behalf of Superb to secure this information, Plaintiff's did not proffer sufficient

facts to show they took reasonable measures to keep the information a secret. While they may

have been confidential in the sense that Plaintiffs expected its use to be only by their employees,

there is scant evidence to suggest Plaintiffs took reasonable measures to ensure both the DMS

and the Customer List information remained a secret.  *See e.g., Zabit, LLC*, 540 F.Supp.3d at

424.  Thus, applying the above six factors to assess the purported trade secrets, the Court finds

that Plaintiffs did not plausibly state the existence of a trade secret.  Therefore, Plaintiffs' trade

secret misappropriation claims under New York and federal law are dismissed.

**B.**   ***Injunctive relief under the DTSA --***
        ***18 U.S.C. § 1836, et seq – Against the Deo Defendants***

The DTSA and the VUTSA also permit an award of permanent injunctive relief. *See* 18

U.S.C. § 1836(b)(3)(A); *see also Smart Team Global, LLC v. HumbleTech LLC,* No. 19-CV-

4873 (AJN), 2022 WL 847301, at *11 (S.D.N.Y. Feb. 18, 2022).  Injunctive relief must,

however, be "narrowly tailored to fit specific legal violations" to "avoid unnecessary burdens of

lawful commercial activity."  *Id.* at 12 (quoting *Faivley Transp. Malmo AB v. Wabtec Corp*., 559

F.3d 110, 119 (2d. Cir. 2009)).  The DTSA cautions against injunctions that "prevent a person

from entering an employment relationship" or "otherwise conflicts with an applicable state law

prohibiting restraints on the practice of a lawful profession, trade or business."  *Id.; see also* 18

U.S.C. § 1836(b)(3)(A). "The DTSA expressly provides for injunctive relief. 18 U.S.C.

1836(b)(3)(A)." *Syntel Sterling Best Shores Mauritius Limited v. TriZetto Group, Inc.*, No. 15

Civ. 211 (LGS), 2021 WL 1553926, at *6 (S.D.N.Y. Apr. 20, 2021) (explaining plaintiffs are

permitted to seek "damages for actual loss caused by misappropriation; and...damages for any

unjust enrichment caused by the misappropriation... that is not addressed in computing damages

for actual loss; or... in lieu of damages measured by [those] methods, the damages... measured by

imposition of liability for a reasonable royalty for the mis appropriator's unauthorized disclosure

or use of the trade secret.").

Given that the DTSA claim against the Deo Defendants fails as a matter of law, Plaintiffs' claim for injunctive relief is likewise dismissed for failure to plead the substantive trade secret under DTSA's requirements, specifically relating to the reasonable measures taken to ensure the information was kept secret.

**C.   *Misappropriation under the DTSA – Against the Deo Defendants***

To allege misappropriation under the DTSA, "a complaint must plead that the defendant misappropriated a trade secret (1) by acquiring a trade secret by improper means, or (2) disclosing or using the trade secret without consent." *JAPNA, Inc. V. SELFX Innovations Inc.*, No. 22-cv-10753 (ALC) (RWL), 2024 WL 1250269 at *7 (Mar. 22, 2024) (quoting *ExpertConnect, L.L.C.*, 2019 WL 3004161, at *6 (citing *AUA Private Equity Partners, LLC* v. Soto, No. 17-cv-8035, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018)).  In other words, the DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *AUA Priv. Equity Partners*, 2018 WL 1684339, at *4 (citation omitted).  Under the DTSA, improper means includes "theft, bribery, misrepresentation, and breach or inducement of a breach of a duty to maintain secrecy, but excludes reverse engineering, independent derivation, or any other lawful means of acquisition." *Core SWX*, 2022 WL 3588081 at *9 (quoting *Altman Stage Lighting, Inc. V. Smith*, 20-CV-2575 (NSR), 2022 WL 374590 at *4 (S.D.N.Y. Feb. 8, 2022) and 18 U.S.C. § 1839(6)).

Under New York common law, "[a] plaintiff claiming misappropriation of a trade secret must prove: [i] it possessed a trade secret, and [ii] defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" *JAPNA, Inc.* 2024 WL 1250269 at *7 (quoting *Catalyst Advisors, L.P. v. Catalyst Advisors Investors Global Inc.*, 602 F. Supp. 3d 663, 671 (S.D.N.Y. May 10, 2022)).  Given the elements for a

misappropriation claim under New York law are fundamentally the same as elements required to sufficiently state a DTSA claim courts have found that if a plaintiff's complaint sufficiently pleads a DTSA claim, then it "also states a claim for misappropriation of trade secrets under New York law." *Catalyst Advisors, L.P.* 602 F.Supp.3d at 671 (quoting *Iacovacci v. Brevet Holdings, LLC.,* 437 F.Supp.3d 367, 380 (S.D.N.Y. 2020)).

As stated above, the Court finds that the Plaintiffs have not set forth sufficient facts to plausibly state that a trade secret exists here with respect to the Customer List or DMS, let alone that the purported trade secret was acquired through improper means, or disclosed or used without their consent. Plaintiffs allege that Urrutia, using his many years of experience and connections, taught Deo how to manage Superb with Tekion and used DMS to streamline dealership operations, inventory management, cash flow management, and reporting features that identify areas of improvement. *See* ECF No. 65 at ¶ 229; ECF No. 38-2 at 1, 38. Further, Plaintiffs allege that the DMS system was protected by password protection, firewalls and "other measures." *See* ECF No. 65 at ¶¶ 36-37. With respect to the Customer List, Plaintiffs contend it was the result of material effort between Superb, Clarke, and Irie Jam which they claim to be evidence of the list's value in secrecy. *Id.*

Ultimately, Plaintiffs' vague assertions that their alleged trade secrets were only accessible to employees who had a need for the information for work purposes are entirely vague and not enough to state a claim. *See e.g., Trahan v. Lazar*, 457 F.Supp.3d 323, 344 (S.D.N.Y. 2020) (finding that misappropriation by improper means is not adequately alleged when the subject information is willingly given, or where defendant acquired information in course of official duties while employed).

IV.  **_Unfair Competition – Against the Deo Defendants_**

"The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another with some element of bad faith." *ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744 at *4 (2d. Cir. Mar. 10, 2022) (quoting *Universal Instruments*, 924 F.3d 32, 50-51 (2d Cir. 2001)); *see also Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) ("The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship."). There is no explicit list of activities which constitute unfair competition; the general principle is that unfair competition occurs when there has been a misappropriation, for the commercial advantage of one person of a benefit or property right belonging to another. *Telecom Int'l Am., Ltd.* 280 F.3d at 197. New York's unfair competition law is a "broad a flexible doctrine that depends more upon the facts set forth" than in other causes of action and has been said to encompass "any form of commercial immorality." *Id.*

However, a claim for unfair competition by misappropriation "will fail where a plaintiff cannot demonstrate the bad faith misappropriation of a commercial advantage which belonged exclusively to him." *Big Vision Private Ltd. V. E.I. du Pont de Nemours and Co.*, 610 F.App'x 69, 70 (2d Cir. 2015) (quoting *LoPresti v. Mass. Mut. Life Ins. Co.*, 920 N.Y.S.2d 275, 277 (N.Y. App. Div. 2d Dep't 2006)) (a claim of unfair competition does not require a finding of breach of contract or misappropriation of a trade secret). Some courts also require a plaintiff to allege special damages by showing "direct financial loss, lost dealings, or an accounting of the profits resulting from the anticompetitive acts at issue." *Barbagallo v. Marcum* LLP, 820 F.Supp.2d

429, 446 (E.D.N.Y. Oct. 25, 2011) (quoting *Coca-Cola N. Am.*, Nos. 09 CV 3259(JG)(RML), 09

CV 3279 (ERK)(RML), 2011 WL 1882845 at *6 (May 17, 2011)); *but see Fairfield Financial*

*Mortg. Group, Inc. v. Luca*, 584 F. Supp.2d 479, 487 (E.D.N.Y. 2008) ("The Court is unaware of

any New York federal or state court that has held that special damages is an element of an unfair

competition claim."). To show special damages, it is sufficient to simply allege that defendant

diverted plaintiff's customers and business. *Barbagallo*, 820 F.Supp.2d at 447 (citing *CA, Inc. V.*

*Simple.com*, 621 F. Supp. 2d 45, 54 (E.D.N.Y. 2009)); *Out of the Box Promotions, LLC v.*

*Koschitzki*, 866 N.Y.S.2d 677, 681 (N.Y. App Div. 2d Dep't 2008)).

Although unfair competition often involves misappropriation of trade secrets pursuant to

the DTSA, a claim may also be based on misappropriation of client lists, internal company

documents, and business strategies "if wrongful or fraudulent tactics [are] employed."

*Barbagallo*, 820 F.Supp.2d at 447; *see also Berman v. Sugo LLC*, 580 F.Supp.2d 191, 209

(S.D.N.Y. 2008) (explaining that an unfair competition claim may arise from the

misappropriation of client lists, internal company documents, and business strategies).

Specifically, solicitation of an employer's customer by a former employee can be actionable if

there was wrongful conduct by the employee such as taking or copying the employer's files or

using the employer's confidential information. *Barbagallo*, 820 F.Supp.2d at 447.

Here, while DMS and the Customer List do not rise to the level of a trade secret, Urrutia

and Superb "invested significant labor, skill and money" in developing this technology for

Superb's use. *See Barbagallo*, 820 F.Supp.2d at 447. Plaintiffs allege that Urrutia's partnership

with Clarke in $1.5 million worth of advertising generated the substantial customer list which

could not possibly reverse engineered or independently generated without also substantially

investing in Irie Jam. *See* ECF No. 65 at ¶ 239. With respect to DMS, Urrutia similarly used his

own decades of experience in the industry to create Superb's business model premised on the

Tekion DMS.  *Id.* at ¶ 260.  In addition to labor and skill invested in the business model, Urrutia

customized the system for Superb's function and invested $120,000 to acquire this unique

competitive advantage for the dealerships.  *See* ECF No. 193 at 26. Although this information

was not found to meet the requirements of a trade secret, Plaintiffs are alleged to have

maintained the information's confidentiality, as is evidenced by it being kept on a computer

system secured with firewalls, usernames, and passwords accessible only to employees. *See* ECF

No. 65 at ¶ 266.

Regarding the necessary bad faith component, wrongful tactics were allegedly employed

to acquire this confidential client information since Plaintiffs allege Deo poached Superb

employees for his own Gold Coast dealerships and trained them in the Tekion DMS system.  *Id.*

at ¶¶ 235-36.  Furthermore, Deo and these employees allegedly used their time at Superb and

familiarity with its Customer List to redirect Caribbean listeners of Irie Jam to Gold Coast

dealerships.  *Id.* at ¶¶ 237-40; *see also Barbagallo,* 820 F.Supp.2d at 447 (finding that

solicitation of an employer's customer by a former employee may be actionable if there was

wrongful conduct by the employee such as taking or copying the employer's files or using the

employer's confidential information).

As such, Plaintiffs allege Deo effectively and illicitly channeled Urrutia's decades of

experience, the Customer List, and DMS customized for Superb into his own Gold Coast

dealerships.  *Id*. at ¶¶ 258-60.  Thus, Plaintiffs have pled sufficient facts to support their claim

that the Deo Defendants engaged in unfair competition, especially given other Courts have held

special damages to be sufficient when a plaintiff only alleges that defendant diverted plaintiff's

customers and business.  *See Barbagallo,* 820 F.Supp.2d at 447 (citing *CA, Inc. V. Simple.com*,

621 F. Supp. 2d 45, 54 (E.D.N.Y. 2009); *Out of the Box Promotions, LLC,* 866 N.Y.S.2d at 681.

## V.    *Tortious Interference with Contracts, Business Relations, and Prospective Economic Advantage – Against the Deo Defendants*

To establish intentional interference with contract under New York law, a plaintiff must

show: (1) "the existence of a valid contract between the plaintiff and a third party[;]" (2)

"defendant's knowledge of that contract[;]" (3) "defendant's intentional procurement of the

third-party's breach of the contract without justification[;]" (4) "actual breach of the contract[;]"

and (5) "damages resulting therefrom." *Lama Holding Co. v. Smith Barney, Inc*., 88 N.Y.2d 413,

424, 668 N.E.2d 1370, 1375 (N.Y. 1996).  The New York Court of Appeals has explained:

> [T]he degree of protection available to a plaintiff for a competitor's tortious interference
> with contract is defined by the nature of the plaintiff's enforceable legal rights. Thus,
> where there is an existing, enforceable contract and a defendant's deliberate
> interreference results in a breach of that contract, a plaintiff may recover damages for
> tortious interference with contractual relations even if the defendant was engaged in
> lawful behavior.

*NBT Bancorp v. Fleet/Norstar Fin. Group*, 664 N.E.2d 492, 496 (N.Y. 1996).

Here, to purchase inventory, Northshore and Sunrise maintained a "Floor Plan" credit

line with Ally Bank under which the Bank kept a lien on vehicles purchased through the Floor

Plan until the dealerships repaid Ally Bank the amount initially borrowed to buy the vehicles.

*See* ECF No. 65 at ¶¶ 77-85.  Northshore and Sunrise placed liens on titles of any financed

vehicles to protect lenders in the event the customer was to default, and, if the dealerships failed

to perfect any of these liens, they would have to repurchase the lender's loan to the customer.  *Id.*

at ¶¶ 99-101.  Furthermore, the failure to satisfy any of these loans or obligations could leave the

dealerships with both civil and criminal liability as well as risk losing their DMV licenses and

the ability of the licensees to obtain a license for other dealerships. *Id.* at ¶¶ 96-97, 103-04.

Plaintiffs allege that Deo acted as manager of Northshore and Sunrise, overseeing these

operations, and acted in a way that jeopardized their relationships and licenses. *Id.* at ¶ 76.

Specifically, it is alleged that Deo purchased then sold vehicles for "less than their
purchase price," incurring a deficiency of over $3,000,000. *Id.* at ¶¶ 86-89. As a result of this
conduct, IAG had to pay Ally Bank this deficiency to cure the floor plan's shortcomings. *Id*.
Deo's failure to have the dealerships pay existing loan and lease balances left vehicles' prior
owners liable despite their lack of ownership or possession. *Id*. at ¶¶ 92-95. Deo also sent out
vehicles to various garages for repair, and at least one garage placed a lien on at least one vehicle
resulting from Deo's failure to satisfy the lien, resulting in the garage selling the vehicle off in
auction. *Id.* at ¶¶ 77-85. Deo is further alleged to have engaged in "double flooring" whereby he
used one vehicle present and available for multiple loans to illegally receive twice the funding
for that single asset (*id.* at 99) by filling out applications for financing and making material
misrepresentations in said applications. *Id.* at ¶ 203.

In support of their claim for tortious interference with contracts, business relations, and
prospective economic advantage, Plaintiffs vaguely claim, "Deo Defendants were at all relevant
times aware of these agreements between Superb Plaintiffs and their banks, vendors, customers
and employees" and further that "Deo Defendants engaged in conduct designed to damage those
relationships." *See* ECF 176-1 at 386-87. However, Plaintiffs do not set forth sufficient facts to
support the Deo Defendant's actual knowledge nor intention to breach the Plaintiff's contracts by
their actions. Ultimately, even if the double flooring scheme were true and possibly caused
Superb to breach agreements with its lenders, nothing in the Amended Complaint alleges that the
Deo Defendants acted intentionally to interfere with the relation between Superb and its third-
party lenders without justification as is required. *See* ECF No. 176-1 at 13.

Furthermore, Plaintiffs do not explicitly allege an actual breach of the contract occurred
although they were required to compensate for deficiencies found on the Floor Plan managed by

Deo. *See Lama Holding Co.,* 668 N.E.2d 1370, 1376 (N.Y. 1996) ("*Lama*") (finding no tortious

interference claim was stated when that there was no allegation that the defendant intentionally

procured the plaintiff's breach of its contract with a third party, nor that the plaintiff in fact

breached its contract at all). In *Lama,* the plaintiffs, much like Plaintiffs here, charged that the

defendants' actions "wrongfully interfered with and frustrated the performance" of their

agreements. *Id.* However, that did not suffice to support their claim of tortious interference

because there was no allegation made that the defendant intentionally procured a breach, nor that

a breach ever occurred as a result of the actions. Furthermore, given tortious interference requires

intentional and improper interference in the business relationship between a third party and the

Plaintiffs, and that Plaintiffs have not sufficiently alleged the Deo Defendants' intent to do so,

and, therefore, Plaintiffs do not state a sufficient claim of tortious interference, and this claim is

dismissed.

## VI.    *Conversion – Against the Deo Defendants, Thomasson, Deo, and the Bank Defendants; Aiding and Abetting Conversion – Against Thomasson*

Conversion is defined as the "unauthorized dominion over personal property in

interference with a plaintiff's legal title or superior right of possession."  *LoPresti v. Terwilliger*,

126 F.3d 34, 41 (2d Cir. 1997) (internal quotation marks and citation omitted).  To succeed on a

conversion claim, New York law requires a plaintiff to show that (1) the defendant acted without

authorization; (2) the defendant exercised dominion or a right of ownership of property

belonging to plaintiff; (3) the plaintiff made a demand for the property; and (4) defendant refused

the demand for the return of the property.  *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F.

Supp. 2d 385, 396 (S.D.N.Y. 2012); *see Clark St. Wine & Spirits v. Emporos Sys. Corp.*, 754 F.

Supp. 2d 474, 484 (E.D.N.Y. 2010).

However, New York makes a distinction between conversion claims where a person wrongfully takes property and conversion claims where a person did not take the property but wrongfully retains it, such that where the original possession is lawful, conversion does not occur until the defendant refuses to return such property after demand. *Newbro v. Freed*, 409 F.Supp.2d 386, 402 (S.D.N.Y. 2006); *see also Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2 Cir. 1993). It follows necessarily that, where the defendant holds the property unlawfully from the start, such that demand would be futile because the circumstances show the defendant knows it has no right to the goods, a demand for the return of the property is not required. *New York v. Seventh Regiment Fund, Inc.*, 774 N.E.2d 702 (N.Y. 2002).

To state a claim for conversion under New York law, "a plaintiff must show: (1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Ancile Inv. Co. Ltd. V. Archer Daniels Midland Co.*, 784 F.Supp.2d 296, 312 (S.D.N.Y. 2011). A plaintiff does not need to show that the defendant had knowledge that he acted wrongfully, "but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *LoPresti*, 126 F.3d at 41. Conversion requires the defendant to exclude the true owner from exercising her rights over the goods at issue. *Pac. M. Int'l Corp.*, 888 F.Supp.2d at 396 (citing *Seventh Regiment Fund*, 774 N.E.2d at 702).

To state a claim for aiding and abetting conversion under New York law, plaintiffs "must allege (1) the existence of a primary violation; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *Berman v. Morgan Keegan & Co., Inc.*, No. 10 Civ.

5866 (PKC), 2011 WL 1002683 at *13 (S.D.N.Y. Mar. 14, 2011).

Money of course can be the subject of a conversion claim but "where the property is

money, it must be specifically identifiable and be subject to an obligation to be returned or to

be otherwise treated in a particular manner." *Cruz v. TD Bank, N.A.*, 855 F.Supp.2d 157, 174

(S.D.N.Y. 2012) (quoting *Republic of Haiti v. Duvalier*, 626 N.Y.S.2d 472 (N.Y. App. Div. 1st

Dep't 1995). With respect to bank defendants, funds in a bank account are generally "not

sufficiently specific and identifiable to support a claim for conversion against the bank." *Id.*

(citing *Fundacion Museo de Arte Contemporaneo de Caracas v. CBI-TDB Union Bancaire

Privee*, 160 F.3d 146, 148 (2d Cir.1998) (quoting *Chem. Bank v. Ettinger*, 602 N.Y.S.2d 332

(N.Y. App. Div. 1st Dep't 1993)). However, conversion can arise where a specific amount of

funds in a bank is withdrawn or transferred. *Id.* (citing *Payne v. White*, 477 N.Y.S.2d 456

(N.Y. App. Div. 3d Dep't 1984).

Additionally, a "conversion claim may only succeed if the party alleges a wrong that is

distinct from any contractual obligations." *Ultra Dairy LLC v. Kondrat*, 514 F.Supp.3d 452,

459 (N.D.N.Y. 2021). A plaintiff must properly allege that defendants "actively participated in

a fraud or conversion." *FDIC v. Concordia*, 2024 WL 4362783 at *4 (S.D.N.Y. Sept. 30,

2024) (citing *Scottenstein v. Lee,* No. 22-CV-1197 (DLC), 2023 WL 3363002 at *3 (S.D.N.Y.

July 6, 2023)) (holding that plaintiffs failed to state a claim for conversion against the

defendant when third parties made all the fraudulent wire transfers, plaintiffs set forth no facts

explaining the defendant's purported involvement in the conversion scheme other than his

control of an account that received stolen funds and no facts to suggest the defendant otherwise

knew he wrongfully possessed the plaintiff's property).

When an underlying act is alleged to be fraudulent, a claim of conversion must be pled

with specificity under Fed. R. Civ. P. 9(b). *See Silverman Ptnrs., L.P. v. First Bank*, 687 F. Supp. 2d 269, 288 (E.D.N.Y. 2010) ("[T]he heightened pleading standards of Rule 9(b) apply to torts that are premised on the defendant's alleged fraudulent actions. Thus, breach of fiduciary duty, conversion, and unjust enrichment must be pled with specificity when the underlying acts are allegedly fraudulent."). In addition, where the underlying wrong with respect to the aiding and abetting conversion claim is fraud, actual knowledge must also be alleged with particularity pursuant to Rule 9(b). *In re Agape Litigation*, 773 F.Supp.2d 298, 307 (E.D.N.Y. 2011).

Here, Plaintiffs allege that Deo treated Northshore, Sunrise, and their respective assets as his own. *See* ECF No. 65. at ¶ 118. Plaintiffs have sufficiently stated numerous allegations, which if true, would suffice to show that Deo exercised unauthorized dominion over Superb's personal property in interference with their legal title. *See Lopresti,* 126 F.3d at 41. Plaintiffs allege Deo has taken over $230,000.00 in customer cash deposits, rather than depositing them in Northshore's account as well as issued and signed checks from such accounts to pay for his personal expenses, such as $60,000.00 from Northshore to a corporation formed and owned by Deo. *Id.* at ¶¶ 119-121. Plaintiffs also allege that Deo employed the asserts of Nortshore to secure loans from Flushing Bank for the purpose of personally taking the proceeds all without the knowledge or approval of Northshore's members. *Id.* at ¶¶ 170-72.

Plaintiffs also specifically allege that on or about November 15, 2022, Deo falsely purported himself as the sole owner of Northshore to enter an agreement with Libertas Funding to sell $997,500.00 of Northshore's future receipts to Libertas for the purchase price of $735,000.00 all without the consent of Northshore's members. *Id.* at ¶¶ 148-50. Plaintiffs allege that Deo arranged for these funds to be deposited into Sunrise's bank account, from

which he was able to withdraw the funds and complete the scheme to wrongfully convert for himself the funds rightfully belonging to Northshore. *Id.* at ¶¶ 150-52.

With regard to the same Libertas Funding transaction, Deo fell under suspicion by the IAG Plaintiffs who suspected he did not have the right to act on Northshore's behalf which led to a dispute over where to deposit the funds. *Id.* at ¶¶ 157-58. At this point, Thomasson, who Plaintiffs allege was aware of the dispute and falsely presented himself as the attorney for Northshore, Sunrise, and Deo, arranged for the Libertas Funds to be placed in his attorney trust account for safekeeping pending resolution. *Id.* at ¶¶ 155, 157-59. The IAG Plaintiffs transferred the funds to Thomasson's attorney trust account, whereby Thomasson immediately disbursed the funds to Deo. *Id.* at ¶¶ 162-63.

Ultimately, Plaintiffs allege that the Deo engaged in conversion by enabling the transfer of the Libertas Funds paid by Libertas to Northshore for the purported sale of future receipts to instead be disbursed to Deo for his own personal use (*id.* at ¶¶161-66), and, in direct interference of Plaintiffs' rightful ownership. Plaintiffs also allege that despite due demand, Deo and Thomasson have refused to return to Northshore the assets converted, although such demand is not necessary because Deo knew the property did not belong to him as he purported the transaction as between Northshore and Libertas, not himself. *Id.* at ¶¶ 469, 475, 510. To this, the Court finds Plaintiffs have successfully alleged conversion as against the Deo Defendants and aiding and abetting conversion against Thomasson.

With respect to the Bank Defendants, Plaintiffs allege that the cash, checks, and wire transfer deposited into an account at Flushing Bank in the name of Superb by Deo without authority, in fact belong to Superb and that the funds in the account Superb maintained with Chase Bank belong to Superb. ECF No. 176 at ¶¶ 620-621. Plaintiffs broadly claim that both

Flushing Bank and Chase Bank "each exercised unauthorized dominion over the funds of

Superb to the exclusion of Superb's rights." *Id.* at ¶ 622.

Here, the Court finds Plaintiffs fail to state a claim for conversion, because Plaintiffs

set forth no facts explaining the Bank Defendants' purported involvement in the Deo

Defendants' scheme, other than control of the account by which fraudulent wire transfers were

made and funds were deposited. *See Schottenstein*, 2023 WL 4363002 at \*3 (holding that

without facts to demonstrate the defendant's involvement in the conversion scheme, facts that

show his control of an account that received stolen funds was insufficient). Furthermore,

Plaintiffs have not suggested that the Bank Defendants knew they wrongfully possessed the

Plaintiff's property, especially given Deo falsely claimed to be the sole owner of the

dealerships in order to open accounts and transfer funds without Superb's approval. *See id.*

(holding plaintiff failed to state a conversion claim when the plaintiffs failed to show they

made a demand for the return of their money from the defendant or that the defendant

otherwise knew he wrongfully possessed their property in the account he controlled); *see also*

ECF No. 176 at ¶¶ 209-210. Therefore, Plaintiffs have failed to set forth sufficient facts to

support a sufficient conversion claim as it pertains to the Bank Defendants, and the conversion

claim as against them is dismissed.

**VII.**   ***Unjust Enrichment Claims – Against Deo, Northshore, and Sunrise***

Under New York law a claim for unjust enrichment has elements of (1) the defendant

was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of

the benefit would be unjust." *Bartfield v. Murphy*, 578 F.Supp.2d 638, 648-49 (S.D.N.Y. 2008).

In New York, unjust enrichment is an equitable remedy available in cases where there is no

contract between the parties. *Marathon Enterprises, Inc. V. Schroter GMBH & Co.*, No. 01 Civ.

0595 (DC), 2003 WL 355238 at *9 (S.D.N.Y Feb. 18, 2003). It is rooted in the concept that a

person should not be allowed to unjustly enrich themselves at the expense of another and will

depend on "broad considerations of equity and justice." *Columbia Mem. Hosp. V. Hinds,* 192

N.E.3d 1128 (N.Y. 2022). Essentially, courts will determine if it goes against equity to permit a

party to retain what is sought to be recovered by assessing whether "a benefit has been conferred

on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if

there has been otherwise a change of position by the defendant, and whether the defendant's

conduct was tortious or fraudulent." *Id.*

Where, as here, there is no contract between the parties, privity is not required for an

unjust enrichment cause of action. *Financial Assistance, Inc. v. Graham,* 143 N.Y.S.3d 380

(N.Y. App. Div. 2d Dep't 2021).  However, an unjust enrichment cause of action will not stand

where the connection between the parties is too attenuated; such a claim requires a showing of

reliance and is based on an "obligation imposed by equity to prevent injustice, in the absence of

an actual agreement between the parties." *Id.* Notably, an unjust enrichment claim is not a

"catchall cause of action to be used when others fail." *Hesse v. Godiva Chocolatier, Inc.,* 463

F.Supp.3d 453, 473 (S.D.N.Y. 2020) (quoting *Stoltz v. Fage Dairy Processing Industry, S.A.,*

2015 WL 5579872, at *26 (E.D.N.Y. Sept. 22, 2015). Unjust enrichment claims will not survive

a motion to dismiss "where plaintiffs fail to explain how their unjust enrichment claim is not

merely duplicative of their other causes of action." *Id.* at 474 (quoting *Nelson v. MillerCoors,*

*LLC,* 246 F.Supp.3d 666, 679 (E.D.N.Y. 2017)).

Here, Plaintiffs allege, and this Court agrees, that if these allegations are taken as true,

Deo's retention of assets of Northshore and Sunrise have caused him to be unjustly enriched at

Northshore's expense, and the circumstances are such that equity and good conscience require

Deo to make restitution. *See* ECF No. 65 at ¶¶ 473-474; 479-480. Plaintiffs also assert numerous

instances where Deo took and used dealership assets for his own purposes, and at the expense of

the Plaintiffs' dealerships. *Id.* at ¶¶ 118-125. Plaintiffs allege that Deo treated Northshore and

Sunrise and their respective asserts as his own:

> For example, Deo allegedly took over $230,000.00 in customers' cash deposits, rather
> than rightly deposit the money in Northshore's accounts, issued and signed checks from
> Northshore bank accounts to be sent to his own corporation for his own personal
> expenses, used credit cards in Sunrise's name to pay for personal expenses and lastly,
> Deo's son  continues to drive, for personal use, a luxury Maserati, valued at almost
> $80,000 and paid for by IAG Plaintiffs' all of which was done without Plaintiffs' consent.

*Id.*

The Court finds Plaintiffs have sufficiently showed evidence that Deo was enriched at

Plaintiff's expense, which is the necessary component for a claim of unjust enrichment. *See*

*Marathon Enterprises, Inc.*, 2003 WL 355238 at *9 (finding plaintiffs did not have a claim for

unjust enrichment because the plaintiff was unable to show any evidence that the defendant was

enriched at the plaintiff's expense). With respect to the claims for unjust enrichment against

Northshore and Sunrise, Northshore and Sunrise are not named defendants in this action.

Therefore, those causes of actions must be dismissed.

**VIII.** ***Civil Conspiracy – Against the Deo Defendants***

New York law does not recognize a substantive tort of civil conspiracy. *Pope v. Rice*, No.

04 Civ. 4171 (DLA), 2005 WL 613085 at *13 (S.D.N.Y. Mar. 14, 2005) (citing *Durante Bros. &*

*Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 251 (2d Cir. 1985). Rather, a claim for civil

conspiracy requires is "evidence of an underlying actionable tort." *Id.* (quoting *Missigman v. USI*

*Northeast, Inc*., 131 F. Supp. 2d 495, 517 (S.D.N.Y. 2001)). The independent underlying tort

must be any "unlawful" act, or a "lawful" act done "in an unlawful manner." *Dell's Maraschino*

*Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F.Supp.2d 459, 482 (E.D.N.Y. 2012)

(citing *Arlinghaus v. Ritenour*, 622 F.2d 629, 639 (2d Cir. 1980)). Ultimately, a plaintiff's

allegations of conspiracy must serve to connect a defendant's conduct "with an otherwise

actionable tort." *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F.Supp.2d 485, 504

(S.D.N.Y. 2003).

      Once an underlying tort is established, a claimant must demonstrate the elements of civil

conspiracy which are: "(1) the corrupt agreement between two or more persons, (2) an overt act,

(3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting

damage." *Pope*, 2005 WL 613085 at *13. (quoting *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d

Cir. 1986) (applying New York law). As is the case with criminal conspiracies, civil conspiracy

agreements are not easily shown by direct evidence, "but may be inferred from circumstantial

evidence." *Dell's Maraschino Cherries Co.,* 887 F.Supp.2d at 482 (quoting *Cofacredit S.A. v.

Windsor Plumbing Supply Co.*, 187 F.3d 229, 240 (2d Cir. 1999)).

      Here, Plaintiffs allege that the Deo Defendants entered into a civil conspiracy to engage

in, *inter alia,* misappropriation, unfair competition, unjust enrichment, and tortious interference

with contract. *See* ECF No. 65 ¶¶ 400. As stated above, Plaintiffs failed to allege the underlying

torts of misappropriation of trade secrets and tortious interference. However, Plaintiffs also

allege the Deo Defendants entered into a civil conspiracy to engage in unfair competition and

unjust enrichment (ECF No. 65 at ¶¶ 400-405), which have been sufficiently pled as shown

above.

      Since an underlying actionable tort has been sufficiently plead, Plaintiffs must

demonstrate the elements of civil conspiracy. *See Pope,* 2005 WL 613085 at *13. Plaintiffs

allege that the Deo Defendants conspired with each other for an unlawful purpose, to wit: to

obtain Plaintiffs' confidential information and develop a business to compete using Plaintiffs'

confidential information and property obtained through fraud. ECF No. 65 at ¶ 399. Plaintiffs

further allege that the Deo Defendants each agreed to this common goal to obtain Plaintiffs'

confidential information and create a business to compete with Superb using such information

obtained through fraud with the specific purpose of harming the Superb Plaintiffs for their own

personal gain. *Id.* at ¶ 401.

Plaintiffs allege Deo poached Superb employees for his own Gold Coast dealerships and

trained them in the Tekion DMS system customized by Superb. *Id.* at ¶ 235-36.  Furthermore,

Plaintiffs allege that Deo and such employees used their experience at Superb and familiarity

with its customer list to redirect Superb customers to Gold Coast dealerships. *Id.* at ¶ 237-240.

The very essence of unfair competition claim under New York law is that the defendant

misappropriates the labors and expenditures of another with some element of bad faith, which is

established by these facts and overt acts committed by the Deo Defendants. *See ML Genius*

*Holdings LLC*, 2022 WL 710744 at *4. The Deo Defendants' intentional participation of this

purpose to obtain and utilize confidential information from Superb's dealership, resulted in

damage to the Plaintiffs. *See Barbagallo*, 820 F.Supp.2d at 447 (citing *CA, Inc. V. Simple.com,*

621 F.Supp.2d at 54) (special damages are sufficient when a plaintiff alleges that a defendant

diverted the plaintiff's customers and business).

Therefore, Plaintiffs' allegations of conspiracy serve to connect the Deo Defendants'

conduct with an otherwise actionable tort such that this claim may survive a motion to dismiss.

IX.   **_Fraud -- Against Deo and Jones_**

"The elements of fraud are a material, false representation, an intent to defraud thereby,

and reasonable reliance on the representation, causing damage to plaintiff." *Zurich Am. Life Ins.*

*Co. v. Nagel,* 590 F. Supp. 3d 702, 723 (S.D.N.Y. 2022) (citing *Chanayil v. Gulati*, 169 F.3d

168, 171 (2d Cir. 1999)).   These elements must be proven by clear and convincing evidence.

*Goodman v. Waugh,* 882 F. Supp. 64, 65 (S.D.N.Y. 1995). To survive a motion to dismiss under

Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud claims, a plaintiff

must "(1) specify the statements that the plaintiff contends were fraudulent[;] (2) identify the

speaker[;] (3) state where and when the statements were made[;] and (4) explain why the

statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (citation

omitted).  Under New York law, the elements of a common-law fraud claim are (1) a material

misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3)

intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to

the plaintiff.  *MetLife Invs. USA Ins. Co. v. Zeidman*, 734 F. Supp. 2d 304, 312 (E.D.N.Y. 2010)

(citing *Crigger v. Fahnestock & Co., Inc*., 443 F.3d 230, 234 (2d Cir. 2006)).

The necessary intent can be shown where a plaintiff establishes that an intentional or

reckless misstatement was made with the intent that the plaintiff relies on it or by showing that

the defendant had motive and opportunity to commit fraud. *Zurich American Life Ins. Co.*, 590 F.

Supp.3d at 723. Merely alleging that an individual had access to the information by which it

could have discovered the fraud is not enough. *See Meridian Horizon Fund, LP v. Tremont*

*Group Holdings, Inc.*, 747 F.Supp.2d 406, 413 (S.D.N.Y. 2010) (reasoning that elements of

common law fraud are "essentially the same" as those that must be pleaded to establish a claim

under Section 10(b) and Rule 10b-5); *In re aaiPharma Inc. Secs. Litig.*, 521 F.Supp.2d 507, 513

(E.D.N.C. 2007) (noting that "merely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library").

With respect to 9(b)'s heightened pleading standard for fraud claims, Plaintiffs assert that Deo enlisted the help of Thomas Jones and Jones CPA LLP to manipulate and falsify Northshore's and Sunrise's monthly financial reports with an intent to defraud the IAG Plaintiffs and Ally Bank. *See* ECF No. 65 at ¶¶ 130-35. With respect to elements (1), (2), and (3), Plaintiffs specify that these monthly statements compiled by Jones were fraudulent. *See Rombach*, 355 F.3d at 171. Plaintiffs allege that Deo, as general manager, was responsible for ensuring the dealership satisfied financing plans for its own inventory, its customers, and to provide accurate monthly financial so they could continue to receive the Floor Plan. ECF No. 65 at ¶¶ 87-88, 94, 102, 106-08, 128-29. During Deo's tenure overseeing and managing Northshore and Sunrise, Jones was engaged and paid by the dealerships to assist Deo in preparing the information to create the monthly financial reports. *Id.* at ¶132.

With respect to element (4), Plaintiffs allege that the monthly financial reports were fraudulent because they falsely showed Superb was profitable because according to Plaintiff's, the Defendants' conduct caused Superb substantial losses causing Superb to operate at a loss. *Id.* ¶¶ 424-25. Furthermore, Plaintiffs allege that these fabricated financial statements induced IAG Plaintiffs and Ally Bank to sustain the dealerships' Floor Plan (*id.* at ¶¶ 136-37) and Deo used these records to present himself as the true owner of Northshore to secure loans without the consent or knowledge of Northshore's true owners. *Id.* at ¶¶ 169-72. Plaintiffs also claim that had Deo provided IAG Plaintiffs and Ally Bank with the accurate monthly financial reports, IAG and Ally Bank would have discontinued providing the Floor Plan. *Id.* at ¶ 129.

Plaintiffs have adequately pleaded the elements of common-law fraud. The statements were made by Deo with knowledge of the falsity and with intent to defraud, however, not so with Jones. *See MetLife Invs. USA Ins. Co. v. Zeidman*, 734 F. Supp. 2d at 312. Plaintiffs broadly state that Jones "knew or should have known that the information provided or reviewed by him was false and nonetheless reported to Superb Plaintiffs that the dealership bank accounts were balanced and that there were no discrepancies or issues." ECF No. 65 at ¶¶ 427. Plaintiffs also sweepingly conclude that Jones submitted such financials "with an intent to defraud Superb Plaintiffs as he stood to gain compensation for engaging in fraud" without any more detail as to how. *Id.* at ¶ 428. These conclusory allegations are not sufficient to sustain a common law fraud claim. The paucity of allegations to support conclusions of an intent to defraud and knowledge of falsity, with the requisite particularity, fail to sustain a plausible claim against Jones. But, as to Deo, given his job duties and in light of the other claims at issue, the allegations are sufficiently plausible to survive a motion to dismiss as to him.

**X.** ***Article 4-A of the New York UCC – against Flushing Bank***

Article 4-A "governs the procedures, rights, and liabilities arising out of commercial electronic fund transfers," including wire transfers. *Niram, Inc. v. Sterling National Bank*, 697 F.Supp.3d 15, 21 (S.D.N.Y. 2023) (quoting *Grain Traders, Inc. V. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998); *see also* N.Y. U.C.C. § 4-A-102 & comment. Article 4-A "creates a scheme to set clear rules as to who bears the loss for unauthorized transactions. *Id.* (quoting *123RF LLC v. HSBC Bank USA, N.A.*, No. 21 CIV. 8519 (NRB), 663 F.Supp.3d 391, 400 (S.D.N.Y. Mar. 23, 2023). Section 4-A-204 of Article 4-A provides that a bank is obligated to refund a customer for a wire transfer issued in the customer's name that was unauthorized. *Niram*, 697 F.Supp.3d at 21

(explaining that § 4-A-102 "establishes that a bank must refund a payment it issued if the payment was not authorized and not effective as the order of the customer.")

The most common issue that arises in analyzing these claims is whether the transfers at issue were "authorized" or not. *Id.* at 22 (explaining that a payment order is "authorized" if the sender authorized the order or is otherwise bound by it under the law of agency). Furthermore, "ineffective transfers are those in which the bank has not properly executed security procedures." *Id.* at 23 (explaining that a security feature is "effective" if it is "commercially reasonable," and second, if the bank acted "in good faith" and "in compliance with the security procedure and any other written agreement or instruction"). However, if the bank follows commercially reasonable security procedures, the loss for an unauthorized transaction falls on the customer. *123RF LLC*, 663 F.Supp.3d at 400. Whether the security procedures are commercially reasonable is a question of law decided by the court which considers, "the wishes of the customer expressed to the bank, the circumstances of the customer known to the bank, including the size, type and frequency of payment orders normally issued by the customers to the bank, alternative security procedures offered to the customer, and security procedures in general use by customers and receiving banks similarly situated." *Id.*

An agent must have authority, whether actual or implied, to bind his principal. *Highland Capital Management LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010). Under New York law, an agent has actual authority if the principal has granted the agent power to enter contracts on its behalf, subject to whatever specified limitations are in place, either explicitly or implicitly. *Id.* (citing *Ford v. Unity Hosp.*, 299 N.E.2d 659, 664 (N.Y. 1973)). When an agent lacks actual authority to initiate or authorize a transfer, "he may nonetheless bind his principal to a contract if he has created the appearance of authority, leading the other contracting party to reasonably

believe the actual authority exists." *Niram*, 697 F.Supp.3d at 27. To assert apparent authority, it is essential to show words or conduct of the principal, communicated to the third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. *Highland Capital Management*, 607 F.3d at 328. Furthermore, a party may not claim an agent acted with apparent authority when it "knew or should have known that the agent was exceeding the scope of its authority." *Id.* (quoting *Sphere Drake Ins. Ltd. V. Clarendon Nat'l Ins. Co.,* 263 F.3d 26, 33 (2d Cir. 2001)).

Relevant here, Article 4-A encourages banks to adopt appropriate security procedures such that a bank may not disclaim its liability for unauthorized transfers unless a commercially reasonable security procedure is in place or at least has been offered to the customer. *Regatos v. North Fork Bank*, 838 N.E.2d 629, 632-33 (N.Y. 2005). This Article was also intended to promote the finality of banking operations and to spare banks from unknown liability of potentially indefinite duration. *Id.* at 403, 633, 717. Article 4-A may preclude common law claims when such claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4-A. *123RF LLC*, 663 F.Supp.3d at 401. In deciding if a claim is preempted by Article 4-A, "the critical inquiry is whether the provisions protect against the type of underlying injury or misconduct alleged in a claim." *Id.* (quoting *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d. Cir. 2010).

Article 4-A's text strong suggests that it applies to claims asserting the existence of unauthorized wire transfers regardless of what the claim may be called, and, in any event, the accompanying commentary is pellucid on the issue. *Ma*, 597 F.3d at 90. Article 4-A governs electronic fund transfers which are "series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order" and are

completed "by acceptance by the beneficiary's bank of a payment order for the benefit of the

beneficiary of the originator's payment order." *Ma*, 597 F.3d at 87. Under this definition, the

Flushing Bank wire transfers constitute electronic fund transfers governed by Article 4-A. *Id.* at

88.

Here, Plaintiffs allege that the fraudulent transfers at issue were not authorized, and the

Deo Defendants did not have authority to make transfers or sign checks on behalf of Superb,

Northshore, or Sunrise dealerships. ECF No. 65 at ¶ 439.  Plaintiffs maintain, and the

Shareholders' Agreement corroborates, that Deo and the remaining Defendants lacked authority

to enter into the fraudulent transfers. *Id.* at ¶ 441; *see also Highland Capital Management LP*,

607 F.3d at 327. Even if the Deo Defendants lacked the actual authority to initiate or authorize a

transfer, they may nonetheless be capable of binding their principal to a contract they are shown

to have created the appearance of authority leading the other contracting party, in this case, the

Bank Defendants, to reasonably believe the actual authority exists. *See Niram*, 697 F.Supp.3d at

27. For the Bank Defendants to assert Deo had apparent authority, they would need to show

words or conduct of the principal, in this case the Superb Plaintiffs, communicated to them, that

gave rise to the appearance and belief that the Deo Defendants possessed authority to enter a

transaction. *See Highland Capital Management*, 607 F.3d at 328. Furthermore, there are no facts

to suggest that Plaintiffs communicated to Flushing Bank any information that would give cause

for them to believe Deo possessed authority to enter a transaction. *See Highland Capital

Management,* 607 F.3d at 328.

Plaintiffs allege that Flushing Bank knew, or should have known, that Deo had no

membership interest in Northshore or Sunrise to authorize such transactions or at the very least

that a commercially reasonable actor, or in this case a sophisticated bank, would have been

alerted to the fact that the transfers were fraudulent and thus unauthorized. ECF No. 65 at ¶¶

442-444. Plaintiffs allege that if those inquiries had been made, then Flushing would have been

able to confirm that Deo lacked actual authority. *Id.* at ¶¶ 444-445. In addition, Plaintiffs allege

that Flushing Bank had actual knowledge that Urrutia, not Deo, was the majority shareholder of

Superb and sole member of shareholder of his remaining dealerships because Urrutia had

previously provided Flushing Bank with all information concerning his ownership interest in

Superb. *Id.* at ¶ 454.

      Accordingly, these allegations sufficiently state a claim pursuant to Article 4-A against

Flushing Bank to withstand a motion to dismiss.

**XI**    ***Negligence – Against Flushing Bank and***
       ***Chase Bank; Unauthorized Payments – Against Flushing Bank***

      The elements of a negligence under New York law claim are well settled: (1) a duty owed

by the defendant to the plaintiffs; (2) breach of that duty; and (3) injury substantially caused by

that breach. *Cheeseboro v. Little Richie Bus Servs., Inc.*, 254 F. Supp. 3d 485, 490 (E.D.N.Y.

2017) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002)). At

issue here is the threshold question of whether Defendant owed a duty to the Plaintiffs in

undertaking the 1031 Exchange and filing tax paperwork and paying taxes on Plaintiffs'

beAccordingly, alf.  "The existence of duty is an essential element of a negligence claim

because, '[i]n the absence of a duty, as a matter of law, no liability can ensue.'" *Farash v. Cont'l

Airlines, Inc.*, 574 F. Supp. 2d 356, 367 (S.D.N.Y. 2008) (quoting *McCarthy v. Olin Corp.*, 119

F.3d 148, 156 (2d Cir. 1997)).  Determining the existence and contours "of an alleged

tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to

submitting anything to fact-finding or jury consideration." *Palka v. Servicemaster Mgmt. Servs.

Corp.*, 634 N.E.2d 189 (N.Y. 1994).

The breadth of one's duty to another depends on the relationship of the parties, whether the injured party was within the zone of foreseeable harm, and whether that harm fell within a category of reasonably foreseeable harms that the duty exists to prevent. *Id.* (citing *Di Ponzio v. Riordan*, 679 N.E.2d 616 (N.Y.1997). This of course is the lesson of *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928)).

Here, Plaintiffs allege that Flushing Bank owed Superb Plaintiffs a duty of care to act in a manner consistent with commercially reasonable standards and that they failed to do so by following their own "Know Your Customer" procedures, which resulted in enabling Deo to fraudulently open an account with the bank when he falsely stated he was the sole shareholder of Superb. *See* ECF No. 65 at ¶¶ 452-455. Furthermore, Plaintiffs claim both Flushing Bank and Chase Bank are liable for negligence because each failed to conduct "proper due diligence" into whether Deo had the authority to open a new account in Superb's name and sign checks on Superb's existing account which Plaintiffs allege to be a breach of duty of care to the Superb Plaintiffs. *See id.* at ¶¶ 627-630.

However, Article 4-A controls how electronic funds transfers are conducted and specifies certain rights and duties related to the execution of such transactions. *Ma*, 597 F.3d at 89. Article 4-A calls for banks to adopt certain security procedures, controls the timing for executing payments, and assigns responsibility for reporting erroneous electronic debits. *Id.* Article 4-A's principal purposes are to protect against erroneous and unauthorized electronic transfers and to cabin banks' liability for unreported errors. *Id.* at 90. Plaintiffs' negligence claims with respect to the Bank Defendants are preempted by Article 4-A because any common law claims regarding the existence of unauthorized wire transfers and the mechanics of how those transactions were

conducted fall within the regime of Article 4-A and are therefore precluded. *123RF LLC v.
HSBC Bank USA, N.A.*, 663 F.Supp.3d 391, 401 (S.D.N.Y. 2023).

To be sure, courts in this Circuit have found that claims that defendant "violated its duty
of care by negligently honoring" unauthorized transfers, "fall entirely within the coverage of
Article 4-A, which creates a comprehensive risk allocation for unauthorized fund transfers," and
are thus preempted. *See 123RF LLC*, 663 F.Supp.3d at 401 (citing *Banco del Austro v. Wells
Fargo Bank, N.A.*, 215 F.Supp.3d 302, 306-07 (S.D.N.Y. 2016)). In other words, the negligence
claims here against the Bank Defendants cover the same territory as Article 4-A, because the
predicates for the negligence and breach of Article 4-A claims are the same. *Id.* The negligence
claim here concerns the unauthorized transactions and the way in which they occurred which is
the same type of claim covered by Article 4-A and thus precluded against with respect to the
Bank Defendants. *Id.*

Superb Plaintiffs also seek to hold Flushing liable for unauthorized payments in the
amount of "at least $500,000." ECF No. 65 at ¶ 635. Once the Bank accepted Deo's deposits, it
let these funds be disbursed from accounts in Superb's name; however, these funds belonged to
Superb. ECF No. 65 at ¶¶ 632-33. Moreover, Superb Plaintiffs maintain Chase is liable as the
drawee bank for the full amount ("at least $250,000") of checks Deo signed and issued from
Superb's account. ECF No. 65 at ¶¶ 640-41. Although Chase supposedly had on file the
authorized signatories on Superb's account, which did not include Deo, the Bank still paid
checks Deo signed from the dealership's accounts. ECF No. 65 at ¶¶ 637-39.

With respect to the unauthorized payment claim against Flushing Bank, the claim covers
the same territory as Article 4-A as it concerns the same unauthorized transactions and the way
in which the occurred. *See 123RF LLC*, 663 F.Supp.3d at 401. This unauthorized payment claim

with respect to Flushing Bank is similarly preempted by Article 4-A. Put simply, it is yet a common-law claim arising out of the existence of unauthorized wire transfers and the mechanics of how those transactions were conducted, which, like the negligence claim, falls squarely within the coverage of Article 4-A, and therefore is precluded. *See id.*

## XII.    *Drawee Liability – Against Chase Bank*

Most forged check endorsements are ineffective, meaning the instrument will not authorize the drawee bank to pay it from the drawer's account. *Underpinning & Foundation Constructors, Inc. v. Chase Manhattan Bank, N.A.*, 46 N.Y.2d 459, 464-65 (N.Y. 1979) ("*Underpinning*"). That, in turn, means any payment on the check comes from the property of the drawee, and not the drawer – thus, whatever the depository bank does with that payment, it is not a conversion of the drawer's property. *Id.* at 465. To this end, in most drawer/drawee conversion actions, the drawee bears the losses, and naturally, the payee has the cause of action, rather than the drawer, against that drawee. *Sony Corp America v. American Exp. Co.*, 455 N.Y.S.2d 227, 229-30 (N.Y. Civ. Ct. 1982).

However, where there is an effective endorsement (and thus authorization), the drawee pays on that instrument with the *drawer's* funds, and the drawer's interest may be the basis against the depositary bank that wrongfully obtains that money. *Underpinning*, 46 N.Y.2d at 466. Naturally, when an indorsement is effective, no action would lie against the depository bank for payment over the forged indorsement because the drawee is deemed to be paying out its own money because it cannot charge the drawer's account without authorization. *Id.* In summary, a drawer may directly sue a depository bank which has honored a check in violation of a forged restrictive indorsement in situations in which the forgery is effective. *Id.* at 468. In most forged indorsement cases, the party who first took the check from the forger will ultimately be liable

because it is the party who takes from the forger first who is in the best position to verify the indorsement. *Id.* However, that will not always be the case; for example, if the forgery is the result of some other interested party's negligence, the burden may ultimately be placed on that party. *Id.*

Of course, a "tainted check" puts the drawee on constructive notice of an ineffective authorization, but in those "rare instances" where the depository bank has acted wrongfully while the drawee has proceeded diligently, the drawer may proceed against the depositary bank. *Id*. For a forged instrument to be effective, courts look for whether: (1) an imposter has induced the maker or drawer to issue him the instrument, (2) one signing as or on behalf of the maker or drawer intends the payee to have no interest in the instrument, or (3) an agent or employee of the maker or drawer has supplied him with the name of the payee, but intending that the payee have no such interest. *See Leigh Co. v. Bank N.Y.*, 617 F.Supp. 147, 151 (S.D.N.Y. 1985); *see also* N.Y. U.C.C. § 3-405. With respect to (3), the indorsement is deemed to be effective, and the drawer is thus precluded from recovering solely on the basis of the forgery from banks which honor the check. *Underpinning*, 46 N.Y.2d at 468 (reasoning that "as a practical matter the drawer is in a better position to prevent the fraud by utilizing proper accounting methods, than is even the first party to take from the forger"). In instances where it is clear that the loss could have been most readily prevented by the drawer, the code may place the loss upon the drawer as a matter of law. *Id.*

Here, Plaintiffs allege that Chase Bank is liable for the full amount ("believed to be at least $250,000") of checks paid from Superb's account and signed by Deo because the bank had authorized signatories on file and Deo was not one of them, yet Deo still signed checks from Superb's account and Chase Bank paid them. *See* ECF No. 65 at ¶¶ 636-641. Because ordinarily,

a drawer of a check has no cause of action against a depository bank for acceptance of and payment on a forged indorsement since that bank is deemed not to have dealt with any valuable property of the drawer, Plaintiffs have not sufficiently stated a claim for drawee liability against Chase Bank. *See Leigh Co.*, 617 F. Supp. at 151.

Even if the indorsement was forged, yet effective, and the indorsement validly authorizes the drawee bank to withdraw funds from the drawer's account, the Code views the drawer himself or herself as in the best position, among all innocent parties to the transaction, to prevent or detect the forger's deception. *Leigh Co.*, 617 F. Supp. at 151. Plaintiff has a cause of action against Chase Bank only if the bank (1) dealt with the checks in violation of their restrictive indorsements, or, (2) did not deal with the checks or their proceeds in accordance with reasonable commercial standards. *See id.* at 152. However, the complaint does not allege that the bank committed either of these errors; therefore, no matter who's agent Deo was, Plaintiffs cannot defeat Chase Bank's motion to dismiss on drawee liability. *See id.*

**XIII.** ***Violation of New York UCC §3-419 – Against Flushing Bank and Chase Bank***

UCC § 3-419 provides that:

(1) An instrument is converted when (a) a drawee to whom it is delivered for acceptance refuses to return it on demand; or (b) any person to whom it is delivered for payment refuses on demand either to pay or return it; or (c) it is paid on a forged indorsement

(2) In an action against a drawee under subsection (1) the measure of the drawee's liability is the face amount of the instrument. In any other action under subsection (1) the measure of liability is presumed to be the face amount of the instrument.

(3) Subject to the provisions of this Act concerning restrictive indorsements, a representative, including a depository or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

*Kaplan v. Valley Nat. Bank,* 41 N.Y.S.3d 719, 52 Misc.3d 1210(A), 2016 WL 3939922 at *3

(N.Y. Supp. Ct. 2016) ("*Kaplan*"). In *Kaplan,* the plaintiff contended, but failed to sufficiently

plead, that the bank violated this statute by accepting a check without an indorsement, obtaining

payment from the payor bank, and allowing third parties to draw against the funds which was not

commercially reasonable under the circumstances. *Id.*

Depository and collecting banks are absolved from liability to payees or true owners of

negotiable instruments unless (1) they pay out over a restrictive indorsement, (2) they actually

retain proceeds of the instrument in the customer's account, or (3) they failed to act in good faith

or in accordance with reasonable commercial standards. *Id.* "Good faith" is defined as "honest in

fact in the conduct or transaction concerned." *Id* at *4. The common law rule in New York

before enactment of the Code was that "a drawer had no direct action against a depository bank;

its remedy was against the drawee bank," and "the Code did not change the rule." *Lesser v. TD*

*Bank, N.A.*, 463 F.Supp.3d 438, 447 (S.D.N.Y.) (quoting *Prudential-Bache Sec., Inc. V.*

*Citibank, N.A.*, 536 N.E.2d 1118 (N.Y. 1989)). Rather, the Code added defenses that make it

even more difficult for a drawer to recover against a depository bank. *Id.*

Here, Plaintiffs allege that Flushing opened an account in the name of Superb, when it

knew or had reason to know Deo was not, as he represented, the owner of Superb, and thus did

not act in a commercially reasonable manner. *See* ECF No. 65 at ¶ 609. Furthermore, Plaintiffs

allege that Flushing Bank did not employ reasonable due diligence when Deo opened this

account since they had documentation to contradict Deo's claim. *Id.* at ¶ 611. Plaintiffs assert

that Flushing Bank, as a depository or collecting bank, is liable, pursuant to UCC § 3-419(3) to

Superb, the true owner of any cash deposits from Superb deposited by Deo into an account

opened by him at Flushing Bank for the full amount of any such cash deposits as well as any

checks made payable to Superb deposited in these accounts *Id.* at ¶ 612. Similarly, Plaintiffs assert that Chase Bank committed similar infractions by permitting Deo to draw checks on Superb's account when it knew or had reason to know Deo was not an authorized signer on Superb's account, such that it did not act in a commercially reasonable manner.

However, none of the three situations which would allow a depository or collecting bank to be held liable to payees have occurred because Plaintiffs have failed to allege that the Bank Defendants were not acting in "good faith" or in accordance with reasonable commercial standards when they carried out these transactions. *See Kaplan,* 2016 WL 3939922 at *4. The record does not reflect any dishonesty of the Bank Defendants' handling of this money, nor did the Bank Defendants retain any of the proceeds of the money deposited. *See id.* Aside from Plaintiffs' broad conclusory allegations, there are not facts sufficient to allege that the Bank Defendants here dealt with the accounts in a manner that did not comport with good faith and in accordance with reasonable commercial standards. *See id.* Therefore, the Bank Defendants are not liable under UCC § 3-419, and this claim asserted against them is dismissed.

## XIV. *Professional Malpractice – Against Jones CPA LLP*

Under New York law, professional malpractice requires a showing of three elements: (1) negligence (2) which is the proximate cause of (3) damages. *MF Global Holdings Ltd. V. Pricewaterhouse Coopers LLP*, 199F.Supp.3d 818, 829 (S.D.N.Y. 2016). In other words, a *prima facie* case of negligence, gross negligence, or professional malpractice requires the plaintiff to show: (1) a duty to the plaintiff; (b) a breach of duty; (c) a reasonably close causal connection between the contact and the resulting injury; and (d) actual loss, harm or damage. *Cromer Finance Ltd. v. Berger*, 137 F.Supp.2d 452, 495 (S.D.N.Y. 2001) (explaining that New York labels "professional malpractice" a "species of negligence").

To prove liability for professional negligence, a plaintiff must show: (1) the plaintiff contracted for the service, or the service ordinarily would be performed in the course of professional performing its obligations under the contract; (2) the defendant's professional services "departed from accepted standards of practice in the relevant field[;]" and (3) the departure proximately caused the plaintiff's injuries. *MF Global Holdings Ltd.*, 199 F.Supp.3d at 829. The Second Circuit has held that to establish negligent misrepresentation under New York law against a professional when there is no contractual relationship – and thus no privity to give rise to a duty – the plaintiff must specifically establish: (1) that the accountant was aware that the reports would be used for a particular purpose; (2) in furtherance of which a known party was intended to rely; and (3) some conduct by the accountant "linking" him or her to that known party. *Cromer Finance Ltd.*, 137 F.Supp.2d at 495-96.

The standard of care required of a professional demand he or she will "exercise the skill and knowledge normally possessed by members of his or her trade or profession in good standing in similar communities." *MF Global Holdings Ltd.*, 199 F.Supp.3d at 830. Like any other negligence action, a plaintiff must show "beyond the point of speculation and conjecture, a causal connection between its losses and the defendants' actions" such that but for the alleged malpractice, it would not have sustained the damages. *Id.* Furthermore, proof of proximate cause is an essential element in accountant malpractice claims because a defendant is only liable to "those with respect to whom his acts were a substantial factor in the sequence of responsible causation." *Id.* An intervening act may not relieve an actor of responsibility, where the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence. *Id.*

Relevant here, an accountant owes a duty of care for services relied upon by plaintiffs who are part of a specific and identifiable group rather than a "faceless or unresolved class of persons." *Cromer Finance Ltd.*, 137 F.Supp.2d at 496 (quoting *White v. Guarente,* 372 N.E.2d 315, 318-319 (N.Y. 1977)). Conduct is "linking conduct" if there is some form of direct contact between the accountant and the plaintiff, such as face-to-face conversations, exchanging of documents, or other "substantive communication" between the parties. *Id.*

A representation certified as true to the knowledge of the accountants when they do not have such knowledge, a reckless misstatement, or an opinion made on flimsy grounds such that the conclusion must be there was no genuine belief in its truth, are all sufficient upon which to base liability. *In re Allou Distributors, Inc.* 395 B.R. 246, 259, 15 N.E.2d 416 (E.D.N.Y. 2008) (quoting *State Street Trust Co.,* 278 N.Y. 104, 112 (N.Y. 1938)). Gross negligence has been found where "several acts of negligence with foreseeably cumulative effect." *In re Allou Distributors, Inc.*, 395 B.R. at 260. Furthermore, the refusal or inability to see or investigate an obvious doubt among finances may warrant an inference of fraud. *See id.* (explaining that "a refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet.").

Here, Defendant Jones CPA LLP is an accounting firm consisting of Certified Public Accountants. *See* ECF No. 65 at ¶ 407. Plaintiffs allege that in or before March 2023, Superb engaged the services of Jones CPA LLP, by and through the conduct of Deo, to perform various accounting services for Superb such as monthly reconciliation of bank accounts, including general ledger, profit and loss, and inventory, as well as preparation of monthly financial statements required to be sent to Superb's lenders, such as Ally Bank, for the Floor Plan. *Id.* at ¶¶

408-409, 643-645. Plaintiffs maintain that under the standards of care prevailing in the

accounting industry, Jones CPA LLP had an affirmative duty to Superb Plaintiffs to undertake

such tasks with caution and care, and to be vigilant for discrepancies or irregularities and to

report any such findings accordingly (*id.* at ¶ 411) and a duty under Article V of the Principles of

Professional Conduct of the AICPA Code of Professional Conduct to identify and inform

Plaintiffs of any red flags. *Id.* at ¶ 412. Furthermore, Plaintiffs allege that Jones CPA LLP failed

to exercise independence and due professional care "in a variety of ways" including failing to

notice, investigate and/or report to Urrutia the existence of Deo's scheme to create a false record

that he is the 100% owner of Superb Plaintiff's dealerships and to fail to report missing cash

never deposited into Superb Plaintiffs' dealership bank accounts despite seeing cash receipted in

the DMS systems. *Id.* at ¶ 413. Plaintiffs allege that the negligence and wrongful and deficient

conduct proximately caused them to suffer damages that would be reasonably foreseeable. *Id.* at

¶¶ 419-420, 655-657.

However, Plaintiffs have failed to show that "but for" Jones CPA LLP's alleged

malpractice, they would not have sustained some actual ascertainable damages. *See e.g., Herbert*

*H. Post & Co. V. Sidney Bitterman*, 639 N.Y.S.2d 329 (N.Y. App. Div. 1st Dep't. 1996).

Therefore, Plaintiffs have not stated a cause of action for professional malpractice because the

operative Complaint fails to set forth the requisite allegation that, "but for" the accountants'

alleged malpractice, the plaintiff would not have sustained some actual ascertainable damages.

*See Franklin v. Winard*, 606 N.Y.S.2d 162, 164 (N.Y. App. Div. 1st Dept. 1993). Plaintiffs have

also failed to set forth conduct grossly departing from generally accepted accounting standards

aside from broad and conclusory allegations of "failing to notice, investigate and/or report" the

fraud committed by Deo. *See* ECF No. 65 at ¶ 413.  Plaintiffs specifically failed to set forth any

facts to show, with any degree of specificity, how Jones' conduct fell below standards of care prevailing in the accounting industry. Therefore, Plaintiffs' allegations do not state a sufficient claim to support professional malpractice against Jones CPA LLP.

## XV.   *Plaintiffs' Breach of Duty Claims*

### A.   *Breach of Duty of Loyalty – Against Deo*

New York law mandates that an agent "be loyal to his employer and [is] prohibited from acting in any manner inconsistent with [their] agency or trust and [is] at all times bound to exercise the utmost good faith and loyalty in the performance of [their] duties. *Calderon v. Mullarkey Realty, LLC,* No. 14-CV-2616 (PKC)(RLM), 2018 WL 2871834 at *7 (E.D.N.Y. June 10, 2018) (quoting *Phansalkar v. Andersen Weinroth & Co., L.P.,* 344 F.3d 184, 200 (2d Cir. 2003)). The duty of loyalty applies to cases "where the employee acts directly against the employer's interests" such as embezzlement. *Pozner v. Fox Broadcasting Co.*, 59 Misc. 3d 897, 900 (N.Y. Sup. Ct. 2017) (internal citations omitted). Employees owe to their employer a duty of good faith and loyalty while performing their duties. *Qosina Corp. v. C & N Packaging, Inc.*, 948 N.Y.S.2d 308, 310 (N.Y. App. Div. 2d Dep't 2012).

Employees may not act in ways contrary to the interests of their employer. *Id.* Furthermore, "when one who owes a duty of fidelity to a principal is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *Phansalkar v. Andersen Weinroth & Co., L.P.,* 344 F.3d 184, 200 (2d Cir. 2003). In addition, absent an agreement that states otherwise, "an employee who makes a profit or receives a benefit in connection with transactions conducted by him on behalf of his employer is under a duty to give such profit or benefit to his employer, whether or not it was received by the employee in violation of his duty of loyalty." *Phansalkar*, 344 F.3d at 203 (quoting *Western*

*Elec. Co.,* 360 N.E.2d 1091 (N.Y. 1977)). When an employee violates this duty, "not only must the employee or agent account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal." *Id.*

Here, Plaintiffs allege that, as an employee and general manager of Northshore and Sunrise, Deo owed duties of loyalty and good faith to Northshore and Sunrise which he breached. *See* ECF No. 65 at ¶¶ 477, 483-484. Plaintiffs allege that Deo, through fraudulent means, and without the knowledge and consent of Northshore's members, sold the Future Receipts and acquired the Libertas Funds for himself and to the damage of Northshore and Plaintiffs. *Id.* at ¶¶ 498-501. Accepting all the facts alleged as true, Plaintiffs have presented sufficient facts to support that Deo acted in ways contrary to the interests of his employer and even has been alleged to act directly against his employer's interests. *See Pozner,* 59 Misc.3d at 900 (finding that as an employee of the company, the employee owed the company a duty of loyalty, which bound him to exercise "the utmost good faith and loyalty in the performance of his duties" and was "prohibited from acting in any manner that was inconsistent with his agency."). The operative Complaint thus adequately states a cause of action for breach of duty of loyalty with respect to Deo.

**B.**     ***Aiding and Abetting Breach of Duty of Loyalty – Against Thomasson***

Under New York Law, a claim for aiding and abetting a breach of fiduciary duty requires the following elements: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Tilebar v. Glazzio Tiles,* 723 F.Supp.3d 164, 205 (E.D.N.Y. 2024). Furthermore, the claimant must show that the alleged aider and abettor provided "substantial assistance" to the breaching party which can be shown when the aider and abettor affirmatively

assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.
*Id.* However, the mere inaction of an alleged aider and abettor will only constitute substantial
assistance if the defendant owes a fiduciary directly to the plaintiff. *Id.*

Here, Plaintiffs allege that, as set forth above, Thomasson aided and abetted Deo's breach
of the duty of loyalty in selling the Future Receipts so as to acquire the Libertas Funds for Deo's
own personal benefit. *See* ECF No. 65 at ¶ 540. Plaintiffs allege that Thomasson falsely claimed
himself to be the rightful attorney for Northshore to induce the IAG Plaintiffs to transfer the
funds to Thomasson's escrow account for the benefit of Northshore. *Id*. at ¶¶ 506-510. Plaintiffs
further allege that Thomasson not only failed to safeguard the Libertas Funds, when he knew
they were in dispute, but that he intentionally and without authority, disbursed the funds to Deo,
knowing they belonged to Northshore, interfering with Northshore's right of possession. *Id.*
Thomasson's alleged involvement in the transfer of the funds provided Deo with "substantial
assistance" in his fraudulent endeavors and thereby enabled the breach to occur. *See Tilebar,* 723
F.Supp.3d at 205. Given that: (i) Deo's breach of his fiduciary obligations to Plaintiffs, these
facts are sufficient to state a claim, that (ii) Thomasson knowingly participated in the breach, and
(iii) that Plaintiffs' suffered damage as a result, *see e.g., Tilebar,* 723 F.Supp.3d at 205, the Court
finds the operative Complaint adequately stated a cause of action for aiding and abetting a breach
of duty of loyalty with respect to Thomasson.

## C.    *Breach of Fiduciary Duty – Against Deo*

To state a claim for breach of fiduciary duty under New York law, a plaintiff must satisfy
three elements: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii)
damages resulting therefrom." *Leighton v. Poltorak*, No. 17-cv-3120 (LAK) (KNF), 2018 WL
2338789 at *7 (S.D.N.Y. May 23, 2018). A fiduciary relationship exists "between two persons

when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Boston Consulting Group, Inc. V. NCR Corporation*, No. 19 Civ. 10156 (LGS), 2020 WL 5731963 at *2 (S.D.N.Y. Sept. 24, 2020). In other words, it exists "when confidence is reposed on one side and there is a resulting superiority and influence over the other." *Id.* (quoting *Eurycleia Partners, LP v. Seward & Kissel, LLP,* 910 N.E.2d 976, 980 (N.Y. 2009)). Whether a fiduciary relationship exists will be a fact-specific inquiry and is not entirely dependent upon an agreement or contractual relation. *Id.* However, in general, officers and directors owe fiduciary duties to their corporation. *Id.* at *4. This duty bars not only "blatant self-dealing, but also requires avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Id.* at *3.

Here, Plaintiffs allege that as an employee and general manager of Northshore and Sunrise, Deo had a fiduciary duty to act in the best interests of the dealerships and Plaintiffs. *See* ECF No. 65 at ¶¶ 480-481, 487-488.  Plaintiffs allege various instances of Deo's blatant self-dealing including that Deo, in breach of his fiduciary duties, and without the knowledge or consent of Northshore's members, sold the Future Receipts of Northshore and acquired Libertas Funds for himself. *Id.* at ¶ 498-500. That example, taken with all the information set forth with respect to Deo's actions above, are sufficient to conclude that Plaintiffs have stated a claim for breach of fiduciary duty with respect to Deo.

### D.    *Aiding and Abetting Breach of Fiduciary Duty – Against Thomasson*

Here, it is undisputed that Deo owed Plaintiffs a fiduciary duty which includes a duty of loyalty as the general manager of Northshore and Sunrise. *See* ECF No. 65 at ¶¶ 480-481, 487-488. As set forth above with respect to aiding and abetting a breach of duty of loyalty, the same allegations with respect to Thomasson, if taken as true, are sufficient to support a claim that

Thomasson aided and abetted a breach of fiduciary duty when he provided Deo with substantial assistance in receiving the funds then disbursing the funds to Deo at his request, while knowing the facts were at the very least in dispute by the parties. *Id*. at ¶¶ 506-510, 540. Thomasson portrayed himself as the attorney for Northshore in this transaction which is sufficient to indicate that he knowingly participated in Deo's scheme and Plaintiffs lost these funds as a result. *Id.* Therefore, Plaintiffs' claim against Thomasson for aiding and abetting the breach of a fiduciary duty is sufficient to withstand the motion to dismiss.

**XVI.** *__Accounting – Against Deo__*

The elements of a claim for an accounting are: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him the burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." *In re Science, Language, and Arts International School*, No. 22-40065-ess, 2024 WL 2036101 at *24 (E.D.N.Y. May 7, 2024). Under New York law, a plaintiff seeking an accounting, which is an equitable remedy, must specifically allege: (a) that a fiduciary relationship existed between the parties, and (b) that the defendant breached his or her fiduciary duty. *Soley v. Wasserman*, 823 F.Supp.2d 221, 237 (S.D.N.Y. 2011) (citing *Bezuszka v. L.A. Models Inc.,* No. 04 cv. 7703, 2006 WL 770526, at *17 (S.D.N.Y. Mar. 24, 2006). The purpose of an equitable accounting is to require a fiduciary to show what he did with the principal's property. *Id.*

Here, the Court finds that Plaintiffs have adequately alleged the elements of their accounting claim. Specifically, they have sufficiently asserted that Deo had a fiduciary relationship with the Plaintiffs sufficient to satisfy element (1) as a minority shareholder of Superb. *See* ECF No. 65 at ¶ 275.  Furthermore, Deo had a fiduciary duty, as an employee and

general manager of Northshore and Sunrise, to act in the best interest of Northshore and Sunrise. *Id.* at ¶¶ 73-75; 487; 480. As stated above, Plaintiffs have sufficiently demonstrated facts to support allegations that Deo breached his fiduciary duty, such that it is an equitable remedy that Deo be required to show what he did with Plaintiff's property. *See e.g.*, *Soley*, 823 F.Supp.2d at 237. As to element (2), "money or property entrusted to the defendant imposing upon him the burden of accounting," and, here, Plaintiffs have adequately alleged that Deo had a role in the management of Superb's assets such as floor planned vehicles. *See* ECF No. 65 at ¶ ¶206-208. With respect to element (3), Courts have held that in the case of a fiduciary relationship, that relationship alone "gives rise to a claim for accounting" and this is an absolute right "notwithstanding the existence of an adequate remedy at law." *In re Science, Language, and Arts International School*, 2024 WL 2036101 at *25. To this end, Plaintiffs have sufficiently stated a claim for accounting to withstand a motion to dismiss.

## XVII. *Violation of New York Judiciary Law § 487 – Against Thomasson*

Judiciary Law Section 487 prohibits attorneys "(1) engaging in any deceit or collusion, or consenting to any deceit or collusion, with intent to deceive the court or any party; or (2) willfully delaying a client's suit with a view to his own gain, or willfully receiving any money or allowance for or on account of any money which he has not laid out, or becomes answerable for." N.Y. Jud. Law § 487; *see also Musah v. Houslanger & Associates, PLLC*, No. 12 Civ. 3207, 2012 WL 5835293, at *4 (S.D.N.Y. Nov. 16, 2012). A plaintiff must allege his claim with particularity and show "at a bare minimum, that defendants: (1) are guilty of deceit or collusion, or consent to any deceit or collusion; and (2) had an intent to deceive the court or any party." *Ray v. Watnick*, 182 F. Supp. 3d 23, 28 (S.D.N.Y. 2016). "Allegations regarding an intent to deceive

must be stated with particularity." *Id.* (quoting *Brake v. Slochowsky & Slochowsky, LLP*, 504 F.

Supp. 3d 103, 116 (E.D.N.Y. 2020)).

    To demonstrate a violation of Section 487, a plaintiff must meet a very high burden of

proof, because "relief under the statute must be carefully reserved for the extreme pattern of legal

delinquency." *King v. Fox*, No. 97cv4134 (RWS), 2004 WL 68397, at *7 (S.D.N.Y. Jan. 14,

2004); *see also Ray v. Watnick*, 182 F. Supp. 3d 23, 29 (S.D.N.Y. 2016), *aff'd*, 688 F. App'x 41

(2d Cir. 2017) ("New York State courts interpreting the statute, as well as federal courts

construing the state court decisions, have concluded that liability attaches under these Statutes

only if the deceit is 'extreme' or 'egregious.'"). The plaintiff must allege "a chronic, extreme

pattern of legal delinquency." *King*, 2004 WL 68397, at *7. In other words, "even egregious

misconduct" will not be sufficient to show a violation "if there is no pattern of intentional deceit

or wrongdoing." *Id*. This high standard for misconduct "affords attorneys wide latitude in the

course of litigation to engage in written and oral expression consistent with responsible, vigorous

advocacy." *O'Callaghan v. Sifre*, 537 F. Supp. 2d 594, 596 (S.D.N.Y. 2008).

    Here, Plaintiffs allege that Thomasson committed a section 487 violation because he

"intended to deceive this Court" when he argued the escrow transactions were legitimate and

requested the submission of letters related to transactions to perpetuate his "deceitful

misrepresentation" all of which caused IAG Plaintiffs harm. *See* ECF No. 65 at ¶¶ 593-607.

However, the Court finds Plaintiffs' allegations fall short of meeting the high burden of proof

required under this statute and the complaint is devoid of sufficiently particular allegations to

state a section 487 claim. *See King*, 2004 WL 68397, at *7 (explaining that "relief under the

statute must be carefully reserved for the extreme pattern of legal delinquency"); *see also Brake*,

504 F.Supp.3d at 116 (holding that allegations regarding intent under this statute "must be stated with particularity.").

With regard to intent, Plaintiffs allege that Thomasson made "misrepresentations to deceive Justice Gianelli" regarding use of his escrow account in transactions involving Plaintiffs and Plaintiffs further allege that "Thomasson knew or should have known the monies received and taken from his escrow account were impermissibly taken from the IAG Plaintiffs fraudulently to provide the Superb Plaintiffs." ECF No. 65 at ¶¶ 597-99. However, this assertion, devoid of any particularity concerning the attendant circumstances, such as why Plaintiffs believe Thomasson knew this to be the case, would scarcely meet the plausibility standard, let alone the heightened pleading standard that New York imposes to satisfy a Section 487 claim. *See e.g., Brake,* 504 F.Supp.3d at 117. Even if these allegations are sufficient for alleging deceitful intent, Thomasson's conduct, as pled, is not sufficiently extreme, outrageous  or egregious to satisfy the high threshold requirements imposed by New York courts. *Brake*, 504 F.Supp.3d at 117 (citing *Ray*, 182 F.Supp.3d at 29-31) (finding liability attaches only if the deceit is "extreme" or "egregious.").

Plaintiffs loosely allege a pattern of this behavior by referencing an instance whereby Thomasson was ordered to show cause for why he should not be sanctioned because of arguments raised on appeal that appeared to be "completely without merit in law." ECF No. 65 at ¶¶ 604-605. However, this instance alone, in addition to Plaintiffs' allegations, does not suffice to meet the requirement set by New York state courts, that a plaintiff allege "a chronic and extreme pattern of delinquency." *See O'Callaghan*, 537 F. Supp. 2d at 596 (holding that under this threshold, an action grounded on claims that an attorney had made meritless or unfounded allegations in prior state court proceedings is insufficient to sustain a violation of Section 487).

Plaintiffs further contend, "despite the knowledge of the false information" that

"Thomasson decided to continue to advocate for the Deo Defendants." *Id.* at ¶ 601. However, the

very purpose of the high standard for misconduct is that it affords attorneys a wide degree of

latitude in the course of litigation to vigorously and responsibly represent their client with what

they believe to be true. *See O'Callaghan*, 537 F. Supp. 2d at 596. Accordingly, Plaintiffs'

Judiciary Law § 487 claim is dismissed.

## XVIII. *Piercing the Corporate Veil – Against Deo*

A corporate veil, that a parent corporation is not liable for the acts of its subsidiaries, may

be pierced, and the shareholder held liable for the corporation's conduct when, "the corporate

form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud,

on the shareholder's behalf." *Citibank, N.A. v. Aralpa Holdings Limited Partnership*, 714

F.Supp.3d 416, 433 (S.D.N.Y. 2024) (quoting *United States v. Bestfoods,* 524 U.S. 51, 61

(1998). Piercing the corporate veil allows a plaintiff, under certain appropriate circumstances, to

hold a corporation's owner liable for actions taken by the corporation. *Id.* Under New York law,

a plaintiff may also "reverse-pierce" the veil and hold a corporation liable for actions taken by its

owner. *Id.* (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir. 1997)).

The standard for piercing the corporate veil under New York law requires the essential elements

of domination and fraud: "(1) that the owner exercised complete domination over the corporation

with respect to the transaction at issue; and (2) that such domination was used to commit a fraud

or wrong that injured the party seeking to pierce the veil." *Id.* at 438.

New York courts and courts in this Circuit have found that under New York law, the tests

for piercing the corporate veil and alter ego liability are the same. *See Noryb Ventures, Inc. v.*

*Mankovsky,* No. 650378/2009, 47 Misc. 3d 1220(A) (N.Y. Sup. Ct. May 7, 2015) (stating that

the applicable standards for piercing the corporate veil and alter ego theories of recovery "are

virtually identical"). "Alter ego liability exists when a parent or owner uses the corporate form to

achieve fraud, or when the corporation has been so dominated by an individual or another

corporation (usually a parent corporation), and its separate identity so disregarded, that it

primarily transacted the dominator's business rather than its own." *OOO v. Empire United Lines

Co.*, 557 F. App'x 40, 45–46 (2d Cir. 2014). Treating the corporation as the "alter ego" of a

shareholder or director is just one of the theories in which a court can pierce the corporate veil or

otherwise hold the individual defendant personally accountable for the corporation's actions or

debts. *Highcap Group LLC v. Jam Equities, LLC,* No. 655120/2017, 2022 WL 835046, at *1

(N.Y. Sup. Ct. Mar. 21, 2022).

New York courts look at the following factors when determining whether veil-piercing is

warranted and whether there is sufficient control established:

> C]ourts have considered factors such as disregard of corporate formalities; inadequate
> capitalization; intermingling of funds; overlap in ownership, officers, directors and
> personnel; common office space or telephone numbers; the degree of discretion
> demonstrated by the alleged dominated corporation; whether the corporations are treated
> as independent profit centers; and the payment or guarantee of the corporation's debts by
> the dominating entity.

*Highcap Group LLC,* 2022 WL 835046 at *6 (internal citations omitted). The plaintiff's burden

is heavy – "mere conclusory alter ego allegations are insufficient to survive a motion to dismiss."

*Id.* In other words, conclusory statements of domination and control and failure to allege

particularized facts are insufficient to impose alter ego liability and piercing the corporate veil

liability for that matter. *Id.* Additionally, "even in the presence of domination and control, the

corporate form cannot be disregarded without a showing of fraud or that the misuse of the

corporate form led to avoidance of obligations." *226 Fifth Ave. LLC v. SBF Intern., Inc.,* No.

6513272011, 2012 WL 10008060 (N.Y. Sup. Ct. June 06, 2012). Further, the mere claim that the

corporation was completely dominated by the owners, or conclusory allegations that the
corporation acted as their "alter ego," without more, does not suffice to support the equitable
relief for piercing the corporate veil. *Id.*

Here, Plaintiffs allege that in the event the Court determines Deo is an owner of, or sole
owner of Northshore or Sunrise, then IAG Plaintiffs allege he failed to adequately capitalize
Northshore and Sunrise, intermingled his personal assets with Northshore and Sunrise's assets,
used Northshore and Sunrise assets for his own personal use, and overall abused the privilege of
doing business in the limited liability form to perpetuate a wrong or injustice such that the IAG
Plaintiffs seek to pierce the veil of Northshore and enter judgement against Deo for Northshore
and Sunrise's obligations to IAG. *See* ECF No. 65 at ¶¶ 552-558, 566-572. The Court finds
Plaintiffs have failed to meet the heavy burden of showing a corporation was dominated by Deo
and thus have failed to show the presence of domination and control with any factual allegations
beyond mere conclusory statements. *See e.g., 226 Fifth Ave. LLC,* No. 6513272011, 2012 WL
10008060 (finding that the amended complaint was devoid of any specific facts demonstrating
that the defendant exercised complete domination and control over the remaining defendants for
the purpose of defrauding plaintiff and noting that the complaint only asserts, "in a conclusory
manner, and 'upon information and belief,'" which is insufficient). Therefore, Plaintiffs'
conjectural conclusions are insufficient to establish alter ego liability against Deo.

## XIX.    *Violation of NY GBL § 349 – Against Deo*

New York law prohibits deceptive acts or practices in the conduct of any business, trade
or commerce or in the furnishing of any service. *See* N.Y. Gen. Bus. Law § 349. For a cause of
action under § 349, a plaintiff must show: "(1) the defendant's conduct was consumer-oriented;
(2) the defendant's act or practice was deceptive or misleading in a material way; and (3) the

plaintiff suffered injury as a result of the deception." *Paradowski v. Champion Petfoods USA, Inc.*, No. 22-962-cv, 2023 WL 3829559 at *2 (2d. Cir. June 6, 2023). New York courts apply an objective standard when assessing if an act was deceptive or misleading which focuses on whether the representation or omission is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (citing *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611-12 (N.Y. 2000)). A reasonable consumer is interpreted as someone who, when making purchases, does not stop to analyze but is instead governed by appearances and general impressions. *Id.* (citing *Guggenheimer v. Ginzburg*, 372 N.E.2d 17, 19 (N.Y. 1977)). A plaintiff must prove actual injury to recover under the statute, though not necessarily pecuniary harm. *Eidelman v. Sun Products Corp.*, No. 21-1046-cv, 2022 WL 1929250, at *1 (2d. Cir. June 6, 2022). One method of demonstrating actual injury in the consumable goods context is by showing a price premium, that being that the plaintiff paid more for a product than he otherwise would have as a result of the defendant's deception. *Id.*

Here, Plaintiffs allege that "many of Deo's practices described herein were specifically directed to consumers" such as "accepting Trade-ins whereby Deo represented and was required but failed to satisfy the consumer's existing loan." ECF No. 65 at ¶¶ 576-577. However, Plaintiffs fail to explain why a reasonable consumer, acting reasonably under the circumstances, would have been misled by these practices. *See e.g., Paradowski*, 2023 WL 3829559 at *2 (holding that the standard employed by New York courts when assessing an action is whether the representation or admission was "likely to mislead a reasonable consumer acting reasonably under the circumstances."). Therefore, because Plaintiffs' operative Complaint fails to show that Deo's act or practice was deceptive or misleading in a material way, *see Paradowski*, 2023 WL 3829559 at *2, Plaintiffs' claim under the NYGBL is dismissed.

XX.   **_Permanent Injunction – Against Deo and Libertas Funding_**

The requirements for a permanent injunction are "essentially the same" as for a preliminary injunction, except that the moving party must demonstrate "actual success" on the merits. *NY Civil Liberties Union v. NYC Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2012). To obtain a permanent injunction, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EMA Financial, LLC*, No. 1:19-cv-01545 (ALC), 2020 WL 1233608 at *3 (S.D.N.Y. Mar. 13, 2020) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). To obtain a permanent injunction, "a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006). The decision of whether to grant or deny permanent injunctive relief is an act of equitable discretion by the Court. *EBay Inc.*, 547 U.S. at 391.

Here, the IAG Plaintiffs assert that Libertas claims ownership over Northshore's Future Receipts, but that claim to ownership is illegitimate, and thus Plaintiffs seek a judgment permanently enjoining Libertas from exercising any rights over Northshore's Future Receipts. *See* ECF No. 65 at ¶¶ 436-438. With respect to Libertas, the Court finds Plaintiffs fail to demonstrate the required elements to obtain a permanent injunction. Plaintiffs only assertions are that Libertas claims illegitimate ownership of the Northshore Future Receipts (*id.* at ¶ 436-437), which may suffice to show an injury, but does not explain how it constitutes an "irreparable injury." *See e.g., EMA Financial, LLC,* WL 1233608 at *3 (reasoning that an injury compensable

by money damages is insufficient to establish irreparable harm). Furthermore, Plaintiffs fail to

assert element (2): how remedies available at law, such as monetary damages, are inadequate to

compensate for this injury. *See id.* Lastly, Plaintiffs provide no analysis as to the balancing of

hardships with respect to themselves and the defendant which renders a remedy in equity

warranted under the circumstances. *See id.* Therefore, Plaintiffs have not sufficiently alleged it is

entitled to a permanent injunction with respect to Libertas.

The IAG Plaintiffs additonally allege that Deo has misrepresented his ownership of

Northshore, engaged in illegal and fraudulent conduct towards its members, and used the License

issued to Chabrier to continue to operate Northshore in a matter to perpetuate his wrongful

activities. *See* ECF No. 65 at ¶¶ 491-493.  Plaintiffs further allege that Deo's actions had harms

and will continue to harm Chabrier and other members of Northshore and thus seek a permanent

injunction restraining Deo from participating in the continued management and operation of

Northshore. *Id.* at ¶¶ 494-497. Plaintiffs make similar allegations with respect to Sunrise and

Deo's misrepresentations, fraudulent actions, and use of the License issued to Aarsonson and J.

Baron to operate Sunrise in a manner to perpetuate his wrongful activities, and likewise seek a

permanent injunction restraining Deo's participation in the continued management and operation

of Sunrise. *Id.* at ¶¶ 484-490. These allegations alone are not sufficient to demonstrate "actual

success" on the merits. *See e.g., NY Civil Liberties Union*, 684 F.3d at 294.

The Deo Defendants respond to these allegations with the notion that Plaintiffs have only

set forth conclusory allegations that Deo, acting on behalf and for Northshore and Sunrise, is

utilizing a license purportedly owned by Chabrier and Aaronson and Baron respectively. *See*

ECF No. 176-1 at 20-21. Deo contends that if Chabrier, Aaronson and Baron have any cause of

action at all for permanent injunction, it would be against Northshore and Sunrise, who are not

named as defendants. *Id.* Given these inconsistencies, and the fact that Plaintiffs have only vaguely asserted that Deo's actions will continue to harm members of Northshore and Sunrise and that they have no adequate remedy at law, Plaintiffs have also not sufficiently alleged the elements set forth above to demonstrate it is entitled to a permanent injunction with respect to Deo. Therefore, Plaintiffs' claims for permanent injunction as against Deo and Libertas Funding are dismissed.

## XXI.   *Declaratory Judgement – Against Deo*

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy," a federal court "may declare the rights . . . of any interested party seeking such declaration." 28 U.S.C. §2201(a). Second Circuit courts apply a two-pronged test to determine if an actual controversy exists in a declaratory judgment action. *Beacher v. Estate of Beacher,* 756 F.Supp.2d 254, 272 (E.D.N.Y. 2010). The ripeness standard for a declaratory judgement action is that there must be "substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005). *First*, "the defendant's conduct must have 'created a real and reasonable apprehension of liability on the part of the plaintiff.'" *Ritz Hotel, Ltd. v. Shen Mfg. Co.*, 384 F. Supp. 2d 678, 682 (S.D.N.Y. 2005) (quoting *Starter Corp. V. Converse, Inc.*, 84 F.3d 592, 595 (2d Cir. 1996)). *Second*, "the plaintiff must have 'engaged in a course of conduct which has brought it into adversarial conflict with the defendant.'" *Id.*

Once it has been established that an actual controversy exists, federal courts have discretion in issuing a declaratory judgment and among relevant considerations in exercising this discretion is "whether the judgement will serve a useful purpose in clarifying or settling the legal

issues involved." *Id.* (quoting *Duane Reade, Inc.* 411 F.3d at 389). A decision should be made on the merits of the parties' dispute only with regard to pure questions of law. *Duane Reade, Inc.*, 411 F.3d at 388. However, relevant here, Courts often reject declaratory judgment claims when other claims in the suit will resolve the same issues because under those circumstances, a declaratory judgment does not serve any useful purpose. *Brunckhorst v. Bischoff*, No. 21 Civ. 4362 (JPC), 2024 WL 4277788 at \*20 (S.D.N.Y. Sept. 24, 2024). For example, Courts in the Second Circuit "routinely dismiss requests for declaratory judgment when the parties' rights will be adjudicated through a breach of contract claim in the same action." *Id.* (citing *StandardAero Aviation Holdings, Inc. v. Signature Aviation Ltd.*, No. 22 Civ. 7515 (AT), 2024 WL 125574, at \*5 (S.D.N.Y. Jan. 11, 2024) (quoting *Com Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14 Civ. 7483 (MKB), 2017 WL 343 2073, at \*17 (E.D.N.Y. Aug. 8, 2017)).

Here, Plaintiffs assert that there exists a justiciable controversy which is ripe for judgment, and necessary to resolve the rights and obligations of each of the parties to each other, with respect to determination of the ownership of Northshore and Sunrise. *See* ECF No. 65 ¶¶ 458-463, 465-470.  Given the extensive causes of action set forth by Plaintiffs related to these issues and rights, the Court dismisses this request for declaratory judgment given other claims in the suit will likely resolve the same issues set forth here.

**XXII.** ***Contribution and Indemnification for Fraud, Bread of Fiduciary Duty, Breach of Loyalty and Conversion – Against Deo; Contribution and Indemnification for Conversion and Aiding and Abetting Conversion, Fraud, Breach of Fiduciary Duty, Breach of Duty of Loyalty – Against Thomasson***

Generally, contribution involves a situation in which several tort-feasors can share liability for a plaintiff's injury, while indemnification "involves a complete shifting of the loss" stemming from a "contractual or other relationship between the actual wrongdoer and another, such as that of [an] employer and employer." *Sherleigh Assocs. v. Patron Sys*., No. 04 Civ. 907

(JFK), 2005 WL 1902844, at *2 (S.D.N.Y. Aug. 9, 2005) (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 306 (1979)). The right to contribution does not arise from contract and only ratable or proportional reimbursement is sought in an action for contribution. *McDermott v. City of New York*, 406 N.E.2d 460 (N.Y. 1980).

In New York, indemnification claims "must be grounded in contract either express or implied." *Cohen v. Elephant Wireless, Inc.*, 03 Civ. 4058 (CBM), 2004 WL 1872421, at *11 (S.D.N.Y. Aug. 19, 2004). A classic indemnity claim exists in favor of a person held vicariously liable for the tort of another, such as when an employer who has been forced to pay damages, by virtue of *respondeat superior*, may obtain indemnity from his employee. *McDermott*, 406 N.E.2d 460, n.4. Indemnification is a restitution concept which "allows shifting of loss to avoid unjust enrichment of one party at the expense of another." *Lewis v. Rosenfeld*, 00 CIV. 5368 (SAS), 2002 WL 441185, at *4 (S.D.N.Y. Mar. 20, 2002). However, until payment is made to the claimant, or a third-party action is filed, there is no cause of action for indemnification. *Mars Assoc. v. New York City Educ. Constr. Fund*, 126 A.D.2d 178, 191 (N.Y. App. Div. 1st Dep't 1987) (explaining that "technically a claim for indemnity does not arise until the prime obligation to pay has been established" however, the CPLR "allows third-party actions to be commenced in certain circumstances before they are technically ripe, so that all parties may establish their rights and liabilities in one action.").

Here, Plaintiffs assert a cause of action for contribution and indemnification for fraud, breach of fiduciary duty, breach of loyalty and conversion against Deo. *See* ECF No. 65 at ¶¶ 491-504. Plaintiffs additionally assert several causes of action for contribution and indemnification with respect to Thomasson for conversion (ECF No. 65 at ¶¶ 518-521) and for aiding and abetting conversion (*id.* at ¶¶ 522-525), fraud (*id.* at ¶¶ 526-530), breach of fiduciary

duty (*id.* at ¶¶ 534-538), and breach of duty of loyalty (*id.* at ¶¶ 541-545). Plaintiffs' claims for

indemnification and contribution with respect to both Deo and Thomasson rest on the assertions

that:

> If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then
> such damages were necessarily caused by Deo; Libertas shall have recourse against Deo
> who, fraudulently and without authority and in breach of his fiduciary duties and duty of
> loyalty, sold the Future Receipts in exchange for the Libertas Funds and was unjustly
> enriched thereby and/or converted same. As such, Deo would ultimately be liable to
> Libertas for the damages arising out of the causes of action alleged by Libertas in its
> Libertas Claims.
>
> If it is determined that Libertas sustained damages, as alleged in its Libertas Claims,
> then such damages were necessarily caused by Thomasson; and/or Libertas shall have
> recourse against Thomasson as the party who converted the Libertas Funds, and as such,
> Thomasson would ultimately be liable to Libertas for the damages arising out of the
> causes of action alleged by Libertas in its Libertas Claims.

*Id.* at ¶ 502, 519. Specifically, the IAG Plaintiffs request that they "shall have judgment over and

against Deo [and Thomasson] for any damages assessed against IAG Plaintiffs arising out of Deo

[and Thomasson's] actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for

any liability arising out of the aforesaid causes of action." *Id.*

Plaintiffs contend that "if Libertas recovers from IAG Plaintiffs, then Plaintiffs will have

been injured" and would therefore be entitled to "indemnification and/or contribution" from

Thomasson and/or Deo. *Id.* at ¶ 504. However, "Libertas is neither a plaintiff in this action, nor

have they asserted any claims against" the IAG Plaintiffs[;]" rather, the IAG Plaintiffs "are

[seemingly] trying to prematurely assert, on Libertas' behalf, claims that have yet to be asserted

or raised." ECF No. 176-1 at 28.[6] Because Plaintiffs do not allege how or why either Deo or

---

[6] Defendants further contend that "even if it was determined that Northshore was liable to Libertas for the
'Libertas Funds,' and even if it was determined that Deo breached his duty to Northshore in borrowing
said funds, the [IAG Plaintiffs] fail to plead any basis for their conclusory allegation that they would be
personally liable and suffer damages distinct than that would be sustained by Northshore." *Id.* Moreover,
"based on the factual allegations set forth in the Complaint, any rights to the 'Libertas Funds,' were solely
Northshore's [,and] [t]o the extent that the Complaint alleges that the funds were converted by

Thomasson has an obligation – express or implied – for contribution or indemnification to the IAG Plaintiffs in the instant case, Plaintiffs' claims for contribution and indemnification with respect to both of these defendants are therefore dismissed.

## XXIII. _Plaintiffs' Cross-Motions to Amend the Pleadings: Legal Standard_

Motions to amend pleadings are governed by Federal Rule of Civil Procedure 15(a). Rule 15(a)(2) provides that "[t]he court shall freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Generally, "[u]nless there is a showing of bad faith, undue delay, futility or undue prejudice to the non-moving parties, the district court should grant leave to amend." _Adlife Mktg. & Communs Co. V. Best Yet Mkt., Inc._, No. 17-CV-02987 (ADS) (ARL), 2018 WL 4568801, at *1 (E.D.N.Y. Sept. 24, 2018) (citing _Forman Davis_, 371 U.S. 178, 182 (1962)).

The party opposing the proposed amended pleading has the burden of establishing that amendment would be prejudicial or futile. _Jipeng Du v. Wan Sang Chow_, No. 18-CV-01692 (ADS) (AKT), 2019 WL 3767536, at *4 (E.D.N.Y. Aug. 9, 2019) (internal quotations and citations omitted). The moving party must attach the proposed amended complaint to the motion, as was done here, specifying the new claims and/or parties intended to be added. _See Nabatkhorian v. County of Nassau_, No. 12-CV-1118 (JS) (GRB), 2012 WL 13113646, at *1 (E.D.N.Y. Aug. 9, 2012).

The Second Circuit has clarified the standard District Courts should apply in considering motions for leave to amend dependent upon the timing of the proposed amendment:

---

Thomasson, or that Thomasson's conduct aided and abetted in the conversion of said funds, in the breach of a fiduciary duty, in the breach of a duty of loyalty, or in fraud, the property rights, duties, and harm would have been Northshore's, and not the [IAG Plaintiffs] (since they had no direct ownership interest or possessory right in the 'Libertas Funds,' as their interest would arise solely out of their purported membership interest in Northshore)." _Id._ at 29.

The ability of a plaintiff to amend the complaint is governed by Rules 15 and 16 of the
Federal Rules of Civil Procedure which, when read together, set forth three standards for
amending pleadings that depend on when the amendment is sought. At the outset of the
litigation, a plaintiff may freely amend her pleadings pursuant to Rule 15(a)(1) as of right
without court permission. After that period ends—either upon expiration of a specified
period in a scheduling order or upon expiration of the default period set forth in Rule
15(a)(1)(A)—the plaintiff must move the court for leave to amend, but the court should
grant such leave "freely . . . when justice so requires" pursuant to Rule 15(a)(2). This is a
"liberal" and "permissive" standard, and the only "grounds on which denial of leave to
amend has long been held proper" are upon a showing of "undue delay, bad faith,
dilatory motive, [or] futility." The period of "liberal" amendment ends if the district court
issues a scheduling order setting a date after which no amendment will be permitted. It is
still possible for the plaintiff to amend the complaint after such a deadline, but the
plaintiff may do so only up [to] a showing of the "good cause" that is required to modify
a scheduling order under Rule 16(b)(4).

*Sacerdote v. NYU*, 9 F.4th 95, 115 (2d Cir. 2021); *Johnson v. Barnett Outdoors, LLC*, No. 21-

CV-6311 (MJP), 2023 WL 8050236, at *2 (W.D.N.Y. Nov. 20, 2023) (stating that Rule 15(a)'s

standard must be balanced with Rule 16(b)'s good cause standard).

　　　　To this end, under Rule 16(b), "good cause" is required to modify a scheduling order

implemented by the Court.  Fed. R. Civ. P. 16(b)(4); *Sacerdote,* 9 F.4th at 115 ("[T]he period of

'liberal' amendment ends if the district court issues a scheduling order setting a date after which

no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after

such a deadline, but the plaintiff may do so only up a showing of the 'good cause' that is

required to modify a scheduling order under Rule 16(b)(4)").  Furthermore, "district courts

wishing to evaluate motions for leave to amend under Rule 16 after a particular date need only

write their scheduling orders consistent with that intent, and state that no amendment will be

permitted after that date in order to trigger the Rule 16 standard."  *Id.* at 116.

　　　　A finding of good cause is largely dependent on whether the moving party can

demonstrate diligence, however, the court may consider other relevant factors such as whether

the amendment at this stage would prejudice the defendants. *Johnson*, 2023 WL 8050236 at *2

(reasoning that a plaintiff does not meet the burden of showing good cause or diligence to amend
if "the proposed amendment rests on information" he knew, "or should have known, in advance
of the deadline" for motions to amend); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d
326, 340-41 (2d Cir. 2000) (holding that the district court properly denied the leave to amend
where the plaintiff "had all the information necessary" to support his claim, "and nothing he
learned in discovery or otherwise altered that fact.").

  With respect to the "futility" factor, "where the amended portion of the complaint would
fail to state a cause of action," the district court may deny the party's request to amend. *Parker*,
204 F.3d at 338.  In other words, when determining whether a proposed pleading is futile, courts
will analyze whether it would withstand a motion to dismiss.  *Agerbrink v. Model Service LLC*,
155 F.Supp.3d 448, 456 (S.D.N.Y. 2016).  Leave to amend may be denied based on futility if the
proposed amendment still "fails to state a legally cognizable claim or fails to raise triable issues
of facts."  *AEP Energy Services Gas Holding Co. V. Bank of America, N.A.*, 626 F.3d 699, 726
(2d Cir. 2010); *see also, Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding that
a plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face.").

  However, "if a proposed amendment is not clearly futile, then denial of leave to amend is
improper."  *See Brawer v. Egan-Jones Ratings Company*, 347 F.R.D. 650, 654 (S.D.N.Y. 2024)
(citing Fed. Prac. & Proc. Civ. § 1487); *see also Dougherty v. Town of North Hempstead Board
of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (reversing the district court's denial of
amendment as futile because, although defendants "vigorously disputed" plaintiff's version of
events, "proposed amended complaint adequately set forth specific facts, which if proven, could
support a finding of [defendants' liability").  In deciding whether an amended complaint is futile,
"the Court is required to accept the material facts alleged in the amended complaint as true and

draw reasonable inferences in the plaintiff's favor." *Alkhatib v. NY Motor Group LLC*, Nos. CV-

13-2337 (ARR), CV-13-5643 (ARR), 2015 WL 3507340, at *7 (E.D.N.Y. June 3, 2015)

(quoting *Chan v. Reno*, 916 F.Supp. 1289, 1302 (S.D.N.Y. 1996)).

 "In the Second Circuit, 'mere delay, absent a showing of bad faith or undue prejudice,

does not provide a basis for a district court to deny the right to amend.'" *Agerbrink*, 155

F.Supp.3d at 452 (citing *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 856 (2d

Cir. 1981)).   However, where a significant amount of time has passed prior to filing a motion to

amend, the moving party must provide an explanation for the delay.  *Id.* (citing *Park B. Smith v.

CHF Industries Inc.*, 811 F.Supp.2d 766, 779 (S.D.N.Y. 2011).  A "motion to amend will not be

denied by reason of plaintiffs' delay in alleging facts that were previously within their

knowledge."  *Id.* at 453 (quoting *Dilworth v. Goldberg*, 914 F.Supp.2d 433, 460 (S.D.N.Y.

2012)).  However, the court may deny leave to amend if the motion is made after an inordinate

delay, no satisfactory explanation is offered for the delay, in addition to the fact that the

amendment would prejudice other parties.  *Id.* (quoting *Grace v. Rosenstock*, 228 F.3d 40, 53-54

(2d Cir. 2000)).

 Finally, prejudice "has been described as the most important reason for denying a motion

to amend.  *Id.* at 454. (citing *Frenkel v. New York City Off-Track Betting Corp.*, 611 F.Supp.2d

391, 394 (S.D.N.Y. 2009) (quoting *Turkenitz v. Metromotion, Inc.*, 97 Civ. 2513, 1997 WL

773713, at *8 (S.D.N.Y. Dec. 12, 1997))).  In deciding whether prejudice exists, courts will

assess the following factors as to whether the amendment would "(i) require the opponent to

expend significant additional resources or to conduct disocvery and prepare for trial; (ii)

significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a

timely action in another jurisdiction."  *Id.* (citing *Monahan v. New York City Department of*

*Corrections*, 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993))). The inquiring requires the court to balance and weigh "any potential prejudice to the opposing party against the prejudice that the moving party would experience if the amendment were denied." *Id.* (citing *Oneida Indian Nation of New York State v. County of Oneida*, 199 F.R.D. 61, 77 (N.D.N.Y. 2000)).

Courts may be more likely to find an amendment prejudicial if a discovery has already closed, however, an amendment that warrants additional discovery may be permitted so long as it does not significantly prolong the resolution of the action. *Id* at 454-55 (citing *Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 200 (S.D.N.Y. 2014)). The non-moving party bears the burden of showing that "substantial prejudice would result were the proposed amendment to be granted. *Id.* at 454 (citing *Oneida Indian Nation of New York*, 199 F.R.D. at 77.) Under this lens, the Court reviews Plaintiffs' first and second requests motion to amend.

### A.      *Plaintiffs' First Motion to Amend*

Plaintiffs now set forth additional allegations with respect to Flushing Bank's involvement in the Deo Defendants' fraudulent scheme in their first Cross-Motion for Leave to Amend the Pleadings. *See* ECF No. 180-1 at ¶¶ 211-228. Plaintiffs allege these facts to further demonstrate that Flushing Bank knowingly participated in the Deo Defendants' fraudulent schemes by permitting him to open an account with Superb, all while lacking the actual authority to do so and further that Deo opened this account to divert Superb's funds to an account he could control "with assistance from Flushing Bank." *Id.* at ¶¶ 222. However, the Court finds Plaintiffs' proposed amendments to the pleadings are futile, as their allegations against Flushing Bank and its involvement in the Deo Defendants' fraudulent schemes still could not survive a motion to dismiss, and thus the motion must be denied for this reason alone. *See Kiarie v.*

*Dumbstruck, Inc.,* 473 F.Supp.3d 350, 356-58 (S.D.N.Y. 2020) (holding that the motion to amend must denied based purely on its futility, such that its allegations still could not survive a motion to dismiss, and it was doubtful that the evidence would even allow a jury to find for the plaintiff on that issue).

Plaintiffs allege that Deo successfully opened a bank account for Superb on or about April 4, 2023, but that a month prior, Urrutia began the process of opening an account with Flushing in March 2023 and submitted various documents and records, including his tax returns and other documents which indicated her was the majority shareholder of Superb. *Id.* at ¶¶ 211-13. Furthermore, Plaintiffs allege that Urrutia spoke directly with David Weinstein, the Vice President and Branch Manager of Flushing's Borough Park branch and that Weinstein knew Urrutia was the majority shareholder of Superb. *Id.* at ¶ 214. However, Plaintiffs allege that around the same time, on March 31, 2023, Deo had contacted Robert Puccio, the Vice President of Flushing Bank's Business Banking Group located at 99 Park Avenue in Manhattan, who Deo represented was his "personal banker" to open an account. *Id.* at ¶ 215.

On that same day, Weinstein asked Urrutia whether Urrutia wanted to share his personal tax returns with Puccio, and Weinstein also asked Urrutia for the name of Urrutia's partner at Superb, which Plaintiffs assert as sufficient to establish that both Weinstein knew Deo was not the sole shareholder of Superb and that Puccio knew given that Weinstein was in contact with Puccio about opening an account at Superb. *Id.* at ¶ 217. Deo subsequently informed Novicky that he has a personal banker ready to open an account for Superb with Flushing Bank and that he could obtain a $500,000.00 line of credit as well adding "[t]his guy and the Credit underwriter are in my pocket. Get me the info and 2021 taxes and I will bring it home[,]" which Plaintiffs

contend establishes that Flushing Bank and its agents were in on the Deo Defendants' schemes. *Id.* at ¶¶ 218-20.

Plaintiffs further allege Flushing Bank knew and had reason to know the Deo Defendants were using the account for fraudulent purposes because the transactions should have raised red flags for Flushing Bank given the nature of the transaction which consisted of money coming in, then immediately being transferred out, and the lack of expenses or payroll paid out of the sole checking account for the dealership. *Id.* at ¶¶ 226-27. Finally, Plaintiffs assert, in a conclusory fashion, that "Flushing Bank's agents benefitted from assisting the Deo Defendants" purely on the basis that Deo said they were "in his pocket." *Id.* at ¶ 228.

Plaintiffs' proposed amendments are insufficient because they do not permit the Court to infer more than the mere possibility of Flushing Bank's misconduct. *See e.g., Kiarie*, 473 F.Supp.3d at 354; *see also, Iqbal*, 556 U.S. at 678 (explaining that the plausibility standard is not akin to a probability requirement, but it asks for "more than a sheer possibility that a defendant has acted unlawfully."). As mentioned, with respect to the RICO claims, *Reves* provides that RICO claims against outside services professionals, like banks, are insufficient unless they allege more substantial involvement by the outsider defendant in the charged racketeering activity than is set forth here. *See Alkhatib*, 2015 WL 3507340 at *18. Where a party, like Flushing Bank, deals in an ordinary way with its agents and others who owe the party a professional obligation, like opening bank accounts, such that their role in Deo's illicit activities was purely incidental as a course of ordinary business, and, where there is no evidence that these agents acted with intent to effectuate those illicit activities, the party does not constitute an associated-in-fact enterprise for RICO purposes. *See in re: General Motors LLC Ignition Switch Litigation*, 2016 WL 3920353 at *15.

112

Even considering Plaintiffs' additional allegations about Weinstein's knowledge of Urrutia as the majority shareholder, Plaintiffs do not dispute that it was Puccio who opened the account for Deo, and Plaintiffs' only assert conclusory allegations that "Puccio knew given that Weinstein was in contact with Puccio about opening an account at Superb." ECF No. 180-1 at ¶ 217.

Plaintiffs also broadly claim Deo's own communications of "[t]his guy and the Credit underwriter are in my pocket" establish that Flushing Bank and its agents were "in" on the Deo Defendants' schemes. *Id.* at ¶ 220. While these allegations may suffice to show the mere possibility of wrongful conduct, they do not establish that Flushing Bank shared in the Deo Defendants' nefarious intention, aside from the accusation that "Flushing Bank's agents benefitted from assisting the Deo Defendants because they were in Deo's 'pocket.'" *Id.* at ¶ 228. For the same reasons the operative Complaint was insufficient to survive the very difficult "operation and management" test set forth by the Supreme Court in *Reves*; the mere fact that Flushing provided services, such as opening the account, without more, remains insufficient to state a claim under Section 1962(c). *See e.g., Zhu*, 2005 WL 275736, at *5.

Therefore, Plaintiffs' First Motion to Amend is ***denied*** for reason of futility: even with these additional allegations, Plaintiffs fail to sufficiently allege that Flushing Bank was involved in the "operation and management" of the fraudulent enterprise of the Deo Defendants, aside from performing standard bank services, mere conjecture as to their fraudulent intentions, and an utter lack of factual allegations showing how they benefitted from the scheme. *See Zhu*, 2005 WL 2757536, at *5 (finding no existence of an enterprise when the only "pattern of activity" alleged by the plaintiff is that of "banks complying with their customers' requests").

**B.**     *Plaintiffs' Second Motion to Amend*

**1.**     *The Addition of Northshore and Sunrise as Defendants*

Plaintiffs' second motion to amend the operative Complaint claim seeks to add

Northshore and Sunrise as defendants for the alternative claims, correcting the alleged deficiency

in the previously submitted complaint. *See* ECF No. 182 at 42.  With respect to Counts 16, 17,

18, 21, 23, 26, and 42, the Plaintiffs' proposed Third Amended Complaint ("TAC") adds the

prerequisite demand to the derivative claims and adds the necessary plaintiffs and Northshore

and Sunrise as defendants.  *Id.* at 38-39.  Furthermore, with respect to Count 22, Northshore now

asserts the corporate waste claim. Plaintiffs further argue that it is "nonsensical" to dismiss

Chabrier's claim against Deo, as Deo's mismanagement of Northshore cost Chabrier the DMV

license.  *Id.* at 39. Similarly, with respect to Count 27, Sunrise now asserts the corporate waste

claim, and Plaintiffs argue that Aaronson's and J. Baron's claims have merit because Deo's

mismanagement of Sunrise cost those Plaintiffs the DMV license.  *Id.* at 40.

  With respect to Count 28, the TAC asserts the prerequisite demand and adds Northshore

as a nominal defendant.  *Id.* at 40.  Further, Plaintiffs note that Libertas Funding has discontinued

its claim against IAG Plaintiffs in state court to pursue the claim in this Court; us, in the interest

of judicial economy, the claim should stand.  *Id.* at 41.  With respect to Counts 29 to 37,

Plaintiffs now seek to have Counts 29, 20, 34, and 36 brought against Northshore directly, and

Counts 31, 32, 33, and 35 as standard indemnification claims "should be successful against any

indemnified party."  *Id.* at 41.  Regarding Counts 38 and 40, the TAC alleges a contractual

relationship between IAG and Northshore and Sunrise, such that an agreement obligated the

former to cover the duties of the latter. *Id.* at 42.  Lastly, with respect to Counts 43 and 44, the

TAC addresses the prerequisite demand and joins Northshore and Sunrise as nominal defendants.

Moreover, it alleges that Deo owed Northshore and Sunrise accurate accounting through his role as manager.  *Id.* at 43.

These above-mentioned requests with respect to joining Northshore and Sunrise as nominal defendants, and the proposed claims that follow on their behalf and against them, are ***denied***.  Aside from the fact that the scheduling order set a deadline of April 5, 2024 (ECF No. 142 at 3) for motions to join new parties or amend the pleadings, and Plaintiffs did not file this until May 14, 2024, Plaintiffs fail to provide any explanation that would excuse this delay given Plaintiffs have been aware of Northshore and Sunrise as the dealerships which are largely at the center of these claims since the initial complaint was filed on August 17, 2023.  *See* ECF No. 1 at 9-11); *see also Shi Ming Chen v. Hunan Manor Enterprise, Inc.*, 437 F.Supp.3d 361, 366 (S.D.N.Y. Feb. 3, 2020) (reasoning that reopening the case to add new defendants "would certainly risk a re-do of the entire discovery process inasmuch as each new defendant would be entitled to obtain discovery from the plaintiffs and potentially from co-defendants.").

Furthermore, this is Plaintiffs' Third Amended Complaint and "prejudice is generally found where the motion to amend comes after many months or years of pre-trial activity" and "adds new parties."  *See Antrobus v. N.Y.C. Dep't of Sanitation*, 2016 WL 5394697, at *11 (E.D.N.Y. Feb. 25, 2016). Furthermore, prejudice is also found when "permitting an amendment at this late juncture would unduly delay the resolution of this litigation."  *See Aguilar v. Connecticut*, 2013 WL 657648, at *8 (D. Conn. Feb. 22, 2013). In sum, Plaintiffs' request to amend their complaint to add additional defendants, Northshore and Sunrise, and claims with respect to those entities is ***denied***, even applying Rule 15(a)(2)'s lenient standard.  *See Shi Ming Chen*, 437 F.Supp.3d at 367.

### 2.   *Allegations Pertaining to Piercing the Corporate Veil*

With respect to Counts 39 and 41, asserting a claim for piercing of the corporate veil,

Plaintiffs TAC omits these counts as unnecessary and instead asserts them as an alternative

method of recovery under Counts 38 and 40. *See* ECF No. 182 at 42-43. For the reasons stated

above with respect to Northshore and Sunrise, Plaintiffs' request to assert these claims as an

alternative method of recovery still fail for the same reasons the claims were initially dismissed,

because these conjectural conclusions are insufficient to establish that the Deo exercised

complete domination and control over Northshore and Sunrise to perpetuate fraud against the

IAG Plaintiffs as well as a lack of capitalization and intermingling of funds. *See e.g., 226 Fifth*

*Ave. LLC,* No. 6513272011, 2012 WL 10008060 (finding that the complaint only asserts, "in a

conclusory manner, and 'upon information and belief,'" which is insufficient to show the

presence of domination and control with any factual allegations beyond mere conclusory

statements).

### 3.   *Violation of Judiciary Law § 487*

With respect to Count 45, Plaintiffs' claim the FAC "adequately allege[s]" Thomasson's

knowledge of the scheme surrounding the Libertas Funds, and, therefore, Plaintiffs assert he is

guilty of lying in open court when he claimed there was nothing wrong with using his attorney

escrow account to transfer the funds from IAG Plaintiffs to Deo, constituting a violation of the

Judiciary Law § 487. *See* ECF No. 182 at 44. For the same reasons that this claim fails to

survive a motion to dismiss, the proposed amended pleading fails as well. Plaintiffs allege in the

TAC that "Thomasson knew the funds were the product of Deo Defendants' fraudulent schemes

because he was complicit in them, actively conspired with the Deo Defendants to carry them out

and even maintained an office inside the dealership that the Deo Defendants operated out of." *Id.*

116

In the TAC, once again, Plaintiffs allege Thomasson made misrepresentations to deceive Justice Gianelli regarding the use of his escrow account. *Id.*

Even if these allegations were sufficient to allege deceitful intent, which, given the lack of particularity as to how Thomasson knew this, they are likely not, they remain insufficient to show a pattern that was either extreme or egregious as required by the statute. Again, the standard for § 487 is a high one, and Courts afford attorneys a wide degree of latitude during litigation to vigorously and zealously advocate on behalf of their client. *See O'Callahan*, 537 F.Supp.2d at 596. Plaintiffs' request to amend the pleadings with respect to this claim is ***denied***, because it is futile and would not withstand a motion to dismiss even with these proposed allegations. *See Agerbrink*, 155 F.Supp.3d at 456.

### 4.    *Misappropriation*

With respect to their misappropriation claim, the Court finds Plaintiffs have failed to plead a cause of action for misappropriation under New York law in the TAC, because Plaintiffs have failed to allege a trade secret pursuant to the DTSA. In the TAC, Plaintiffs rehash much of the same arguments they proffered for the DTSA claim. *See* ECF No. 182 at 49-52. Once again, Plaintiffs have set forth sufficient information to show the customer list and DMS system derive independent economic value and are not readily ascertainable through proper means in the marketplace, yet these allegations would still fall short in a motion to dismiss because Plaintiffs fail to allege the extent of measures taken by Plaintiff to guard the secrecy of the information, which is required for a valid trade secret and thus a misappropriation claim. *See Core SWX, LLC,* 2022 WL 3588081 at, *4. Therefore, Plaintiffs' request to amend their misappropriation claim is ***denied*** on futility grounds.

**5.** ***Tortious Interference; Negligence***
***and Conversion Against the Bank Defendants***

With respect to Plaintiffs' Tortious Interference claim, in Plaintiffs' TAC, Plaintiffs reason that, because they had a business relation with NMAC and Deo "intentionally interfered" with that relation to harm Superb and caused harm.  ECF No. 182 at 55.  Even if Plaintiffs have identified the Superb Plaintiffs' business relationship with the Floor Plan lenders, and showed the resulting harm and issues it caused with the Floor Plan, they still fail to show the ways in which the Deo Defendants *intentionally* interfered with such relationship to cause such harm, and, therefore, Plaintiffs' request to amend the pleadings with respect to this claim is also ***denied*** on futility grounds. *See Agerbrink,* 155 F.Supp.3d at 456. Likewise, Plaintiffs' request to amend the pleadings with respect to these negligence and conversion claims against the Bank Defendants – particularly Chase (ECF No. 182 at 58) – is ***denied*** on futility grounds. As mentioned, Article 4-A precludes common law claims asserting the existence of unauthorized wire transfers regardless of what the claim may be called, and, therefore, Plaintiffs' proposed negligence and conversion claims fall within the regime of Article 4-A and are precluded.  *See e.g., Ma,* 597 F.3d at 89.

**6.** ***Fraud – Against Deo and Jones***

Further, Plaintiffs' motion for leave to amend their complaints with respect to Deo and Jones' fraud set forth in Count 52 (ECF No. 182 at 60-61) is ***granted*** with respect to additional factual assertions pertaining to Deo and ***denied*** with respect to Jones.  In the TAC, Plaintiffs reiterate the allegation that "Jones provided Urrutia, *by and through Deo,* with monthly financials and falsely showed Superb was profitable." *Id.* at 60.  However, these new assertions still do not support a showing that Jones made such statements with knowledge of its falsity nor

with any intent to defraud Plaintiffs outside of the ordinary course of business they were paid to provide. *See MetLife Invs. USA Ins. Co. v. Zeidman*, 734 F.Supp.2d 304, 312 (E.D.N.Y. 2010).

**7.**   ***Standing – Urrutia and Team Auto***

Finally, between the TAC and FAC, Plaintiffs have made a case for Urrutia's and Team Auto's standing such that those Plaintiffs should be permitted to pursue their claims against the Defendants accordingly. Plaintiffs assert Urrutia has standing because he is "President of Superb Motors" and "has been harmed by the Defendants' conduct." ECF No. 182 at 48-49. Team Auto has standing because it is an auto wholesaler that owned 13 cars Deo allegedly absconded with. *See* ECF No. 182 at 49. Plaintiffs' motion for leave to amend their complaints to include facts to further support their standing is ***granted***.

In conclusion, Plaintiffs' motion for leave to amend their complaints is ***granted***, except with respect to those claims already dismissed.[7]

## CONCLUSION

For the foregoing reasons:

(i)     the Deo Defendants' Motion to Dismiss (ECF No. 176) is **GRANTED** *in part* and **DENIED** *in part*. The following claims are dismissed ***with prejudice***:

    (a)   Tortious Interference with Contracts, Business Relations, and Prospective Economic Advantage against the Deo Defendants;

    (b)   Defend Trade Secrets Act Claims, including Misappropriation under the DTSA against the Deo Defendants;

    (c)   Violation of New York Judiciary Law § 487 against Thomasson;

---

[7] Plaintiffs are permitted to amend the operative Complaint to include the proposed further factual allegations regarding the surviving claims. For example, Plaintiffs are permitted to amend the operative Complaint to incorporate further factual allegations regarding the conversion and civil conspiracy claims against the Deo Defendants. *See* ECF No. 182 at 56-58, 59-60.

    (d)      Piercing the Corporate Veil against Deo;

    (e)      Violation of New York GBL § 349 against Deo;

    (f)      Permanent Injunction against Deo; Libertas Funding

    (g)      Declaratory Judgment against Deo

    (h)      Contribution and Indemnification for Fraud, Breach of Fiduciary Duty, Breach of Loyalty and Conversion against Deo; and

    (i)      Contribution and Indemnification for Conversion and Aiding and Abetting Conversion, Fraud, Breach of Fiduciary Duty, Bready of Fiduciary Duty against Thomasson.

(ii)    the Bank Defendants' Motions to Dismiss (ECF Nos. 164, 175 and 177) are

**GRANTED** *in part* and **DENIED** *in part*. The following claims are dismissed

*with prejudice*:

    (a)      Permanent Injunction against Libertas Funding;

    (b)      Plaintiffs' RICO Claims against Bank Defendants;

    (c)      Conversion claims against the Bank Defendants;

    (d)      Negligence and Unauthorized Payments against the Bank Defendants;

    (e)      Drawee Liability against Chase Bank;

    (f)      New York UCC §3-419 against the Bank Defendants;

(iii)    the CPA Defendants' Motions to Dismiss (ECF No. 168) is **GRANTED.** The

following claims are dismissed *with prejudice*:

    (a)      Plaintiffs' RICO Claims against CPA Defendants;

    (b)      Plaintiffs' Fraud Claims against Jones; and

    (c)      Professional Malpractice against the CPA Defendants.

(iv)     Plaintiffs' Motions for Leave to Amend (ECF Nos. 178 and 181) are **GRANTED** *in part* and **DENIED** *in part*, consistent with this Order.  Plaintiffs are directed to file an Amended Complaint consistent with the rulings in the Order on or before April 4, 2025.

Dated: Central Islip, New York
        March 21, 2025

                                    **S O  O R D E R E D:**

                                    /S/ *James M. Wicks*

                                        JAMES M. WICKS
                                    United States Magistrate Judge